## UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| PHILADELPHIA ENTERTAINMENT AND DEVELOPMENT PARTNERS, LP d/b/a FOXWOODS CASINO PHILADELPHIA, | Case No. 14-12482 (MDC) |
| Debtor. | |
| PHILADELPHIA ENTERTAINMENT AND DEVELOPMENT PARTNERS, LP d/b/a FOXWOODS CASINO PHILADELPHIA, | Adv. No. 14-00255 (MDC) |
| Plaintiff, | **Date of Hearing:  October 7, 2014**<br>**Time of Hearing:  11:00 a.m.**<br>**Location:     U.S. Bankruptcy Court**<br>**900 Market Street**<br>**Courtroom 2**<br>**Philadelphia, PA 19107** |
| v. | |
| COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF REVENUE and COMMONWEALTH OF PENNSYLVANIA, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS ADVERSARY COMPLAINT OR , IN THE ALTERNATIVE, TO ABSTAIN

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel:  (215) 665-8500
Fax:  (215) 864-8999

*Counsel for Commonwealth of*
*Pennsylvania, Department of Revenue and*
*the Commonwealth of Pennsylvania*

## <u>TABLE OF CONTENTS</u>

**Page**

I. PRELIMINARY STATEMENT ................................................................................... 1

II. STATEMENT OF FACTS .......................................................................................... 5

    A.    General Case Background ................................................................................. 5

    B.    The Commonwealth's Comprehensive Scheme for the Regulation of
        Gaming in Pennsylvania ................................................................................. 6

    C.    Issuance and Revocation of the Debtor's License ........................................ 10

    D.    The State Court Judgment .............................................................................. 16

III. ARGUMENT ............................................................................................................ 17

    A.    The Complaint Should be Dismissed Because this Court Lacks Subject-
        Matter Jurisdiction Over this Adversary Proceeding ..................................... 17

        1.    The Complaint Should Be Dismissed Because the Defendants are
            Immune from Suit Under the Doctrine of Sovereign Immunity .............. 18

            (i)    Abrogation ................................................................................. 19

            (ii)    Waiver ....................................................................................... 20

        2.    The *Rooker-Feldman* Doctrine and Preclusion ........................................ 25

            (i)    *Rooker-Feldman* ........................................................................ 25

            (ii)    Preclusion .................................................................................. 29

                a.    Claim Preclusion .............................................................. 29

                b.    Issue Preclusion ................................................................ 33

    B.    If this Court Does Not Dismiss the Complaint for Lack of Subject-Matter
        Jurisdiction, it Should Abstain from Hearing this Adversary Proceeding ........... 34

        1.    This Court Should Permissively Abstain from Hearing this
            Adversary Proceeding .............................................................................. 34

        2.    Abstention Under the *Burford* Doctrine is Also Warranted .................... 40

    C.    If this Court Addresses the Merits of the Complaint, Each Claim
        Thereunder Should Be Dismissed Under Federal Rule 12(b)(6) .......................... 43

        1.    Count I Should Be Dismissed Because Section 542 of the
            Bankruptcy Code Does Not Provide a Debtor With an Independent
            Cause of Action ........................................................................................ 44

        2.    Count II Should Be Dismissed Because the Alleged Transfer Took
            Place Outside of the Two-Year Look-Back Period Under Section
            548 (a)(1)(B) ............................................................................................ 45

3.      Counts II, III, and IV Should Be Dismissed Because the Revocation of the License Was Not a Transfer That is Constructively Fraudulent Within the Meaning, Intent, and Underlying Policy of Fraudulent Transfer Law ...................................... 47

    (i)    The Prepetition Termination of a License Pursuant To Applicable Law is Not Covered by Fraudulent Transfer Law ............................................................................ 48

    (ii)    When Rights to Property Have Been Extinguished Under Applicable Law, There is No Transfer of the Debtor's Property ...................................................................... 52

4.      Count III Should Be Dismissed Because No Actual Creditor with Actual Standing Under State Law Was or Could Be Alleged ................. 54

5.      Count V Should Be Dismissed Because Revocation of the License Did Not Constitute a Taking Requiring Compensation Under Either the Pennsylvania Constitution or the U.S. Constitution................. 57

6.      Counts VI and VII Should Be Dismissed Because They Must Be Asserted Before the Pennsylvania Board of Claims and Because the Applicable Statute of Limitations To Do So has Expired................... 61

7.      Count VII Should Also Be Dismissed Because the Debtor Cannot Establish Promissory Estoppel Under Pennsylvania Law ........................ 62

8.      The Complaint Should Be Dismissed As to the Department of Revenue for Failure to State a Claim on all Counts................................. 65

D.    If this Court has Jurisdiction, Does not Abstain, and Does not Dismiss the Complaint for Failure to State a Claim, the Gaming Board and the Treasury Department are Necessary Parties to Any Trial on the Merits under Rule 19, and Failure to Join Such Parties Would Subject This Matter to Dismissal Under Rule 12(b)(7). ........................................................... 66

1.      The Gaming Board.................................................................... 67

2.      The Treasury Department ...................................................... 67

IV. CONCLUSION................................................................................................ 68

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adefumi v. City of Phila.*,
445 Fed. App'x. 610 (3d Cir. 2011) ..............................................................................30, 31

*Am. Pelagic Fishing Co., L.P. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004) ..............................................................................59

*Ankerstjerne v. Schlumberger Ltd.*,
Civ. A. No. 03-3607, 2004 U.S. Dist. LEXIS 9927 (E.D. Pa. May 12, 2004) ......................62

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................43

*Atascadero State Hosp. v. Scanlon*,
473 U.S. 234 (1985) ..............................................................................18

*Balcor/Morristown Ltd. P'ship v. Vector Whippany Associates*,
181 B.R. 781 (D. N.J. 1995) ..............................................................................39

*Baldino v. Wilson (In re Wilson)*,
116 F.3d 87 (3d Cir. 1997) ..............................................................................25

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..............................................................................43

*Besing v. Hawthorne (In re Besing)*,
981 F.2d 1488 (5th Cir. 1993) ..............................................................................25

*BML Group, Inc. v. U.S. Pizza, Inc.*,
Civ. A. No. 88-7463, 1989 U.S. Dist. LEXIS 11330 (E.D. Pa. Sept. 25, 1989) ...................65

*Burford v. Sun Oil*,
319 U.S. 315 (1943) .............................................................................. passim

*C & K Petroleum Prod., Inc. v. Equibank*,
839 F.2d 188 (3d Cir. 1988) ..............................................................................62

*Capital Indem. Cor. v. Curiale*,
871 F. Supp. 205 (S.D.N.Y. 1994) ..............................................................................40

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ..............................................................................43

*Carpenter v. Ashby*,
No. 06-1451, 2007 U.S. Dist. LEXIS 5264 (E.D. Pa. Jan. 25, 2007) ....................................30

*Centr. Va. Cmty. Coll. v. Katz*,
546 U.S. 356 (2006)................................................................ passim

*Chiropractic Am. v. Lavecchia*,
No. 98-4986 (JBS), 1999 U.S. Dist. LEXIS 21508 (D. N.J. Feb. 8, 1999) ...........................42

*Chiropractic America v. Lavecchia*,
180 F.3d 99 (3d Cir. 1999)...................................................................40, 41, 42

*Confederated Tribes of the Colville Reservation Tribal Credit v. White (In re White)*,
139 F.3d 1268 (9th Cir. 1998) ...............................................................20

*Creative Data Forms, Inc. v. Pennsylvania Minority Bus. Dev. Auth. (In re Creative Data Forms, Inc.)*,
41 B.R. 334 (Bankr. E.D. Pa. 1984), *aff'd*, 72 B.R. 619 (E.D. Pa. 1985), *aff'd*, 800 F.2d 1132 (3d Cir. 1986) .......................................................44

*Creditors' Comm. for Jermoo's Inc. v. Jermoo's Inc. (In re Jermoo's Inc.)*,
38 B.R. 197 (Bankr. W.D. Wis. 1984).......................................................52

*D'Angelo v. J.P. Morgan Chase Bank, N.A.*,
475 B.R. 424 (Bankr. E.D. Pa. 2012) ................................................ passim

*David Cutler Indus., Ltd. v. Pa Dep't of Revenue (In re David Cutler Industries, Ltd.)*,
471 B.R. 110 (Bankr. E.D. Pa. 2012) .......................................................56

*Davis v. United States Steel Supply*,
688 F.2d 166 (3d Cir.1982).......................................................28

*Demekpe v. Bd. of Trs. of the Cal. State Univ.*,
551 Fed. App'x. 338 (9th Cir. 2013) .......................................................18

*Dillworth v. Ginn (In re Ginn-La St. Lucie Ltd., LLP)*,
No. 08-29769-BKC-PGH, 2010 Bankr. LEXIS 6325 (S.D. Fla. December 10, 2010)...........56

*District of Columbia of Appeals v. Feldman*,
460 U.S. 462 (1983).......................................................24, 27

*Edelman v. Jordan*,
415 U.S. 651 (1974).......................................................18

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005).......................................................25

*FDIC v. Harrison*,
735 F.2d 408 (11th Cir. 1984) .......................................................63

*First Options of Chicago, Inc. v. Kaplan*,
    913 F. Supp. 377 (E.D. Pa. 1996) ................................................................28, 29, 30

*FLR Co. v. United States (In re FLR Co.)*,
    58 B.R. 632 (Bankr. W.D. Pa. 1985) ...............................................................24, 44

*Funches v. Household Fin. Consumer Dis. Co. (In re Funches)*,
    381 B.R. 471 (Bankr. E.D. Pa. 2008) ....................................................................26

*Gardner v. New Jersey*,
    329 U.S. 565 (1947).................................................................................................20

*General American Communication Corp. v. Landsell (In re General American*
    *Communication Corp.)*,
    130 B.R. 136 (S.D.N.Y. 1991).................................................................................36

*Great Western Mining & Mineral Co. v. Fox Rothschild LLP*,
    615 F.3d 159 (3d Cir. 2010)..............................................................................25, 27

*Green v. Mansour*,
    474 U.S. 64 (1985)...................................................................................................18

*Gregory v. Chehi*,
    843 F.2d 111 (3d Cir.1988).....................................................................................29

*Grubbs Const. Co. v. Fla. Dep't of Revenue (In re Grubbs Constr. Co.)*,
    321 B.R. 346 (Bankr. M.D. Fla. 2005) ..................................................................54

*Hanna v. U.S. Veterans' Admin. Hosp.*,
    514 F.2d 1092 (3d Cir. 1975)..................................................................................60

*Haun v. Retail Credit Co.*,
    420 F. Supp. 859 (W.D. Pa. 1976)..........................................................................34

*Hi Tech Trans, LLC v. New Jersey*,
    382 F.3d 295 (3d Cir. 2004)....................................................................................40

*Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*,
    198 B.R. 45 (S.D.N.Y. 1996)..................................................................................44

*In re 130/40 Essex St. Dev. Corp.*,
    03-40944, 2008 Bankr. LEXIS 4017 (Bankr. S.D.N.Y. Oct. 22, 2008)............48, 49

*In re 421 Willow Corp.*,
    No. Misc. 03-182, 2003 U.S. Dist. LEXIS 18029 (E.D. Pa. Oct. 9, 2003) .........47, 48, 49

*In re Allen*,
    No. 13-14348 (GMB), 2013 Bankr. LEXIS 1965 (Bankr. D. N.J. May 10, 2013) ................21

*In re Ascher*,
128 B.R. 639 (Bankr. N.D. Ill.1991) ...................................................................39

*In re Best*,
417 B.R. 259 (Bankr. E.D. Pa. 2009) ............................................................33, 34

*In re Boughton*,
49 B.R. 312 (Bankr. N.D. Ill. 1985) ................................................................35

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)...........................................................................5

*In re C.F. Foods, L.P.*,
265 B.R. 71 (Bankr. E.D. Pa. 2001) .................................................................55

*In re Chandler*,
441 B.R. 452 (E.D. Pa. 2010) .........................................................................26

*In re Coast Cities Truck Sales, Inc.*,
147 B.R. 674 (D.N.J. 1992) *aff'd sub nom Coast Cities Truck Sales, Inc. v. Navistar
Int'l Transp. Co.*, 5 F.3d 1488 (3d Cir. 1993)..............................................47, 49, 52

*In re Cybergenics Corp.*,
226 F.3d 237 (3d Cir. 2000)......................................................................53, 54, 55

*In re Durso Supermarkets, Inc.*,
193 B.R. 682 (Bankr. S.D.N.Y. 1996).......................................................47, 48, 49

*In re Egyptian Bros. Donut, Inc.*,
190 B.R. 26 (Bankr. D.N.J. 1995) ..............................................................47, 48

*In re Equip. Acquisition Resources*,
742 F.3d 743 (7th Cir. 2014) ........................................................................55

*In re Forbes*,
372 B.R. 321 (B.A.P. 6th Cir. 2007).................................................................54

*In re Fruit of the Loom, Inc.*,
407 B.R. 593 (Bankr. D. Del. 2009) ................................................................35

*In re G & R Mfg. Co.*,
91 B.R. 991 (Bankr. M.D. Fla. 1988) ...............................................................25

*In re Knapper*,
407 F.3d 573 (3d Cir. 2005)........................................................................26, 28

*In re Lehigh Prop., Inc.*,
482 B.R. 127 (Bankr. E.D. Pa. 2012) ...............................................................25

*In re Madera*,
　　586 F.3d 228 (3d Cir. 2009)...........................................................................................25

*In re Marks*,
　　192 B.R 379 (E.D. Pa. 1996) . ........................................................................................29

*In re Metro Water & Coffee Services*,
　　157 B.R. 742 (Bankr. W.D.N.Y. 1993) ......................................................................47, 49

*In re Muir*,
　　107 B.R. 13 (Bankr. E.D.N.Y. 1989)................................................................................39

*In re Perry*,
　　86 B.R. 388 (Bankr. E.D. Pa. 1988) ................................................................................34

*In re Pharm. Distrib. Servs., Inc.*,
　　455 B.R. 817 (Bankr. S.D. Fla. 2011) ..............................................................................55

*In re Reliance Group Hldgs., Inc.*,
　　273 B.R. 374 (Bankr. E.D. Pa. 2002) ...............................................................................36

*In re Republic Reader's Serv., Inc.*,
　　18 B.R. 422 (Bankr. S.D. Tex. 1986) ...............................................................................39

*In re Sabertooth, LLC*,
　　443 B.R. 671 (Bankr. E.D. Pa. 2011) ...............................................................................27

*In re Sasson*,
　　424 F.3d 864 (9th Cir. 2005) ......................................................................................25, 26

*In re Stephen Smith Home For The Aged, Inc.*,
　　80 B.R. 678 (Bankr. E.D. Pa. 1987) ...............................................................35, 36, 37, 38

*In re Sverica Acquisition Corp., Inc.*,
　　179 B.R. 457 (Bankr. E.D. Pa. 1995) ...............................................................................54

*In re Wey*,
　　854 F.2d 196 (7th Cir.1988) .......................................................................................50, 52

*John T. v. De Cty. Intermediate Unit*,
　　2000 U.S. Dist. LEXIS 6169 (E.D. Pa. May 8, 2000) .......................................................66

*Jurista v. Amerinox Processing, Inc.*,
　　492 B.R. 707 (D. N.J. 2013) ............................................................................................54

*Kaliner v. MDC Sys., Inc.*,
　　2012 U.S. Dist. LEXIS 158694 (E.D. Pa. Nov. 5, 2012).....................................................40

*Keystone Redevelop Partners, LLC v. Decker,*
   674 F. Supp. 2d 629 (M.D. Pa. 2009) ........................................................36, 37, 41

*Kessler v. Pollick,*
   851 F. Supp. 687 (E.D. Pa. 1994) ........................................................................65

*Koken v. AMCORP Preferred Ins. Co.*,
   No. 1:CV-03-2052, 2004 U.S. Dist. LEXIS 5280 (M.D. Pa. Mar. 24, 2004) ........................21

*Kost v. Kozakiewicz,*
   1 F.3d 176 (3d Cir. 1993) ........................................................................43

*Luther v. Kia Motors Am., Inc.*,
   676 F. Supp. 2d 408 (W.D. Pa. 2009) ................................................................62

*Marran v. Marran,*
   376 F.3d 143 (3d Cir. 2004)........................................................................29

*Matter of Wood*,
   825 F.2d 90 (5th Cir. 1987) ........................................................................34

*Matusow v. Trans-County Title Agency, LLC,*
   545 F.3d 241 (3d Cir. 2008)........................................................................40

*Morse v. Lower Merion Sch. Dist.*,
   132 F.3d 902 (3d Cir. 1997)........................................................................43

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
   549 F.2d 884 (3d Cir. 1977)........................................................................17

*New Orleans Pub. Serv. Inc. v. Council of New Orleans*,
   491 U.S. 350 (1989)........................................................................40

*OHC Liquid. Trust v. Nucor Corp.*,
   325 B.R. 696 (Bankr. D. Del. 2005) ........................................................45

*Olick v. House (In re Olick)*,
   2011 Bankr. LEXIS 2522 (Bankr. E.D. Pa. June 28, 2011) ................................29

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984)........................................................................18

*Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993)........................................................................5

*Petruska v. Gannon Univ.*,
   462 F.3d 294 (3d Cir. 2006)........................................................................17

*Purpura v. Bushkin Gaimes,*
    317 Fed. App'x. 263 (3d Cir. 2009) ...................................................................27

*Retzlaff v. Horace Mann Ins.*,
    738 F. Supp. 2d 564 (D. Del. 2010)...................................................................43

*Richard Johnson Honeyshine Shoe Express Services v. U.S. Equity Realty, Inc.*,
    125 F.Supp.2d 695 (E.D. Pa. 2000) ...................................................................29

*Riley v. Simmons,*
    45 F.3d 764 (3d Cir. 1995)..................................................................................40

*Robinson v. Johnson*,
    313 F.3d 128 (3d Cir. 2002)................................................................................60

*Rooker v. Fidelity Trust Co.*,
    263 U.S. 413 (1923) ...........................................................................................24

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Gr. Ltd.*,
    181 F.3d 410 (3d Cir.1999)..................................................................................5

*Sacred Heart Hosp. of Norristown v. Pa. (In re Sacred Heart Hosp. of Norristown)*,
    133 F.3d 237 (3d Cir. 1998)................................................................................19

*Schwartz v. OneWest Bank, FSB*,
    2013 U.S. Dist. LEXIS 162613 (E.D. Pa. Nov. 13, 2013) ...................................5

*Seminole Tribe of Fla. v. Fla.*,
    517 U.S. 44 (1996)........................................................................................18, 19

*Shah v. United States*,
    No. 13-2383, 2013 U.S. App. LEXIS 19906 (3d Cir. Sept. 30, 2013) ...............29

*Stern v. Marshall*,
    564 U.S. ***, 131 S. Ct. 2594 (2011)................................................................39

*Taliaferro v. Darby Twp. Zoning Bd.*,
    458 F.3d 181 (3d Cir. 2006)................................................................................27

*Tennessee Student Assistance Corp. v. Hood*,
    541 U.S. 440 (2004)............................................................................................21

*U.S. Express Lines, Ltd. v. Higgins*,
    281 F.3d 383 (3d Cir. 2002)..................................................................................5

*United States v. Edge Broad. Co.*,
    509 U.S. 418 (1993)............................................................................................57

*United States v. Nordic Village, Inc.*,
  50 U.S. 30 (1992).............................................................................................22, 23

*Vigilante v. Statharos*,
  2009 U.S. Dist. LEXIS 12322 (E.D. Pa. Feb. 16, 2009) ........................................63

*Village of Rosement v. Jaffe*,
  482 F.3d 926 (7th Cir. 2007) .................................................................................50

*Zazzali v. Swenson (In re DBSI, Inc.)*,
  2011 Bankr. LEXIS 791 (Bankr. D. Del. Feb. 11, 2011) ..................................55, 56

STATE CASES

*Balent v. City of Wilkes-Barre*,
  542 Pa. 555, 669 A.2d 309 (1995).....................................................28, 29, 31, 32

*Corman v. Nat'l Collegiate Athletic Ass'n*,
  74 A.3d (Pa. Commw. Ct. 2013) ............................................................................11

*Commonwealth v. Wida*,
  No. CR-79-27, 1979 Pa. Dist. & Cnty. Dec. LEXIS 189 (C.P. Northumberland Cty.,
  Pa., June 20, 1979)................................................................................................57

*Crouse v. Cyclops Indus.*,
  745 A.2d 606 (Pa. 2000).........................................................................................62

*Dep't of Health v. Data-Quest, Inc.*,
  972 A.2d 74 (Pa. Commw. Ct. 2009) ......................................................................60

*Emp. Ins. Of Wausau v. Com., Dep't of Transp.*,
  581 Pa. 381 (2005).................................................................................................60

*Kuriakose v. Workmen's Comp. Appel Bd.*,
  681 A.2d 1389 (Pa. Commw. Ct. 1996) .................................................................46

*Lobolita, Inc. v. N. Pocono Sch. Dist.*,
  562 Pa. 380, 755 A.2d 1287 (Pa. 2000)................................................................64

*Meyers v. Kim*,
  2001 Pa. Dist. & Cnty. Dec. LEXIS 201 at *9 (Lawrence Cty. Pa Ct. Com. Pleas,
  March 16, 2001)...............................................................................................29, 28

*Muse v. Cermak*,
  428 Pa. Super. 199, 630 A.2d 891 (1993).............................................................32

*Pa. Gaming Control Bd. v. City Council of Phila.*,
  593 Pa. 241, 928 A.2d 1255 (2007) ..................................................................7, 66

*Pa. Against Gambling Expansion Fund, Inc. v. Com.*,
    583 Pa. 275 (2005) ................................................................................................6

*Phila. Entm't & Dev. Partners, L.P. v. Pa. Gaming Control Bd.*,
    34 A.3d 261, 263 (Pa. Commw. Ct. 2011) ................................................... passim

*Phila. Entm't & Dev. Partners, L.P. v. Pa. Gaming Control Bd.*,
    615 Pa. 146, 41 A.3d 852 (2012) ...............................................................3, 17, 45

*Pittsburgh Baseball Inc. v. Stadium Auth. of City of Pittsburgh*,
    630 A.2d 505 (Pa. Commw. Ct. 1993) ................................................................63

*Pittsburgh v. Zoning Bd. of Adjustment*,
    522 Pa. 44, 559 A.2d 896 (1989) .......................................................................32

*Replogle v. Commonwealth*,
    514 Pa. 209 (Pa. 1987) ...............................................................................58, 59

*Revay v. Cleveland State Univ.*,
    No. 2002-04003-AD, 2003 Ohio Misc. LEXIS 74 (Ohio Ct. Claims Jan. 7, 2003)...............63

*Riverwalk Casino v. Pa. Gaming Control Bd.*,
    592 Pa. 505, 726 A.2d 926 (2007) .....................................................................11

*Rubino v. Pa. Gaming Control Bd.*,
    1 A.3d 976 (Pa. Commw. Ct. 2010) .....................................................................7

*Smock v. Commonwealth*,
    496 Pa. 204 (1981) ...............................................................................60, 61

**FEDERAL STATUTES**

11 U.S.C. § 106(a) ................................................................................... passim

11 U.S.C. § 365.........................................................................................48

11 U.S.C. § 541.........................................................................................38

11 U.S.C. § 542..................................................................................19, 44, 45

11 U.S.C. § 544(b) ....................................................................................53

11 U.S.C. § 547.........................................................................................48

11 U.S.C. § 548.........................................................................................19

11 U.S.C. § 548(a)(1)...........................................................................45, 46, 52

11 U.S.C. § 548(a)(1)(B) ........................................................................45, 46, 47

11 U.S.C. § 550 ......................................................................................................................20

11 U.S.C. § 554(b) .................................................................................................................53

28 U.S.C. § 1257 ....................................................................................................................24

28 U.S.C. § 1334(c)(1) ...................................................................................................... passim

**STATE STATUTES AND REGULATIONS**

72 P.S. § 1503 ..................................................................................................................11, 65

72 P.S. § 3832 ..................................................................................................................11, 65

72 P.S. § 4651-4 ....................................................................................................................60

1 Pa. C.S. § 2310 ...................................................................................................................54

2 Pa. C.S. § 702 ...............................................................................................................38, 40

4 Pa. C.S. § 1102 ...................................................................................................................57

4 Pa. C.S. § 1102(1) .............................................................................................................42

4 Pa. C.S. § 1102(2.1) ...........................................................................................................9

4 Pa. C.S. § 1102(3) ...............................................................................................................9

4 Pa. C.S. § 1102(6) ...............................................................................................................9

4 Pa. C.S. § 1102(7) .....................................................................................................9, 50, 58

4 Pa. C.S. § 1102(8) .......................................................................................................6, 58

4 Pa. C.S. § 1201(a) ...............................................................................................................7

4 Pa. C.S. § 1202(b) ...............................................................................................................7

4 Pa. C.S. § 1202(a)(1) ....................................................................................................42, 66

4 Pa. C.S. § 1202(b)(12) ..................................................................................................8, 66

4 Pa. C.S. § 1204 ...................................................................................................................41

4 Pa. C.S. § 1207 ...................................................................................................................7

4 Pa. C.S. § 1207(1) .....................................................................................................8, 57, 66

4 Pa. C.S. § 1208(1)-(2) .........................................................................................................7

4 Pa. C.S. § 1208(e) ..................................................................................65

4 Pa. C.S. § 1209 ......................................................................................8

4 Pa. C.S. § 1209(d) .............................................................................11, 67

4 Pa. C.S. § 1210(a)(2)..........................................................................10, 12

4 Pa. C.S. § 13A02(1)-(9) ..........................................................................7

4 Pa. C.S § 1301 ....................................................................................12

4 Pa. C.S. § 1313 ....................................................................................7

4 Pa. C.S. § 1313(c) ...........................................................................10, 63

4 Pa. C.S. § 1313(d) ................................................................................10

4 Pa. C.S. § 1313(e) ................................................................................10

4 Pa. C.S. § 1326(b) ..........................................................................passim

4 Pa. C.S. § 1326 ....................................................................................7

4 Pa. C.S. § 1327 ............................................................................9, 50, 58

4 Pa. C.S. § 1328 ............................................................................9, 50, 58

4 Pa. C.S. § 1329 ...................................................................................50

4 Pa. C.S. § 1403 ....................................................................................9

4 Pa. C.S. § 1403(a) ...........................................................................11, 66

4 Pa. C.S. § 1408(e) ................................................................................66

4 Pa. C.S. § 1517(a) ................................................................................12

4 Pa. C.S. § 1518(c) .................................................................................7

4 Pa. C.S. § 1518(c)(1)(iii)......................................................................8, 66

4 Pa. C.S. § 1904 ...................................................................................41

12 Pa. C.S. § 5104 ..................................................................................52

12 Pa. C.S. § 5105 ..................................................................................52

12 Pa. C.S. § 5108 ..................................................................................48

42 Pa. C.S. § 8522 ...........................................................................................................55

62 Pa. C.S. § 1702 ...........................................................................................................55

62 Pa. C.S. § 1724(a) .......................................................................................................60

47 Pa. Code § 4-472 .........................................................................................................58

58 Pa. Code § 401a ............................................................................................................6

58 Pa. Code § 421a.1(a) .................................................................................................9, 57

58 Pa. Code § 423a.6(b)(5) ...............................................................................................8

58 Pa. Code § 441a.5 ...........................................................................................10, 12, 63

58 Pa. Code § 494a.11(b) .................................................................................................45

58 Pa. Code § 664a ............................................................................................................6

## CONSTITUTIONAL PROVISIONS

US Const. amend. V ..........................................................................................................56

US Const. amend. XI .........................................................................................................18

US Const. amend. XIV .......................................................................................................56

US Const., Art. I, § 8 .........................................................................................................20

Pa Const., Art. I, § 10 ........................................................................................................56

## FEDERAL RULES

Fed. R. Bankr. P. 7012 ......................................................................................................43

Federal Rule 12(b)(l) .........................................................................................................17

Fed. R. Civ. P. 12(b)(6) ........................................................................................43, 60, 65

Fed. R. Civ. P. 12(b)(7) .....................................................................................................65

Fed. R. Civ. P. 19 ..............................................................................................................65

**OTHER AUTHORITIES**

16 J. Moore, *et al*., 18 MOORE'S FEDERAL PRACTICE, § 133.30[3][c] (3d ed. 2006) ...................27

16 J. Moore, *et al*., MOORE'S FEDERAL PRACTICE § 108.70[1] (3d ed. 2004).............................21

Wright & Miller, *Federal Practice and Procedure: Civil* § 1589 (1969) ...................................65

Defendants (i) Commonwealth of Pennsylvania, Department of Revenue (the "**Department of Revenue**"), and (ii) the Commonwealth of Pennsylvania (the "**Commonwealth**," and together with the Department of Revenue, the "**Defendants**"), file this memorandum of law in support of their motion to dismiss or, in the alternative, to abstain (the "**Motion to Dismiss**"), the Adversary Complaint (the "**Complaint**") filed against them by plaintiff Philadelphia Entertainment and Development Partners, LP d/b/a Foxwoods Casino Philadelphia (the "**Debtor**"), and in support hereof state as follows: [1]

## I.

## PRELIMINARY STATEMENT

The Debtor asserts seven causes of action against the Defendants with but a single objective: reversal of a judgment of the Commonwealth Court of Pennsylvania (the "**State Court**") affirming an order of the Pennsylvania Gaming Control Board (the "**Gaming Board**") revoking the Debtor's Category 2 Slot Machine License (the "**License**") and forfeiting its $50 million license fee (the "**License Fee**"). After years of unsuccessfully attempting to develop a gaming facility and otherwise to comply with the conditions of the License, after multiple hearings before the Gaming Board, and after exhaustion of its appeals of the Gaming Board's ultimate revocation of the License, the Debtor invites this Court to let the Debtor have one last bite at the same apple, disguised as new claims for relief. The Court should decline the invitation.

In May 2008, the Gaming Board – the governmental entity charged with "protect[ing] the public through the regulation and policing of all activities involving gaming," 4 Pa. C.S. § 1102(1) – issued the License to the Debtor. Issuance of the License was subject to a number of

---

[1]     An Addendum of the relevant sections of the Pennsylvania statutes cited herein has been filed concurrently with this memorandum of law.

applicable statutory and regulatory conditions, including imposition of a one-year deadline for the Debtor to open its casino, maintenance of "financial suitability," and payment by the Debtor of the statutorily required non-refundable License Fee of $50 million.  Two-years later, the Gaming Board found that the Debtor had (i) failed to commence operations at, or even broken ground on, the casino, (ii) failed to maintain financial suitability in accordance with the Gaming Act and the Gaming Board's regulations, and (iii) violated several Gaming Board orders.  In light of these findings, the Gaming Board exercised its statutory authority and revoked the Debtor's License pursuant to a December 23, 2010 order (the "**Gaming Board's Revocation Order**").  By operation of law, the Debtor's License Fee was automatically forfeited.  *See* 4 Pa. C.S. § 1326(b) ("In the event of a revocation . . ., the applicant's authorization to conduct the previously approved activity shall immediately cease, and all fees paid in connection therewith shall be deemed to be forfeited.").

The Debtor petitioned the State Court to review the Gaming Board's Revocation Order (the "**State Court Action**"), asserting that the Gaming Board wrongfully revoked the License on the basis, among other things, that:  (i) "financial suitability" was an unconstitutionally vague standard; and (ii) the Debtor's due process rights had been violated, both procedurally (by revocation of the License via summary judgment and without adequate discovery) and substantively (by imposition of the "excessive sanction" of revocation of the License accompanied by loss of the License Fee).  *See Phila. Entm't & Dev. Partners, L.P. v. Pa. Gaming Control Bd.,* 34 A.3d 261, 263, 275 (Pa. Commw. Ct. 2011).  The State Court denied the Debtor's appeal in a November 10, 2011, decision (the "**State Court Judgment**"), holding that the Gaming Board had neither erred as a matter of law nor abused its discretion in revoking the License.  The State Court specifically held that the Gaming Board did not violate the Debtor's

due process rights and that the revocation of the License and the statutory forfeiture of the

License Fee were lawful and appropriate. *Phila. Entm't & Dev. Partners, L.P.,* 34 A.3d at 276.

On March 29, 2012, the Pennsylvania Supreme Court denied the Debtor's petition for an appeal

of the State Court Judgment. *Phila. Entm't & Dev. Partners, L.P. v. Pa. Gaming Control Bd.*,

615 Pa. 146, 41 A.3d 852 (2012).   More than two-years later, the Debtor commenced its

bankruptcy case, shortly after which it filed the Complaint.

The Debtor asserts two categories of causes of action against the Defendants.  The first –

the federal and state fraudulent transfer claims (Counts II, III, and IV of the Complaint) – seeks

the avoidance of the revocation of the License and grant of a $50 million money judgment in the

amount of the alleged "value" of such License;[2] and the second – the turnover, unconstitutional

takings, unjust enrichment, and promissory estoppel claims (Counts I, V, VI, and VII of the

Complaint) – seeks, in effect, to invalidate the statutory forfeiture of the License Fee and to

obtain a money judgment of $50 million in the amount of such fee.  At root, therefore, though

dressed in different clothing, the assertions made by the Debtor in the Complaint are the exact

same assertions made by the Debtor in the State Court Action:  (i) the revocation of the License

was wrongful; and (ii) the statutory forfeiture of the License Fee was "excessive" under state or

federal law.  Consequently, for this Court to consider the claims asserted by the Debtor, the

Court must review and address the merits of the State Court Judgment.  And in order to grant

---

[2]      Although the fraudulent transfer counts seek avoidance of the revocation of the License, the
Debtor does not ask for the License back.  Rather, the Debtor seeks a judgment in the amount of
the value of the License which the Debtor alleges (an allegation that the Defendants do not
concede) to be $50 million at the time of revocation.  The decision to focus on the revocation of
the License as the alleged "transfer" for purposes of the fraudulent transfer counts, with the
attendant valuation issues that will arise if this case gets that far, was clearly tactical by the
Debtor.  Were the Debtor to challenge the payment of the License Fee in October 2007 as a
fraudulent transfer – a far more direct route to a claim for $50 million – the applicable "look
back" periods would plainly bar that action under both federal and state law.

relief to the Debtor, the Court must, in effect, reverse that judgment, and grant the Debtor a $50 million money judgment against the Defendants.

As to all Counts in the Complaint, this Court lacks subject-matter jurisdiction.  As a threshold matter, the doctrine of sovereign immunity deprives this Court of subject-matter jurisdiction to award to the Debtor a $50 million judgment against the Defendants.  The purported abrogation of State sovereign immunity in section 106(a) of the Bankruptcy Code has been held to be unconstitutional in this Circuit, and the claims asserted, or the relief requested, in the Complaint do not fall within the waiver of state sovereign immunity associated with this Court's *in rem* jurisdiction that was articulated by *Centr. Va. Cmty. Coll. v. Katz,* 546 U.S. 356 (2006).  Alternatively, the *Rooker-Feldman* doctrine (or the tandem concepts of issue and claim preclusion) prohibits precisely the sort of review and reversal of state court judgments that would be required of this Court if it were to grant the relief requested by the Debtor in its Complaint.

If this Court should determine that it has subject-matter jurisdiction over this adversary proceeding, this case is an appropriate candidate for abstention under both 28 U.S.C. § 1334(c)(1) and the *Burford* abstention doctrine.  The Debtor, having lost before the Gaming Board and the State Court, is now shopping for a forum in which to have another go at it.  Moreover, resolution of this case depends upon the interpretation, enforcement, and potential invalidation of Pennsylvania state law in an area – gaming – that is subject to a detailed and complex regulatory scheme, where the Gaming Board exercises regulatory and police powers, and where the Commonwealth has a strong public policy interest in maintaining control of interpretation and enforcement of gaming in its boarders.  While in form the Debtor's claims are based upon quasi-contract recovery, fraudulent transfer, and unconstitutional takings, in substance the claims are a substantive and procedural challenge to the Commonwealth's

comprehensive statutory and regulatory scheme for regulating gaming within Pennsylvania.  Any such challenge belongs in state court, not in federal court, particularly since the challenge seeks to circumvent that State Court Judgment.

Should this Court nevertheless entertain the merits of the Debtor's claims, for a variety of reasons summarized on **Exhibit A** attached hereto and discussed in detail below, such claims should be dismissed.

## II.

## STATEMENT OF FACTS[3]

### A.    General Case Background

On April 1, 2014, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court.  Complaint, ¶ 3 and docket for Case No. 14-12482 (the "**Docket**") No. 1.  On May 29, 2014, the Debtor filed the Complaint. Docket for Adversary Proceeding No. 14-00255 (the "**Adversary Proceeding Docket**") No. 1. The Defendants' time to answer or otherwise respond to the Complaint was extended through and including August 28, 2014, pursuant to stipulations approved by this Court on June 19, 2014, and July 30, 2014.  Adversary Proceeding Docket Nos. 6 and 11.

---

[3]     The Statement of Facts is based upon the facts alleged in the Complaint, which Defendants treat as true only for purposes of the Motion to Dismiss, and upon documents in the public record.  *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Gr. Ltd*., 181 F.3d 410, 426 (3d Cir.1999) ("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.").  On a motion to dismiss, a court may also consider any "document integral to or explicitly relied upon in the complaint." *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (citing *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997)); *Schwartz v. OneWest Bank, FSB*, No. 13-0113, 2013 U.S. Dist. LEXIS 162613, at *8 (E.D. Pa. Nov. 13, 2013) (holding that upon deciding a motion to dismiss, the court may consider "undisputedly authentic document[s] that the defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the attached document[s]" or "[d]ocuments whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading") (quoting *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)) (internal quotation marks omitted, some alterations in original).

On July 28, 2014, this Court approved the *Disclosure Statement for Chapter 11 Plan of Liquidation of Philadelphia Entertainment and Development Partners, L.P.*, dated as of March 10, 2014, and confirmed the *Chapter 11 Plan of Liquidation of Philadelphia Entertainment and Development Partners, L.P.*, dated as of March 10, 2014, as modified by the *First Modified Chapter 11 Plan of Liquidation of Philadelphia Entertainment and Development Partners, L.P.*, dated as of May 27, 2014.  Docket No. 153.

**B.      The Commonwealth's Comprehensive Scheme for the Regulation of Gaming in Pennsylvania**

Originally enacted in 2004 and amended in 2006 and 2010, the Pennsylvania Race Horse Development and Gaming Act, 4 Pa. C.S. §§ 1101-1904 (the "**Gaming Act**"), for the first time authorized licensed casinos in Pennsylvania, including two in Philadelphia.[4]  The Gaming Act itself is divided into 10 distinct chapters with 152 individual sections in total.  The regulations promulgated under the Gaming Act by the Gaming Board consist of 70 chapters, each with numerous individual sections.  58 Pa. Code §§ 401a-664a.[5]  The Gaming Act and the regulations thereunder embody the Commonwealth's intention to comprehensively regulate gaming in Pennsylvania.  *See* 4 Pa. C.S. § 1102(8); *Pennsylvania Against Gambling Expansion Fund, Inc. v. Com.,* 583 Pa. 275, 297 (2005) (The Gaming Act reflects "the legislative intent of regulating gaming").

When enacting the Gaming Act, the Commonwealth expressly codified 17 public policy purposes for which this comprehensive scheme for the regulation of gaming is intended to serve. 4 Pa. C.S. § 1102.  The "primary objective . . . to which all other objectives and purposes are

---

[4]      Act of July 5, 2004 (P.L. 572, No. 71); Act of Nov. 1, 2006 (P.L. 1243, No. 135); Act of Jan. 7, 2010 (P.L. 1, No. 1).

[5]      A master copy of all such regulations, which exceeds 870 pages, is maintained on the Gaming Board's website at
http://gamingcontrolboard.pa.gov/files/regulations/Final_Regulations_Master.pdf.

secondary is to protect the public through the regulation and policing of all activities involving

gaming." 4 Pa. C.S. § 1102(1). To further this primary objective, the Gaming Act established

the Gaming Board as a newly-formed and independent agency dedicated to the regulation of all

aspects of gaming in Pennsylvania. 4 Pa. C.S. § 1201(a). The Gaming Board was vested with

the "general and sole regulatory authority over the conduct of gaming . . . [and] every aspect of

the authorization, operation and play of slot machines and table games." 4 Pa. C.S. § 1202(a)(1);

see Pa. Gaming Control Bd. v. City Council of Phila., 593 Pa. 241, 247, 928 A.2d 1255, 1258

(2007) (city precluded from using local ordinances to nullify Gaming Board's broad authority).

As noted by the Commonwealth Court of Pennsylvania:

> [I]n accordance with 4 Pa. C.S. § 1202(a)(1) of the Gaming Act,
> the [Gaming] Board has sole regulatory authority over the conduct
> of gaming and related activities in the Commonwealth, vesting
> broad discretion with the [Gaming] Board to administer all aspects
> of the gaming industry in Pennsylvania.

Phila. Entm't & Dev. Partners, L.P, 34 A.3d at 267 (citation omitted). Consistent with this

broad mandate, appellate review of the Gaming Board is deferential to the Gaming Board's

expertise and general authority in the regulation of gaming:

> [A] reviewing court must give considerable weight and deference
> to an agency's interpretation of a regulation the agency is charged
> with enforcing. Moreover, an agency's interpretation of its
> regulation is controlling unless the interpretation is plainly
> erroneous, inconsistent with the regulation or statute, or
> unreasonable.

Rubino v. Pa. Gaming Control Bd., 1 A.3d 976, 980 (Pa. Commw. Ct. 2010) (citations omitted).

The Gaming Act details more than 50 specific powers and duties that are vested in the

Gaming Board.[6] Section 1202(b)(12) of the Gaming Act specifically authorizes the Gaming

---

[6]      See, e.g., 4 Pa. C.S. §§ 1102(1), 1102(7), 1202(a)(1), 1202(b)(1) – (34), 1207(1) – (21), 1208(1) –
(2), 1313, 1326, 13A02(1)-(9), and 1518(c).

Board, at its discretion, to issue and condition the slot machine licenses authorized under the Gaming Act. 4 Pa. C.S. § 1202(b)(12). Once issued, a license "shall be in effect unless suspended, revoked or not renewed by the [Gaming] [B]oard upon good cause consistent with the license requirements as provided for in this part." 4 Pa. C.S. § 1209. Section 1207(1) of the Gaming Act provides in relevant part:

> The board shall have the power and its duties shall be to: (1) . . . revoke . . . any license . . . if the board finds in its sole discretion that a licensee . . . failed to comply with the provisions of this part or the rules and regulations of the board and that it would be in the public interest to . . . revoke . . . the license.

4 Pa. C.S. § 1207(1). Section 1518(c)(1)(iii) of the Gaming Act specifically authorizes the Gaming Board to revoke a license on the basis of a willful and knowing violation of an order of the Gaming Board. 4 Pa. C.S. § 1518(1)(iii). *See also* 58 Pa. Code § 423a.6(b)(5) (authorizing revocation of license for non-compliance with the Statement of Conditions associated with issuance of a license). Upon the Gaming Board's revocation of a license, the "authorization to conduct the previously approved activity shall immediately cease and *all fees paid in connection therewith shall be deemed to be forfeited*." 4 Pa. C.S. § 1326(b) (emphasis added). Thus, the forfeiture of the fees automatically follows the revocation of the License.

Gaming licenses themselves are a qualified and, as set forth above, revocable privilege to conduct gaming activities strictly in furtherance of and consistent with the policies of the Gaming Act:

> Participation in limited gaming authorized . . . by any license . . . shall be deemed a privilege, conditioned upon the proper and continued qualification of the licensee or permittee and upon the discharge of the affirmative responsibility of each licensee to provide the regulatory and investigatory authorities of the Commonwealth with assistance and information necessary to assure that the policies declared by this part are achieved.

> Strictly monitored and enforced control over all limited gaming
> authorized by [the Gaming Act] shall be provided through
> regulation, licensing and appropriate enforcement actions of
> specified locations, persons, associations, practices, activities,
> licensees and permittees.

4 Pa. C.S. § 1102(7 – 8); *see also* 58 Pa. Code § 421a.1(a) ("A license . . . issued by the Board is a revocable privilege[, and] [n]o person holding a license . . . is deemed to have any property rights related to the license").  The Gaming Act prohibits the sale or transfer of the license or the grant of any security interest in the license.  4 Pa. C.S. §§ 1327-28.

In addition to strictly regulating and policing licensed casinos, the Commonwealth's General Assembly also intended the Gaming Act to:  (i) "provide a significant source of new revenue to the Commonwealth to support property tax relief, wage tax reduction, economic development opportunities and other similar initiatives," 4 Pa. C.S. § 1102(3); (ii) "provid[e] new employment opportunities by creating skilled jobs for individuals related to the conduct of table games at licensed facilities in this Commonwealth," 4 Pa. C.S. § 1102(2.1); and (iii) "enhance the further development of the tourism market throughout this Commonwealth, including, but not limited to, year-round recreational and tourism locations in this Commonwealth."  4 Pa. C.S. § 1102(6).

Since the initial casinos first opened in 2006, Pennsylvania now has 12 licensed casinos generating approximately $1.46 billion in annual gaming tax revenue and more than 16,000 jobs.[7]  All of the gaming taxes, as well as the upfront license fees, are paid into the Commonwealth's State Gaming Fund, which is dedicated by statute to "municipal and county governments, [4 Pa. C.S.] § 1403; compulsive problem gaming treatment programs; [4 Pa. C.S.] § 1408(a); volunteer fire company grants, [4 Pa. C.S.] § 1408(b); local law enforcement grants [4

---

[7]  *Pa. Gaming Control Bd.*, Annual Report for 2012-2013, available at http://gamingcontrolboard.pa.gov/files/communications/2012-2013_PGCB_Annual_Report.pdf.

Pa. C.S.] § 1408(c); and the Property Tax Relief Fund, [4 Pa. C.S.] §§ 1408(e), 1409."

Complaint, Exhibit B at p.15.

In furtherance of the revenue generating purposes of the Gaming Act, the Act requires

that each applicant for a license demonstrate, by clear and convincing evidence, several financial

criteria, including that the applicant:  (i) "has sufficient business ability and experience to create

and maintain a successful, efficient operation," 4 Pa. C.S. § 1313(d); (ii) "is likely to maintain a

financially successful, viable and efficient business operation," 4 Pa. C.S. § 1313(e); (iii) "will

likely be able to maintain a steady level of growth of revenue to the Commonwealth," 4 Pa. C.S.

§ 1313(e); and (iv) has the ability to pay the license fee, 4 Pa. C.S. § 1313(c).  With respect to

demonstrating an ability to pay the license fee, each applicant is specifically required to submit

with its application and maintain during the application period a $50 million letter of credit or

bond as assurance of the applicant's ability to pay the license fee when due.  4 Pa. C.S. §

1313(c); 58 Pa. Code § 441a.5.  If the applicant fails to pay the license fee when due for any

reason, the Gaming Board is entitled to obtain the license fee by drawing down on the licensee's

letter of credit or bond.  *Id.*  In addition, licensees are required to construct their licensed

facilities and commence operations within one year of the issuance of their license.  4 Pa. C.S. §

1210(a)(2).

## C.    Issuance and Revocation of the Debtor's License

On December 20, 2006, the Gaming Board awarded the Debtor one of two Category 2

slot machine licenses available for the operation of a gaming facility in the City of Philadelphia.

Complaint, ¶ 14.  Thereafter, on February 1, 2007, the Gaming Board issued an order and

adjudication setting forth its findings of fact and conclusions of law in support of the award of

the License to the Debtor (the "**License Issuance Order**"), which order and adjudication are

attached hereto as **Exhibit B**.  The License Issuance Order provided, among other things, as

follows:

> The grant and issuance of this Category 2 license does not give
> [the Debtor] a property right and the [Gaming Board] may, at its
> discretion, revoke or suspend the license of [the Debtor] if the
> [Gaming Board] finds that [the Debtor], and their officers,
> employees or agents have not complied with the conditions of the
> license, the provisions in the Act, or the [Gaming Board]'s
> regulations, and that it would be in the best interest of the public to
> revoke or suspend the slots license.

License Issuance Order, pp. 112–13.[8]

In connection with issuance of the License, and after receiving a temporary extension, the

Debtor was required to pay the $50 million License Fee by October 17, 2007.  On the day before

such deadline, counsel for the Debtor sent a letter to the Gaming Board (the "**Debtor's Fee**

**Letter**") acknowledging the Debtor's obligation to pay the License Fee pursuant to Section 1209

of the Gaming Act, but unilaterally purporting to "reserve all of [the Debtor's] available legal

rights and remedies to obtain repayment of its License Fee" if circumstances "cause[d] its license

or this project to be jeopardized or extraordinarily harmed."  Debtor's Fee Letter at p. 5.  On the

following day, October 17, 2007, the Debtor wired $50 million to the Commonwealth in

satisfaction of its obligation under the Gaming Act to pay the License Fee to the Gaming Board.

Complaint, ¶ 20.  Given the statutory requirements, the Gaming Board could not and did not

agree to the reservation of rights.

Upon receipt, the License Fee was deposited into the State Gaming Fund within the State

Treasury, for which the Treasury Department and the State Treasurer are custodian.  4 Pa. C.S.

§§ 1209(d), 1403(a), 1408(e); *see also* 72 P.S. §§ 1503, 3832; *Corman v. Nat'l Collegiate*

---

[8]     On July 17, 2007, the Pennsylvania Supreme Court affirmed the License Issuance Order after one
of the unsuccessful applicants for the License appealed the Gaming Board's decision.  *Riverwalk
Casino v. Pa. Gaming Control Bd.*, 592 Pa. 505, 726 A.2d 926 (2007).

*Athletic Ass'n,* 74 A.3d 1149, 1160 (Pa. Commw. Ct. 2013). Had the Debtor failed to pay the License Fee in a timely fashion, regardless of any purported unilateral reservation of rights, the Gaming Board (as set forth above) was entitled to draw down on the Debtor's letter of credit in the amount of $50 million, which the Debtor had been required to submit with its application. Complaint, Exhibit B at p. 4; 58 Pa. Code § 441a.5. No purported reservation of rights is alleged to have been made with respect to delivery of such letter of credit.

On May 29, 2008 (the "**License Issuance Date**"), the Gaming Board formally issued the Debtor the License after it satisfied all prerequisites required for issuance of the License. Complaint, ¶ 22; 4 Pa. C.S § 1301. Pursuant to the Gaming Act, the Debtor was permitted one year from the License Issuance Date – until May 29, 2009 – to commence its operations with a minimum of 1,500 slot machines available to play at its casino. Complaint, ¶ 23. *See also* 4 Pa. C.S. § 1210(a)(2).

The Debtor was unable to commence operations by May 29, 2009 and petitioned the Gaming Board on May 22, 2009, for an extension of time to commence its operations. Complaint, ¶ 24. After an evidentiary hearing, the Gaming Board granted the Debtor an extension of time to commence operations until May 29, 2011, pursuant to a September 1, 2009 order (the "**September 2009 Order**"). The September 2009 Order made the extension subject to certain conditions, including:

> 4. Within 6 months of the date of this Order [March 1, 2010], Foxwoods shall submit to BIE[9] all financing documents and commitments for financing regarding development of its facility with a minimum of 1,500 slot machines available for play, on or before May 29, 2011;

---

[9] BIE is the Gaming Board's Bureau of Investigations and Enforcement. *See* 4 Pa. C.S. § 1517(a) ("There is hereby established within the [Gaming Board] a bureau of Investigations and Enforcement which shall be independent of the board in a matter relating to enforcement of [the Gaming Act].").

5. Within 3 months of the date of this Order [December 1, 2009], Foxwoods shall submit to BIE all architectural renderings, artist renderings, conceptual proposals, engineering opinions, any and all other documents relating to construction of a facility, substantially similar to that approved by the Board on December 20, 2006. The submissions must provide for a minimum of 1,500 slot machines available for play, on or before May 29, 2011, at the Columbus Boulevard site; [and]

6. Within 3 months of the date of this Order, Foxwoods shall submit to BIE a timeline for commencement and completion of all phases of development regarding its facility with a minimum of 1,500 slot machines available for play, on or before May 29, 2011.

Complaint, Exhibit D. at pp. 2–3 (footnote added).[10]

The Debtor was unable to meet the deadline set for the fifth and sixth conditions in the September 2009 Order ("**Conditions 5 and 6**"), and petitioned the Gaming Board for an additional extension of time to timely satisfy such conditions. Complaint, ¶¶ 30–31. After an evidentiary hearing held on January 27, 2010, the Gaming Board denied the petition for extension of time by Order dated February 10, 2010 (the "**February 2010 Order**"). Complaint, ¶ 31. A copy of the February 2010 Order and accompanying adjudication are attached hereto as **Exhibit C**.[11]

In the meantime, on December 15, 2009, the Gaming Board's Bureau of Investigations and Enforcement (the "**BIE**"), through the Office of Enforcement Counsel (the "**OEC**"), moved for sanctions against the Debtor for failure to satisfy Conditions 5 and 6 in a timely manner.[12] Complaint, ¶ 32, and Exhibit E at p. 2. The Gaming Board granted that motion in the February 2010 Order, and assessed a $2,000 *per diem* sanction against the Debtor beginning December 1,

---

[10]     The Debtor did not appeal the September 2009 Order.

[11]     The Complaint purports to attach a copy of the February 10, 2010 Order and adjudication as Exhibit E. However, Exhibit E of the Complaint only contains the one-page order and first page of the adjudication. The remainder of the adjudication is omitted.

[12]     In proceedings before the Gaming Board, the OEC represents the BIE and the public interest in regulatory enforcement as legal counsel.

2009, and continuing until the Debtor satisfied Conditions 5 and 6.  *Id*.  In addition, the Gaming

Board set March 3, 2010 as the date for a further hearing related to the Debtor's compliance with

the September 2009 Order at which additional sanctions, including possible revocation of the

License, would be considered in the event that the non-compliance was on-going.  Complaint,

¶ 32 and Exhibit E at p. 2.

At the March 3, 2010, hearing, the Debtor presented evidence regarding the prospects of

a potential transaction with Wynn Resorts, Limited ("**Wynn Resorts**").  Complaint, ¶¶ 33-35.

Based on such evidence, the Gaming Board declined to impose stricter sanctions and instead

extended the time for the Debtor to satisfy the fourth condition in the September 2009 Order –

demonstration of the existence of sufficient development financing – from March 1, 2010, until

March 31, 2010.  The Gaming Board, however, continued the $2,000 *per diem* sanction for non-

compliance with Conditions 5 and 6.  Complaint, Exhibit F.  On April 8, 2010, Wynn Resorts

withdrew from the Debtor's proposed project.  Complaint, ¶ 38.

On April 29, 2010, the BIE filed a Complaint with the Gaming Board seeking revocation

of the Debtor's License (the "**Revocation Complaint**").  Complaint, ¶ 42.  The Revocation

Complaint asserted four counts:

> failure to comply with the Board's September 1, 2009 and March
> 3, 2010 orders (Count I), failure to comply with the Statement of
> Conditions to a Slot Machine License (Count II), inability to have
> a minimum of 1,500 slot machines available for play by May 29,
> 2011 (Count III), and failure to maintain suitability (Count IV).

*Phila. Entm't & Dev. Partners, L.P.*, 34 A.3d at 266.  After the Debtor answered the Revocation

Complaint and the parties exchanged discovery, both the Debtor and the BIE on October 5, 2010,

filed Motions for Summary Judgment.  *Id.*

On October 27, 2010, the Gaming Board heard oral argument on the Motions for

Summary Judgment after which the Gaming Board took both motions under advisement to allow

the Debtor additional time to negotiate a last minute deal with Harrah's Entertainment, Inc. ("**Harrah's**"). Complaint, ¶ 54. *See Phila. Entm't & Dev. Partners, L.P*, 34 A.3d at 266. At the Gaming Board's next meeting, held November 18, 2010, the Debtor and Harrah's updated the Gaming Board on their progress on the proposed transaction. Complaint, ¶ 55. *See Phila. Entm't & Dev. Partners, L.P*, 34 A.3d at 266. On November 19, 2010, the Gaming Board denied the Debtor's Motion for Summary Judgment but held in abeyance the BIE's Motion for Summary Judgment to allow the Debtor further time to negotiate with Harrah's. Complaint, at p. 13. *See Phila. Entm't & Dev. Partners, L.P*, 34 A.3d at 266. In connection therewith, the Gaming Board required the Debtor to submit definitive documentation for a transaction with Harrah's by December 10, 2010, and then to report to the Gaming Board at its next meeting on December 16, 2010. *Phila. Entm't & Dev. Partners, L.P*, 34 A.3d at 266.

On December 10, 2010, the Debtor and Harrah's submitted documents seeking Gaming Board approval of a change of ownership, modifications to the approved gaming facility, and an extension of time from March 29, 2011, until December 31, 2012, to commence operations; on December 16, 2010, the Debtor appeared before the Gaming Board as required. Complaint, ¶ 55; *Phila. Entm't & Dev. Partners, L.P*, 34 A.3d at 266–67. Neither the provided documentation nor the report provided to the Gaming Board on December 16 were satisfactory to the Gaming Board and, on December 23, 2010, the Gaming Board granted the BIE's summary judgment motion and revoked the License on the grounds set forth in the Revocation Complaint. Complaint, ¶ 60; *see also* Gaming Board's Revocation Order, a copy of which is attached hereto as **Exhibit D**. Thereafter, on January 26, 2011, the Gaming Board issued an adjudication making 124 specific findings of fact, determining conclusions of law, and setting forth additional

discussion to substantiate the revocation (the "**Revocation Adjudication**").   A copy of the

Revocation Adjudication is attached to the Complaint as Exhibit H.

## D.        The State Court Judgment

The Debtor appealed the Gaming Board's Revocation Order to the State Court on

January 14, 2011.  *Phila. Entm't & Dev. Partners, L.P*, 34 A.3d at 267.  On November 26, 2011,

the State Court affirmed the revocation of the Debtor's License.  *Id.*  In its unsuccessful appeal,

as set forth above, the Debtor argued (among other things) that (i) "financial suitability" was an

unconstitutionally vague standard, and (ii) the Debtor's due process rights had been violated,

both procedurally (by revocation of the License via summary judgment and without adequate

discovery) and substantively (by imposition of the "excessive sanction" of revocation of the

License accompanied by loss of the License Fee).  *Phila. Entm't & Dev. Partners, L.P*, 34 A.3d

at 263, 279.[13]

The State Court found none of these arguments persuasive, and affirmed the Gaming

Board's Revocation Order, noting (among other things) that:

- the Debtor was on notice of the potential revocation and "had many opportunities to be heard," *Phila. Entm't & Dev. Partners, L.P*, 34 A.3d at 276–77;

- the Gaming Board's Revocation Order "was supported by undisputed facts of record," *id*.; and

- "revocation was not an excessive sanction under these circumstances.  [The Debtor] argues that revocation of its $50 million License as a result of its purported noncompliance was an unreasonably harsh sanction. . . .  In this case, however, a lesser sanction in the form of a daily $2,000.00 fine was imposed for more than a year, but, even together with the threat of revocation, it did not result in the achievement of the [Gaming] Board's objectives in [the Debtor's] case," *id.* at 279.

---

[13]      Indeed, at oral argument, the Debtor made a particular point of the fact that it "will be required to forfeit a $50 million licensing fee paid to the Board."  *Phila. Entm't & Dev. Partners, L.P*, 34 A.3d at 281 (dissenting opinion).

On March 29, 2011, the Pennsylvania Supreme Court denied the Debtor's Petition for Allowance of Appeal from the State Court Judgment. *Phila. Entm't & Dev. Partners, L.P. v. Pa. Gaming Control Bd.*, 615 Pa. 146, 41 A.3d 852 (2012) (denial of Petition for Allowance of Appeal).

### III.

### ARGUMENT

A.   **The Complaint Should be Dismissed Because this Court Lacks Subject-Matter Jurisdiction Over this Adversary Proceeding**

In evaluating a Federal Rule 12(b)(l) motion, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).[14] "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen*, 549 F.2d at 891. The plaintiff has the burden of proving that proper jurisdiction exists. *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006) (quoting *Mortensen*, 549 F.2d at 891). In this matter, there are two bars to the exercise of subject-matter jurisdiction by this Court – sovereign immunity, and the *Rooker-Feldman* doctrine, in tandem with claim and issue preclusion.

---

[14]   All references to "**Federal Rules**" are to the Federal Rules of Civil Procedure, as presently in effect. All references to "**Bankruptcy Rules**" are to the Federal Rules of Bankruptcy Procedure, as presently in effect.

1.     **The Complaint Should Be Dismissed Because the Defendants are Immune
from Suit Under the Doctrine of Sovereign Immunity**

The Debtor seeks the award of a money judgment in the amount of $50 million from the

Commonwealth and one of its executive agencies, the Department of Revenue.   Accordingly,

this action, against a sovereign state and an administrative agency of the sovereign, falls within

the scope of the Eleventh Amendment of the United States Constitution, which provides:

> The Judicial power of the United States shall not be construed to
> extend to any suit in law or equity, commenced or prosecuted
> against one of the United States by Citizens of another State, or by
> Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.  Although the Amendment expressly prohibits only suits against states

by citizens of other states, the Supreme Court long has held that the Eleventh Amendment also

bars suits against a state by its own citizens.  *See Edelman v. Jordan*, 415 U.S. 651, 662-63

(1974) (collecting cases).  Moreover, the immunity memorialized in the Eleventh Amendment

applies not just to the states themselves, but also to the agencies and instrumentalities of the

states. *See Demekpe v. Bd. of Trs. of the Cal. State Univ.,* 551 Fed. App'x. 338 (9th Cir. 2013).

Eleventh Amendment immunity is based on a two-part presupposition:  (i) "each State is

a sovereign entity in our federal system," *Seminole Tribe of Fla. v. Fla.,* 517 U.S. 44, 54 (1996);

and (ii) "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual

without . . . consent."  *Id.* at 54 (quotation marks omitted).  Notwithstanding the sweeping

language of the Eleventh Amendment and subsequent interpretations thereof, courts have held

that Congress may abrogate a state's Eleventh Amendment immunity if it (i) unequivocally

expresses an intent to do so, and (ii) acts "pursuant to a valid exercise of power."  *Green v.

Mansour,* 474 U.S. 64, 68 (1985) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S.

89, 98 (1984)).  Moreover, under certain circumstances, a state may also waive its immunity.

*See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 (1985).  Neither abrogation nor

waiver, however, applies to the claims asserted in the Debtor's Complaint, and the Eleventh

Amendment bars consideration of Debtor's claims by this Court.

### (i)    Abrogation

Pursuant to Section 106(a) of the Bankruptcy Code,[15] Congress purported to abrogate

state sovereign immunity as to certain specifically enumerated bankruptcy causes of action,

including those arising under Sections 542, 544, 548, and 550 of the Bankruptcy Code,

encompassing Counts I, II, III, and IV of the Complaint (although not Counts V, VI, and VII, as

to which sovereign immunity is not even purportedly abrogated).   The Third Circuit, however,

on the authority of *Seminole Tribe*, has held that Article I of the Constitution does not provide

Congress with the power to abrogate state sovereign immunity, and therefore Section 106(a) is

unconstitutional as applied to the states.   *Sacred Heart Hosp. of Norristown v. Pa. (In re Sacred*

*Heart Hosp. of Norristown),* 133 F.3d 237, 243, 245 (3d Cir. 1998) ("Having concluded that

Congress may not abrogate state sovereign immunity pursuant to any of its Article I powers, and

that there is no evidence that Congress enacted § 106(a) of the Bankruptcy Code pursuant to

section 5 of the Fourteenth Amendment, we hold that § 106(a) is unconstitutional to the extent

that it purports to abrogate state sovereign immunity in federal court.").[16]   *Sacred Heart* remains

the law in this Circuit.   Accordingly, state sovereign immunity has not been abrogated as to any

of the Counts in the Complaint.

---

[15]    All references to sections of the Bankruptcy Code are references to sections of title 11 of the
United States Code, 11 U.S.C. §§ 101 *et seq.*

[16]    Section 106(a) also acts as a *waiver* of sovereign immunity by the federal government.   Such
section's constitutionality as a federal government waiver was not at issue in *Sacred Heart.*

(ii)     **Waiver**

In the bankruptcy context, there are two possible waiver scenarios.  The first is a waiver specific to a particular proceeding, and arises when a state entity has brought itself into the bankruptcy process by filing a proof of claim.  In that event, courts have consistently held that such state entity has waived its sovereign immunity under Section 106(b) of the Bankruptcy Code, at least as to litigation involving the filed claim.  *See, e.g., Confederated Tribes of the Colville Reservation Tribal Credit v. White (In re White)*, 139 F.3d 1268, 1271 (9th Cir. 1998) (noting that "[t]he Supreme Court made clear in *Gardner v. New Jersey*, 329 U.S. 565 (1947), that when a sovereign files a claim against a debtor in bankruptcy, the sovereign waives immunity with respect to adjudication of the claim").  Neither of the Defendants have filed a proof of claim in the Debtor's bankruptcy proceeding.

The second is a general waiver with respect to the exercise by a bankruptcy court of its *in rem* jurisdiction, which the Supreme Court in *Centr. Va. v. Cmty. College v. Katz,* 546 U.S. 356 (2006), has determined all states made in connection with ratification of the U.S. Constitution. In *Katz,* the court-appointed liquidating trustee for the debtor, a bookstore business, brought a preference action against four state colleges seeking, in the alternative, "return of the 'value' of the preference, *see* 11 U.S.C. § 550, and return of the actual 'property transferred.'"  *Id.* at 372 n.10 (citation omitted).  The colleges moved to dismiss on the basis that the abrogation of state sovereign immunity contained in Section 106(a) of the Bankruptcy Code was unconstitutional, and, accordingly, the bankruptcy court lacked jurisdiction.  The bankruptcy court denied the motion, and the denial was affirmed by the district court and the Sixth Circuit.  The Supreme Court originally granted certiorari to decide the issue of the constitutionality of Section 106(a) of the Bankruptcy Code, but later it determined that it did not need to reach that issue. *Id.* at 361-62.

Instead, the Supreme Court determined that, properly viewed, abrogation of sovereign immunity as to a preference claim, when coupled with relief seeking return of the "property transferred," was unnecessary, because such claim and such relief were within the *in rem* jurisdiction of bankruptcy courts. Through ratification of the Bankruptcy Clause contained in Article I, section 8 of the U.S. Constitution, the court determined that states were deemed to have waived sovereign immunity with respect to such *in rem* jurisdiction:

> [T]he States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts.

*Katz,* 546 U.S. at 378 (footnote omitted).

A bankruptcy court's *in rem* jurisdiction is by nature limited in scope, as therefore is the waiver of sovereign immunity attendant to ratification of the Constitution. Indeed, the *Katz* court took care to note that:

> We do not mean to suggest that every law labeled a "bankruptcy" law could, consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity.

*Id.* at 378 n.15. Bankruptcy court *in rem* jurisdiction is confined to "an adjudication of interests claimed in a *res.*" *Id.* at 362 (quoting *Garnder v. New Jersey,* 239 U.S. 565, 574 (1947)). *See also Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004) ("A bankruptcy's court's *in rem* jurisdiction permits it to determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is one against the world." (quoting 16 J. Moore, *et al.*, MOORE'S FEDERAL PRACTICE § 108.70[1], p. 108-106 (3d ed. 2004) (alteration in original)). Consistent with the foregoing, an action is not *in rem,* but rather is *in personam,* when it seeks not to assert rights in or to recover specific, identifiable property, but rather is a claim for a money judgment against the defendant. *See, e.g., Koken v. AMCORP*

*Preferred Ins. Co.,* No. 1:CV-03-2052, 2004 U.S. Dist. LEXIS 5280, at *9 (M.D. Pa. Mar. 24, 2004); *In re Allen*, No. 13-14348 (GMB), 2013 Bankr. LEXIS 1965, at *29-30 (Bankr. D. N.J. May 10, 2013).

Moreover, even where a claim may relate to specific, identifiable property, such as the fraudulent transfer claims in this case, if the *relief* sought is not return of the specific property, but a money judgment in the amount of the value of the property, the proceeding ceases to be an exercise of *in rem* jurisdiction, and becomes *in personam.* For example, in *United States v. Nordic Village, Inc.,* 50 U.S. 30 (1992), decided before *Katz* and specifically distinguished by *Katz* (*see Katz,* 546 U.S. at 372, n.10), the Supreme Court considered an action by a trustee under Sections 549(a) and 550(a) of the Bankruptcy Code to recover a money judgment against the Internal Revenue Service ("**IRS**") in the amount of a post-petition transfer by the debtor to the IRS to pay a personal tax liability of an officer and shareholder of the debtor. The bankruptcy court granted judgment in favor of the trustee, and the judgment was subsequently upheld by the Sixth Circuit, notwithstanding an argument, made for the first time on appeal, that the action was barred by sovereign immunity. In rejecting that argument, the Sixth Circuit relied on the federal waiver of sovereign immunity contained in Section 106(a) of the Bankruptcy Code, as then in effect. *Nordic Village,* 503 U.S. at 31-32. The Supreme Court reversed.

In so doing, the Supreme Court first determined that insofar as Section 106(a) of the Bankruptcy Code constituted a valid waiver of sovereign immunity, such waiver did not extend to the award of a monetary judgment against the IRS. *Id.* at 37. The trustee, however, argued that the "bankruptcy court's *in rem* jurisdiction overrides sovereign immunity." *Id.* at 38. Although waiting until *Katz* to ultimately agree with that proposition, the Supreme Court rejected the applicability of any such override to the case before it in *Nordic Village*:

> [T]he premise of that argument is missing here, since [the trustee] did not invoke, and the Bankruptcy Court did not purport to exercise, *in rem* jurisdiction. [The trustee] sought to recover a sum of money, not "particular dollars," . . . so there was no *res* to which the court's *in rem* jurisdiction could have attached.

*Id.* at 38. In other words, when, regardless of the nature of the claim, the relief sought is a money judgment, the proceeding is not *in rem,* and any waiver or abrogation of sovereign immunity that would otherwise attach to the proceeding if it were an *in rem* proceeding does not apply.

Here, in Counts V (unjust enrichment), VI (unconstitutional takings), and VII (promissory estoppel), the debtor neither asserts claims nor seeks relief that invokes this Court's *in rem* bankruptcy jurisdiction. Such Counts do not seek adjudication of competing rights in a particular *res,* but rather, each such Count asserts a claim for monetary liability, and each seeks relief in the form of a money judgment. These causes of action therefore can be heard by this Court, if at all, only under this Court's *in personam* jurisdiction, and the *Katz* waiver of sovereign immunity in connection with *in rem* jurisdiction does not apply.

As for Counts II (federal fraudulent transfer), III (state fraudulent transfer), and V (recovery of the alleged fraudulent transfers), although the *claim* asserted may be *in rem* in nature (avoidance of the revocation of the License), the *relief* sought is strictly *in personam, i.e.,* a money judgment for the *value* of the License, not the return of the License itself. *See* Complaint, ¶ 114 ("[T]he Debtor is entitled to a judgment . . . directing that the Commonwealth or any immediate or mediate transferee of the Commonwealth, turn over to the Debtor the full value of the Avoided Transfer, which is Fifty Million Dollars"). Accordingly, any waiver of sovereign immunity that would otherwise have attached to Counts II, III, and IV if the relief sought were return of "the property transferred," is unavailable under the holdings in *Nordic*

*Village* and *Katz* when this Court is asked to step outside its *in rem* jurisdiction to award a money judgment for the "value" of the property.

Finally, Count I of the Complaint (turnover) nominally purports to stay within this Court's *in rem* jurisdiction, by seeking a money judgment on a "matured" debt, or in the alternative, an order requiring the Defendants "to deliver the License Fee to the Debtor." Complaint, ¶¶ 91–92. This is only wordplay, however. Since the License Fee was paid years ago, it is no longer (if it ever was) an identifiable *res,* having been commingled with other funds in the Gaming Fund as set forth above. Accordingly as a practical matter, there are no "particular dollars" to be recovered by the Debtor if it were to prevail under Count I, with the only relief available being a money judgment.[17]

Based on the foregoing, sovereign immunity deprives this Court of jurisdiction over the Debtor's Complaint, which should therefore be dismissed.

---

[17]    Moreover, Count I of the Complaint is not properly a claim at all, and would not, on its own, support the continued jurisdiction of this Court in any event. As set forth in more detail below, Section 542 of the Bankruptcy Code does not support relief for a debtor when the proposed property interest is in dispute, rather than acknowledged. *See, e.g., FLR Co. v. United States (In re FLR Co.),* 58 B.R. 632, 634 (Bankr. W.D. Pa. 1985) ("Implicit in the bankruptcy concept of turnover is the idea that the property being sought is clearly the property of the Debtor but not in the Debtor's possession. Turnover, 11 U.S.C. § 542, is not the provision of the Code to determine the rights of the parties in legitimate contract disputes.").

## 2.     The *Rooker-Feldman* Doctrine and Preclusion[18]

### (i)     *Rooker-Feldman*

The *Rooker-Feldman* doctrine is premised on 28 U.S.C. § 1257, which grants the

Supreme Court exclusive jurisdiction to review state court judgments, and arose out of two

Supreme Court cases from which it draws its name – *Rooker v. Fidelity Trust Co.,* 263 U.S. 413

(1923), and *District of Columbia of Appeals v. Feldman,* 460 U.S. 462 (1983).   The doctrine

prohibits the lower federal courts from exercising jurisdiction over a claim or cause of action if

the resulting judgment would have the effect of "overturn[ing] an injurious state-court

judgment."   *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 292 (2005).   Said

differently, *Rooker-Feldman* deprives lower federal courts of jurisdiction over cases that are

"essentially appeals from state-court judgments," *Great Western Mining & Mineral Co. v. Fox

Rothschild LLP,* 615 F.3d 159, 165 (3d Cir. 2010), and "is implicated when, in order to grant the

federal plaintiff the relief sought, the federal court must determine that the state court judgment

was erroneously entered or must take action that would render the judgment ineffectual."   *In re

Madera,* 586 F.3d 228, 232 (3d Cir. 2009) (quotations omitted).   More specifically, *Rooker-

Feldman* divests a court of jurisdiction where:   "(1) the federal plaintiff lost in state court; (2) the

plaintiff complain[s] of injuries caused by [the] state-court judgments; (3) those judgments were

rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to

---

[18]     The doctrines of claim preclusion (res judicata) and issue preclusion (collateral estoppel), although not strictly jurisdictional like *Rooker-Feldman,* serve similar policy goals and involve similar inquiries.   Thus, these preclusion doctrines are often considered by federal courts, including this Court, in tandem with the *Rooker-Feldman* doctrine when a federal court plaintiff seeks relief with respect to a matter as to which a state court has already rendered judgment.   *See, e.g., D'Angelo v. J.P. Morgan Chase Bank, N.A.,* 475 B.R. 424, 442-43 (Bankr. E.D. Pa. 2012). The Defendants will follow this convention.

review and reject the state judgments." *Great Western,* 615 F.3d at 166 (quotations omitted); *see also D'Angelo v. J.P. Morgan Chase Bank, N.A.,* 475 B.R. 424, 442 (Bankr. E.D. Pa. 2012).

As recognized by the Third Circuit, this Court, and courts across the country, bankruptcy courts are generally subject to the jurisdictional limitations of the *Rooker-Feldman* doctrine to the same extent as are other lower federal courts. *See, e.g., Baldino v. Wilson (In re Wilson),* 116 F.3d 87, 90-91 (3d Cir. 1997) (holding that the *Rooker-Feldman* doctrine applies to bankruptcy courts); *Besing v. Hawthorne (In re Besing),* 981 F.2d 1488, 1496 (5th Cir. 1993) ("The Bankruptcy Code was not intended to give litigants a second chance to challenge a state court judgment nor did it intend for the Bankruptcy Court to serve as an appellate court [for state court proceedings]") (quoting *In re G & R Mfg. Co.,* 91 B.R. 991 (Bankr. M.D. Fla. 1988)); *D'Angelo,* 475 B.R. at 442; *In re Lehigh Prop., Inc.,* 482 B.R. 127, 131 (Bankr. E.D. Pa. 2012). Some courts, including this Court in *In re Chandler,* 441 B.R. 452, 460-61 (E.D. Pa. 2010), the Ninth Circuit in *In re Sasson,* 424 F.3d 864 (9th Cir. 2005) (often considered the leading case), and Judge Frank in *Funches v. Household Fin. Consumer Dis. Co. (In re Funches),* 381 B.R. 471 (Bankr. E.D. Pa. 2008),[19] have noted that the scope of *Rooker-Feldman* may be limited in bankruptcy proceedings because of bankruptcy courts' ability under the Bankruptcy Code to entertain avoidance actions and to modify or discharge judgment claims. *See, e.g., Sasson,* 424 F.3d at 871. However, this ability acts to limit the extent to which judgments or the claims arising thereunder can be *enforced* against the limited assets of a debtor's estate, and does not

---

[19]     In addition to citing *Sasson, Funches* cites to foonote 22 of *In re Knapper,* 407 F.3d 573 (3d Cir. 2005) (a case cited below), in which the *Knapper* court, in dicta, cites to a Ninth Circuit case that makes the same observation as *Sasson* regarding the ability to "avoid" judgments in bankruptcy. *See Funches,* 381 B.R. at 484-85 (citing *Knapper,* 407 F.3d at 583 n.22). The actual holding in *Knapper* required dismissal of an action brought in bankruptcy court by a debtor on *Rooker-Feldman* grounds.

therefore give rise to an exception to the applicability of the core prohibition of *Rooker-Feldman,* which bars the review and reversal of the state court judgment *itself.*

Here*,* the Debtor is asking the Court to violate the core prohibition of the *Rooker-Feldman* doctrine, when each of the elements for application of the doctrine is met.  As to the first and third elements of *Rooker-Feldman,* the record before this Court establishes that the Gaming Board's Revocation Order and the State Court Judgment were entered, and became final, before the commencement of this adversary proceeding.  Similarly, satisfaction of the second element of *Rooker-Feldman* – whether the alleged injury was caused by a state court judgment – is satisfied.  In this proceeding, the Debtor's sole claim to injury arises from revocation of the License and forfeiture of the License Fee, each of which was the direct result of, and indeed effected by, the Gaming Board's Revocation Order and the affirmance thereof by the State Court Judgment.

With respect to the fourth *Rooker-Feldman* element – whether the plaintiff is inviting the court to "review and reject" a state court judgment – courts take a functional approach that looks not to whether there is a nominal identity of claims in the state and federal actions, but rather whether affording relief on the claims made in federal court would be equivalent to "hav[ing] the state-court decisions undone or declared null and void by the federal court."  *Great Western,* 615 F.3d at 173; *see also Taliaferro v. Darby Twp. Zoning Bd.,* 458 F.3d 181, 192 (3d Cir. 2006) ("Under the *Rooker-Feldman* doctrine, a district court . . . lacks subject matter jurisdiction, if the relief requested effectively would reverse a state court decision or void its ruling.").  As this Court itself has noted:

> So long as the federal plaintiff effectively seeks to negate the force of the judgment, it is not possible for the federal court to exercise jurisdiction without exercising appellate review of the validity of the state court judgment.

*D'Angelo*, 475 B.R. at 442 (quoting from *In re Sabertooth, LLC*, 443 B.R. 671, 685 (Bankr. E.D. Pa. 2011)).  *See also, Purpura v. Bushkin Gaimes*, 317 Fed. App'x. 263, 265 (3d Cir. 2009) (*per curiam*).   Under such circumstances, the federal claims are deemed to be "inextricably intertwined" with the state judgment, and the federal court is "in essence being called upon to review the state-court decision."  *Feldman*, 103 S. Ct. at 1315 n.16; *see also Great Western,* 615 F.3d at 170 (noting that "[w]hen a federal plaintiff brings a claim, whether or not raised in state court, that asserts injury caused by a state-court judgment and seeks review and reversal of that judgment, the federal claim is "inextricably intertwined" with the state judgment).[20]

Although the Debtor asserts a host of claims nominally different from those asserted in the State Court Action, the relief sought is precisely the same:  to avoid revocation of the License and recover the License Fee.  The fact that these theories of recovery were not directly raised before the State Court has no impact on the applicability of *Rooker-Feldman*, as the *relief* sought with respect to the Debtor's claims cannot be granted without, in effect, reversing the State Court Judgment, as such relief is directly contrary to the outcome before the Gaming Board and the State Court.  Simply put, however its claims are denominated, the Debtor is asking this Court to provide relief directly contrary to the result before the Gaming Board and in State Court.  Accordingly, if this Court were to provide such relief, it would "reduce the state court judgments to nullities," which is "precisely what *Rooker-Feldman* prohibits."  *In re Knapper*, 407 F.3d 573, 582 (3d Cir. 2005).  Therefore, *Rooker-Feldman* deprives this Court of jurisdiction to entertain the Debtor's action.

---

[20]   As one commentator observed:  "As illustrated by *Feldman*, an 'inextricably intertwined' claim . . . would be one not asserted or decided in state court but whose upholding in federal court would effectively undo the state court's judicial judgment."  Coquillette, *et al.,* 18 MOORE'S FEDERAL PRACTICE, § 133.30[3][c], at 133-30.9 (3d ed. 2006).  In other words, if the *relief* sought by the federal plaintiff includes the review and rejection of a state court judgment, the *Rooker-Feldman* doctrine applies.

(ii)    **Preclusion**

a.    *Claim Preclusion*

The purpose of claim preclusion, or *res judicata*, is to "relieve the parties of the cost and vexation of multiple lawsuits, conserve judicial resources, prevent inconsistent decisions, and encourage reliance on adjudications." *Balent v. City of Wilkes-Barre*, 542 Pa. 555, 566, 669 A.2d 309, 315 (1995) (citation omitted).   To establish the applicability of the doctrine, a party must show (i) a final judgment on the merits in a prior suit, (ii) involving the same parties or their privities, and (iii) a subsequent suit based on the same cause of action. *See id.* at 563 ("Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action."). [21]   As this Court has noted, the "same cause of action" requirement for claim preclusion purposes includes any cause of action that was or "*could have been*" brought in the prior suit. *See D'Angelo,* 475 B.R. at 442 (quoting *Olick v. House (In re Olick),* 2011 Bankr. LEXIS 2522, at *4 (Bankr. E.D. Pa. June 28, 2011) (emphasis added); *see also Balent*, 542 Pa. at 563 ("Res judicata applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action.") (citation omitted).

---

[21]    While federal common law has developed its own set of preclusion principles, if the decision allegedly precluding a later action was issued by a state court, then the federal courts must apply the preclusion principles developed by that state. *Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir.1988); *see Richard Johnson Honeyshine Shoe Express Services v. U.S. Equity Realty, Inc.,* 125 F.Supp.2d 695, 699 (E.D. Pa. 2000) (same); *In re Marks*, 192 B.R. 379, 383 (E.D. Pa. 1996) (same).  This derives from the Full Faith and Credit statute, 28 U.S.C. § 1738, requiring a court to give the same effect to a judgment that the issuing state would. *Gregory v. Chehi*, 843 F.2d at 116 (citing *Davis v. United States Steel Supply*, 688 F.2d 166, 170 (3d Cir.1982)); *In re Marks*, 192 B.R. at 384. Because it is the State Court Action that bars the relitigation of the issues determined therein, this Court must apply Pennsylvania preclusion principles to this case. Nevertheless, there is no material distinction between the Commonwealth's preclusion principles and federal preclusion principles in this District. *See First Options of Chicago, Inc.,* 913 F. Supp. at 383, n.8; s*ee also Meyers v. Kim,* 2001 Pa. Dist. & Cnty. Dec. LEXIS 201 at *11 (Lawrence Cty. Pa Ct. Com. Pleas, March 16, 2001).

All three elements of claim preclusion are present here.  First, the State Court Judgment constitutes a final judgment on the merits with respect to the lawful and proper revocation of the License, and forfeiture of the $50 million License Fee.  Second, although the Defendants were not named parties in the State Court Action, it is settled law that, even when a litigant was not a party to a prior action, it can assert claim preclusion defensively so long as it is in privity with a party to the prior action.   In this context, privity is a flexible concept that courts apply pragmatically.  As the Third Circuit has opined, "[p]rivity 'is merely a word used to say that the relationship between one who is a party on the record and another is close enough to include that other within the res judicata."  *Shah v. United States,* No. 13-2383, 2013 U.S. App. LEXIS 19906, at *7 (3d Cir. Sept. 30, 2013) (quoting *Marran v. Marran*, 376 F.3d 143, 151 (3d Cir. 2004)); *Meyers v. Kim,* 2001 Pa. Dist. & Cnty. Dec. LEXIS 201 at *9 (Lawrence Cty. Pa Ct. Com. Pleas, March 16, 2001)(same); *see also First Options of Chicago v. Kaplan*, 913 F. Supp. 377, 384 (E.D. Pa. 1996) ("The Third Circuit has long recognized that privity is a legal conclusion; the privity inquiry should be flexible enough to acknowledge the realities of parties' relationships.").  Among other grounds for finding privity is an alignment of interests.  *See, e.g., Adefumi v. City of Philadelphia,* 445 Fed. App'x. 610, 611 (3d Cir. 2011) (permitting defendant City of Philadelphia to invoke claim preclusion based on plaintiff's prior action against the Free Library because the City and the Free Library were in privity based on, *inter alia,* their "alignment of interests.").  Here, the Defendants' interests are aligned with the Gaming Board as all parties seek the uniform interpretation and enforcement of the Gaming Act in a manner consistent with the provisions thereof and of the associated regulations, and, as importantly, seek to protect the public policy and strong public interest behind the Gaming Act.  This shared

interest is sufficient, as set forth in *Adefumi*, to permit invocation of claim preclusion by the Defendants.

Third, as set forth above, the substance of the claims that the Debtor is asserting here – *i.e.,* the revocation of the License was wrongful, and the forfeiture of the License Fee was excessive – have not changed between the State Court Action and this adversary proceeding. Only the legal theories pursuant to which the Debtor asserts those claims has changed. Changing legal theories does not relieve a plaintiff from the operation of claim preclusion. *See Carpenter v. Ashby*, No. 06-1451, 2007 U.S. Dist. LEXIS 5264, *8 (E.D. Pa. Jan. 25, 2007) ("[M]ere difference in legal theory does not create a separate cause of action for purposes of claim preclusion."); *Adefumi v. City of Philadelphia*, 445 F. App'x at 610 ("We take 'a broad view of what constitutes identity of causes of action,' analyzing '(1) whether the acts complained of and the demand for relief are the same . . .; (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same …; and (4) whether the material facts alleged are the same.'") (citation omitted). Moreover, to the extent that the legal theories of fraudulent transfer, unjust enrichment, promissory estoppel, or unconstitutional takings have viability,[22] there was nothing precluding the Debtor from asserting them in the State Court Action. That it instead chose only to assert unconstitutional vagueness and due process deprivation does not protect the Debtor from preclusion of these other theories of relief. Accordingly, under the doctrine of claim preclusion, the Debtor may not now assert them in this action. *Cf. D'Angelo*, 475 B.R. at 443 ("The record before this Court does not disclose whether in fact the Debtors raised [forgery] as a defense in the State Court Proceedings. Nothing in the record suggests that the Debtors did not have a full opportunity to raise [forgery] in the State

---

[22] As set forth in more detail below, the Defendants assert that these legal theories neither had, nor now have, any viability.

Court Proceedings. . . .  The fact that the Debtors did not raise these defenses, or the fact that the

[state court] found them unavailing, may not be remedied by this Court.")

The Pennsylvania Supreme Court's decision in *Balent* is instructive.  The plaintiffs in

*Balent* first filed an inverse eminent domain action in which they sought compensation on the

grounds that the city's demolition of their building was a de facto taking.  Following the

dismissal of their action, the plaintiffs filed a second action in which they alleged various Fifth

and Fourteenth Amendment violations.  The court found that the doctrine of *res judicata* barred

the plaintiffs' second action, on the basis that:

> In [the first action], the court analyzed the Owners' action for
> compensation under the City's eminent domain and police powers,
> both claims having their basis in the Constitution.  In the instant
> action, the Owners attempt to ground their claim in the
> Constitution directly.  Granted, while the first action technically
> can be classified as an *in rem* proceeding and the second an *in
> personam* proceeding, this distinction is merely a technical one.
> Both actions involve compensation for the same property and the
> same exercise of power by the City.  The Owners' cause of action
> involves a determination of which power the City exercised and
> whether that power was validly exercised, this second
> determination being a Constitutional analysis as to whether the
> City acted reasonably to accomplish a legitimate police objective.
>
> * * *
>
> [A]s both claims are derived from the same cause of action --
> compensation for the destruction of the Owners' building --
> separate actions would require that the parties rehash the facts and
> legal arguments presented in [the first action], exactly the type of
> situation that the doctrine of res judicata is designed to avoid.

*Balant,* 542 Pa. at 566-67.

Likewise, the present adversary proceeding and the State Court Action originate from the

same allegedly wrongful acts – revocation of the License and forfeiture of the License Fee.  As

in *Balent*, adjudicating the Debtor's new theories of recovery would require the parties to

"rehash" the facts and legal arguments raised before the State Court.  In sum, application of the doctrine of res judicata bars the Debtor's claims here.

## b.    Issue Preclusion

Pennsylvania courts hold that issue preclusion (or collateral estoppel) prevents relitigation of issues previously determined by a court of competent jurisdiction.  *See Muse v. Cermak*, 428 Pa. Super. 199, 203, 630 A.2d 891 (1993).  Under Pennsylvania law, collateral estoppel applies when the following conditions are met:  (i) the issue sought to be precluded is the same as that raised in the prior case; (ii) the prior court issued a final judgment on the merits; (iii) the party against whom issue preclusion is asserted was a party or in privity with the party in the earlier case; (iv) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior action; and (v) the decision in the prior proceeding was essential to the judgment.  *See Pittsburgh v. Zoning Bd. of Adjustment*, 522 Pa. 44, 55, 559 A.2d 896, 901 (1989).  All five of the requirements for issue preclusion are met here. Indeed, based upon the facts alleged in the Complaint and the documents in the public record, factors (ii) through (v) are self-evident.  Accordingly, the only question here is whether the issue sought to be precluded is the same as that raised in the prior case.

Although the Debtor asserts a host of legal theories nominally different than those it asserted in the State Court Action, the issues that those theories raise are precisely the same as those addressed by the State Court:  whether (i) the License was lawfully revoked by the Gaming Board; and (ii) forfeiture of the License under the Gaming Act was appropriate.  Resolution of this case thus depends upon the interpretation and enforcement of Pennsylvania state law, and specifically, requires this Court to address whether the Gaming Board's revocation of the License and the forfeiture of the License Fee was lawful.  And while the Debtor may seek to hide behind the form of its claims to escape from collateral estoppel, even a cursory analysis of the

issues those claims raise lead to the inescapable conclusion that these are the very same issues addressed, and ruled upon, by the State Court. The State Court Action rendered a final, binding decision that, among other things: (i) the Debtor was afforded sufficient due process in connection with the revocation of its License; (ii) the Gaming Board's Revocation Order was supported by undisputed facts on the record; and (iii) revocation of the Debtor's License and forfeiture of the License Fee was not an excessive sanction. The Debtor is bound by those fully litigated issues, which are entirely inconsistent with the relief sought by the Debtor here.

**B.      If this Court Does Not Dismiss the Complaint for Lack of Subject-Matter Jurisdiction, it Should Abstain from Hearing this Adversary Proceeding**

**1.      This Court Should Permissively Abstain from Hearing this Adversary Proceeding**

Permissive abstention, codified in 28 U.S.C. § 1334(c)(1), authorizes a bankruptcy court to abstain from adjudicating a particular matter so that it may be heard in an alternative forum based on "the interest of justice, or in the interest of comity with State courts or respect for State law." "[S]ection 1334(c)(1) affords 'broad power to abstain whenever appropriate' and '[t]he abstention provisions of the Act demonstrate the intent of Congress that concerns of comity and judicial convenience should be met, not by rigid limitations on the jurisdiction of federal courts, but by the discretionary exercise of abstention when appropriate in a particular case.'" *In re Best*, 417 B.R. 259, 274 (Bankr. E.D. Pa. 2009) (quoting *Matter of Wood*, 825 F.2d 90, 93 (5th Cir. 1987) (alteration in original).

As an initial matter, and apart from concerns about state law *per se,* courts generally have been inclined to abstain when, although *Rooker-Feldman* might not apply for a particular reason, it remains the case that, as a practical matter, the bankruptcy court action is tantamount to an appeal of a state court proceeding. *See, e.g., D'Angelo*, 475 B.R. at 441 ("Where a party commences an adversary proceeding to obtain an alternative forum to litigate identical issues

that are the subject of state litigation, courts will find abstention to be appropriate."); *In re Perry,* 86 B.R. 388, 390 (Bankr. E.D. Pa. 1988) (abstaining under section 1334(c)(1) and noting that "the factual record has been made in another forum and we are asked to sit as an appellate court") (citing *Haun v. Retail Credit Co.,* 420 F. Supp. 859, 863 (W.D. Pa. 1976) (removal under 28 U.S.C. §§ 1441 *et seq.* is not to be allowed as an "'alternative appeal' route in federal court")); *In re Best,* 417 B.R. 259, 276 (Bankr. E.D. Pa. 2009) (noting the "most compelling reason" to grant permissive abstention under Section 1334(c)(1) is that "[a]llowing Debtor to proceed with the foreclosure proceeding [in Bankruptcy Court] would undermine and nullify [the foreclosure proceeding in state court]."). In the matter before this Court, this is precisely what the Debtor is attempting to do – "obtain an alternative forum to litigate identical issues." Accordingly, even if this Court otherwise has jurisdiction, this alone forms a basis for abstention.

Moreover, respect for state law also provides a compelling basis for this Court to abstain, as abstention is the appropriate course where there exists state constitutional law issues, or questions of "important State policy," *see, e.g., In re Boughton*, 49 B.R. 312, 316 (Bankr. N.D. Ill. 1985), and in particular, where the state policy is reflected in a comprehensive and complex regulatory scheme. *See, e.g., In re Stephen Smith Home For The Aged, Inc.*, 80 B.R. 678, 686 (Bankr. E.D. Pa. 1987). Courts in particular circumstances have considered up to twelve factors when determining whether discretionary abstention is appropriate out of respect for state law or otherwise, including:

> (1) the effect of abstention on the efficient administration of the bankruptcy estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the basis of bankruptcy jurisdiction, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather

> than the form of an asserted "core" proceeding; (8) the feasibility
> of severing state law claims from core bankruptcy matters to allow
> judgments to be entered in state court with enforcement left to the
> bankruptcy court; (9) the burden of the bankruptcy court's docket;
> (10) the likelihood that the commencement of the proceeding in
> bankruptcy court involves forum shopping by one of the parties;
> (11) the existence of a right to a jury trial; and (12) the presence in
> the proceeding of non-debtor parties.

*D'Angelo,* 475 B.R. at 440-41 (citation omitted).  Not surprisingly, however, because abstention doctrine is premised upon in respect for state courts and state law, primary consideration is often given to the second and third factors – the primacy of state law issues and the difficulty or unsettled nature of state law. *See In re Fruit of the Loom, Inc.,* 407 B.R. 593, 600 (Bankr. D. Del. 2009) ("Some factors are more substantial than others, such as . . . whether the claim involves only state law issues"); *see also In re Stephen Smith Home For The Aged, Inc.,* 80 B.R. 678, 683 (Bankr. E.D. Pa. 1987) (describing as an aspect of comity and federalism "the recognition of important state interests in the outcome of various disputes.") (internal citations omitted); *General American Communication Corp. v. Landsell (In re General American Communication Corp.),* 130 B.R. 136, 146 (S.D.N.Y. 1991) ("[T]he primary determinant for the exercise of discretionary abstention is whether there exist unsettled issues of state law.").

The Debtor purports to assert seven causes of action against the Defendants, some of which are federal and some of which are state, but all of which require a determination either that the revocation of the License or the forfeiture of the License Fee should be avoided or invalidated.  In other words, all of the Debtor's causes of action, federal and state, would require this Court to review, assess, and *invalidate* either the Gaming Board's exercise of authority granted to it under the Gaming Act to revoke the License, or the Gaming Act's provisions insofar as they provide for forfeiture of the License Fee.  Accordingly, no matter how the different causes of action are denominated, state law issues will predominate in this Court's consideration

of the Debtor's claims.  *See generally In re Reliance Group Hldgs., Inc.,* 273 B.R. 374, 396-97 (Bankr. E.D. Pa. 2002) (finding even where claims "present[ed] mixed questions of federal bankruptcy law and state law . . . because the state law issues must be decided first [in order to then determine the outcome of the bankruptcy causes of action] [the second] factor weighs more heavily in favor of abstention.").

Moreover, the state law at issue here is neither trivial in purpose nor simple in execution. As noted above, substantial public policy and public interest concerns underlie the Gaming Act and the associated regulations, and the Gaming Act and such regulations constitute a "complex, technical, and intertwined regulatory scheme."  *See Keystone Redevelop Partners, LLC v. Decker,* 674 F. Supp. 2d 629, 646 n.14 (M.D. Pa. 2009).  Further, it is a complex, technical, and intertwined regulatory scheme that the Commonwealth has specifically entrusted to an administrative body with particular expertise – the Gaming Board.  *Phila. Entm't & Dev. Partners, L.P. v. Pa. Gaming Control Bd.,* 34 A.3d 261, 267 (Pa. Commw. Ct. 2011) ("[I]n accordance with 4 Pa. C.S. § 1202(a)(1) of the Gaming Act, the [Gaming] Board has sole regulatory authority over the conduct of gaming and related activities in the Commonwealth, vesting broad discretion with the [Gaming] Board to administer all aspects of gaming industry in Pennsylvania.") (citation omitted); *Keystone Redevelop Partners, LLC,* 674 F. Supp. 2d at 646 n.14 ("[T]he Gaming Act contains provisions establishing certain policies that are within the particular expertise of the [Gaming Board].").  The interplay between interpretation and enforcement of a comprehensive state regulatory scheme, an adjudicatory body with particularized expertise given authority to manage that scheme, and abstention has been addressed in this District before in the case of *In re Stephen Smith Home for the Aged, Inc.,* 80 B.R. 678, 686 (Bankr. E.D. Pa. 1987).

In *Stephen Smith Home*, the debtor, the Stephen Smith Home for the Aged, brought an adversary proceeding in bankruptcy court against certain banks that were trustees of charitable trusts and the entity to which the debtor had sold certain assets, seeking a determination that the debtor was the rightful beneficiary of various charitable bequests.   The ultimate issue was "[w]hat property interests does the debtor possess which can be distributed to its creditors" under 11 U.S.C. § 541?   *Stephen Smith Home,* 80 B.R. at 682.   The bankruptcy court determined that it should abstain from resolving the questions of statutory construction involving "important state interests" presented by this issue with respect to the charitable bequests.   *See Id.* at 683-84, 685.

In so doing, the court first observed:

> The extensive oversight by the Commonwealth of Pennsylvania in charitable trusts within its jurisdiction is a matter of long-standing. . . .   State oversight of charitable trusts is accomplished by delegating to the state Attorney General the *parens patriae* powers of the Commonwealth. . . .   In addition to delegating this authority to the Attorney General, the state has also determined that the Orphans' Court Division of the Court of Common Pleas "with its control and direction of trustees in the use and disposition of property belonging to corporate charities, exercises broad visitorial and supervisory power of the Commonwealth and its jurisdiction is exclusive." . . .   Not only does the Orphans' Court supervise charitable trustees, resolve disputes concerning the trusts . . . and help determine the settlor's intent in establishing those trusts, but this state court also exercises "cy pres" power.

*Id.* at 684 (internal citations omitted).   In the face of this "extensive oversight" by the Commonwealth, and the "broad power" of the Orphans' Court, the bankruptcy court was unwilling to:

> construe a statue never interpreted before and to exercise discretion statutorily afforded the Orphans' Court, which has expertise in the matter and whose discretion must be exercised for the benefit of the citizens of the Commonwealth.

*Id.* at 685.   Instead, the court concluded that under these circumstances, the "dispute falls squarely within the parameters of § 1334(c)(1) and discretionary abstention is appropriate."   *Id.*

The parallels to the matter before this Court are striking. The Gaming Act and the associated regulations reflect "extensive oversight" by the Commonwealth over gaming activity in Pennsylvania. The Gaming Board, subject exclusively to *state court* review, *see* 2 Pa. C.S. § 702, has "broad power" to exercise that oversight on behalf of the Commonwealth. And the Debtor here is not simply asking this Court to construe the Gaming Act, it is asking this Court to *invalidate* an express provision of the Gaming Act regarding forfeiture of the License Fee. Accordingly, this proceeding, like the one in *Stephen Smith Home,* falls "squarely within the parameters of § 1334(c)(1) and discretionary abstention is appropriate." *Id.*

Moreover, the foregoing are not the only factors that militate in favor of abstention. The following additional factors favoring abstention are also met:

- **Efficient administration of the estate** – This proceeding has already advanced to confirmation of a plan of reorganization without the need to resolve this litigation. Accordingly, litigation of these claims, to the extent they are viable, can proceed in state court without delaying the progress of this case.

- **Jurisdictional basis other than 29 U.S.C. § 1334** – The Debtor alleges no alternative jurisdictional basis.

- **The substance of the claims asserted** – Although certain of the causes of action may be nominally core, allowing the Court to enter final judgment (which Defendants do not concede at this stage, *see Stern v. Marshall*, 564 U.S. ***, 131 S. Ct. 2594 (2011)), in substance the relief sought is the same as for all other Counts of the Complaint – a money judgment in the amount of $50 million – which implicates only this Court's *in personam* jurisdiction, not its core *in rem* jurisdiction. Moreover, granting the relief requested would require this Court to wade into – and invalidate part of – a complex state statutory and regulatory scheme that is well outside anything that could be considered "core." Even if certain Counts are properly considered core, this is not dispositive on the issue of permissive abstention when other, more important factors, counsel in favor of abstention. *See, e.g., Balcor/Morristown Ltd. P'ship v. Vector Whippany Associates*, 181 B.R. 781, 794 (D. N.J. 1995) ("[E]ven where a matter is clearly a core proceeding, discretionary abstention may be appropriate.") (citing *In re Ascher*, 128 B.R. 639, 645 (Bankr. N.D. Ill.1991); *In re Muir*, 107 B.R. 13 (Bankr. E.D.N.Y. 1989); *In Republic Reader's Serv., Inc*., 81 B.R. 422, 427 (Bankr. S.D. Tex. 1986).

- **Forum shopping** – It is clear that forum shopping is precisely what is going on here, with the Debtor hoping to avoid the effect of a Gaming Board order and a Commonwealth Court judgment *years* after each were entered.  As this Court has noted, it does not look favorably on a debtor's efforts to "render a nullity" the results of a state proceeding.  *In re D'Angelo*, 475 B.R. at 441.

- **Right to a jury trial** – The Defendants have a right to a jury trial on at least the fraudulent transfer claims.  *See, e.g., Kaliner v. MDC Sys., Inc.,* 2012 U.S. Dist. LEXIS 158694, at *3-6 (E.D. Pa. Nov. 5, 2012).

In sum, seven out of twelve of the abstention factors weigh in favor of abstention. However, as this Court itself has observed, "the weighting of factors is not a mathematical exercise."  *D'Angelo*, 475 B.R. at 441.   The presence of a complicated state statutory and regulatory scheme, a specialized administrative board to interpret and apply such scheme, and obvious forum shopping by the Debtor seeking to circumvent an adverse State Court Judgment, should be and are enough for this Court to discretionarily abstain from this matter.

**2.      Abstention Under the *Burford* Doctrine is Also Warranted**

While abstention under 28 U.S.C. § 1334(c)(1) is warranted in this case, there exists an independent basis for abstention:  the *Burford* abstention doctrine, which is designed to prevent federal courts from interfering with "a state's efforts to regulate an area of law in which state interests predominate and in which adequate and timely state review of the regulatory scheme is available." *Chiropractic America v. Lavecchia*, 180 F.3d 99, 104 (3d Cir. 1999) (citing *Burford v. Sun Oil*, 319 U.S. 315, at 332-34 (1943)).  "Based upon principals of federalism and comity, *Burford* abstention requires federal courts to abstain where the exercise of jurisdiction would unnecessarily interfere with the administration of a complex state regulatory system." *Capital Indem. Cor. v. Curiale*, 871 F. Supp. 205, 208 (S.D.N.Y. 1994) (citing *New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)).

The *Burford* abstention analysis reviews four different factors, looking first to whether timely and adequate state law review is available, *Matusow v. Trans-County Title Agency, LLC*,

545 F.3d 241, 247 (3d Cir. 2008) (quoting *Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir. 1995)),

and then determining: "(i) whether the particular regulatory scheme involves a matter of

substantial public concern; (ii) whether it is the sort of complex technical regulatory scheme to

which the *Burford* abstention doctrine is usually applied; and (iii) whether federal review of a

party's claims would interfere with the state's efforts to establish and maintain a coherent

regulatory policy." *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 304 (3d Cir. 2004)

(quoting *Chiropractic America*, 180 F.3d at 105)). Each of the facts is met here:

- Timely and adequate state court review is available with respect to provisions of the Gaming Act and actions of the Gaming Board (indeed, the Debtor has already availed itself of the Pennsylvania state courts in obtaining review). 2 Pa. C.S. § 702; 4 Pa. C.S. §§ 1204, 1904.

- The Gaming Act involves a matter of substantial public concern.

- The Gaming Act "exemplifies the type of complex, technical, and intertwined regulatory scheme to which *Burford* abstention is customarily applied." *Keystone Redevelop. Partners, LLC v. Decker*, 674 F. Supp. 2d 629, 646 and n.14 (M.D. Pa. 2009), *rev'd on other grounds*, 631 F.2d 89 (3d Cir. 2011) (holding first and second steps of *Burford* abstention doctrine satisfied).[23]

- A federal court's review of the Debtor's claims would interfere with the Commonwealth's efforts to establish and maintain a coherent regulatory policy governing the gaming industry. The remedy sought by the Debtor from this Court is, in effect, invalidation, on constitutional or other grounds, of either the revocation of the License, effected via the decision of the administrative body charged with administering and enforcing the Gaming Act or the Gaming Act's statutory License Fee forfeiture provisions. A request to invalidate the enforcement of, or the actual terms of, the provisions of a complex regulatory

---

[23]    The *Keystone Redevelop, Partners* court ultimately declined to apply the *Burford* doctrine to the case before it on the grounds that the final *Burford* factor (interference with regulatory policy) was not satisfied because the plaintiff, according to the court, was challenging the way the Gaming Board had "applied" the Gaming Act to "applicants with Atlantic City affiliations," and was not challenging "the content of the Gaming Act." *Id.* at 646. While it is difficult to understand how the court concluded that a review of the application of the Gaming Act to a category of applicants would not "interfere with the state's efforts to establish and maintain a coherent regulatory policy," here, the Debtor in fact directly challenges the content of the Gaming Act – its forfeiture provision.

scheme is precisely what the *Burford* doctrine discourages federal courts from doing.

The Third Circuit's decision in *Chiropractic America v. Lavecchia*, 180 F.3d 99 (3d Cir. 1999), is instructive. *Chiropractic* involved a federal constitutional challenge to certain medical benefits regulations under New Jersey's newly reformed no-fault automobile insurance law. The plaintiffs had sought a declaratory judgment that the state regulations violated the due process and equal protection clauses of the Fourteenth Amendment. The plaintiffs also sought an injunction preventing the State of New Jersey from implementing the regulations. *Id.* at 102. The district court abstained under the *Burford* doctrine, holding that:

> [T]imely and adequate state court review of the challenged regulations is available to plaintiffs, and that federal judicial review of the challenged regulations of the state regulatory agency may disrupt New Jersey's attempt to ensure a coherent policy in its treatment of the substantial local problem of automobile insurance reform. . . . [I]t is apparent that the Appellate Division of the Superior Court of New Jersey is the appropriate forum for adjudicating these issues.

*Chiropractic Am. v. Lavecchia,* No. 98-4986 (JBS), 1999 U.S. Dist. LEXIS 21508, at *2 (D. N.J. Feb. 8, 1999).  The Third Circuit affirmed and, in so doing, noted that automobile insurance has "typically been left to the states to regulate." *Chiropractic,* 180 F.3d at 107 (citations omitted). The court then held that federal intervention would prevent New Jersey from maintaining a coherent regulatory policy, as adjudication of the issues would require:

> an analysis of whether the challenged regulations . . . are consistent with the Legislature's attempt . . . to reform New Jersey's comprehensive no-fault insurance law [and] . . . turns upon an assessment of the rationality of the basis for the regulations, which would involves an examination of the administrative procedure and the substantive result of the state regulatory scheme.

*Id.*

Similarly here, the remedy sought by the Debtor is either invalidation of the License

revocation effected in accordance with a complex statutory and regulatory scheme in an area

typically left to state regulation, *see* 4 Pa. C.S. §§ 1102(1), 1202(a)(1), or the invalidation of a

specific statutory provision embedded in that complex scheme.   Accordingly, as in *Chiropractic,*

providing to the Debtor the relief requested requires "an assessment of the rationality of the"

Gaming Act and the enforceability of the provisions thereof, and "an examination of the

administrative procedure and substantive result" of the Gaming Act.   Such an assessment and

examination should rest solely with the Pennsylvania state courts, and this Court should decline

the invitation to exercise jurisdiction over the Debtor's claims on the basis of the *Burford*

doctrine.

**C.     If this Court Addresses the Merits of the Complaint, Each Claim Thereunder
        Should Be Dismissed Under Federal Rule 12(b)(6)**

Federal Rule 12(b)(6), which applies to this adversary proceeding through Bankruptcy

Rule 7012, governs a motion to dismiss for failure to state a claim upon which relief can be

granted.   The purpose of a motion to dismiss is to test the sufficiency of a complaint.   *Kost v.*

*Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).   The complaint "must contain either direct or

inferential allegations respecting all the material elements necessary to sustain recovery under

some viable legal theory."   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (quoting

*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).   Under *Twombly*, it

is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss;

"threadbare recitals of elements of causes of action, supported, by mere conclusory statements do

not suffice."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   To prevent dismissal all civil

complaints must now set out "sufficient factual matter" to show that the claim is facially

plausible. This then allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*; *see also D'Angelo*, 475 B.R. at 435.

"While the court draws all reasonable factual inferences in the light most favorable to a plaintiff, it rejects unsupported allegations, 'bald assertions,' and 'legal conclusions.'" *Retzlaff v. Horace Mann Ins.*, 738 F. Supp. 2d 564, 567 (D. Del. 2010) (citing, *inter alia*, *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). A complaint need not contain detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

1. **Count I Should Be Dismissed Because Section 542 of the Bankruptcy Code Does Not Provide a Debtor With an Independent Cause of Action**

Count I of the Complaint purports to state a claim for turnover of the License Fee. Turnover under Section 542 of the Bankruptcy Code is a *remedy* available to debtors to obtain what is *acknowledged* to be property of the bankruptcy estate. It does *not* provide a debtor an independent cause of action to reclaim property whose ownership is in dispute. *See, e.g., Creative Data Forms, Inc. v. Pennsylvania Minority Bus. Dev. Auth. (In re Creative Data Forms, Inc.)*, 41 B.R. 334, 336 (Bankr. E.D. Pa. 1984) ("If the debtor does not have the right to possess or use the property at the commencement of the case, a turnover action cannot be a tool to acquire such rights."), *aff'd*, 72 B.R. 619 (E.D. Pa. 1985), *aff'd*, 800 F.2d 1132 (3d Cir. 1986); *Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*, 198 B.R. 45, 50 n.7 (S.D.N.Y. 1996) ("'It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.'") (citation omitted); *FLR Co. v. United States (In re FLR Co.)*, 58 B.R. 632, 634 (Bankr. W.D. Pa. 1985)

("Implicit in the bankruptcy concept of turnover is the idea that the property being sought is clearly the property of the Debtor but not in the Debtor's possession.  Turnover, 11 U.S.C. § 542, is not the provision of the Code to determine the rights of the parties in legitimate contract disputes.").

It is clear from the allegations in the Complaint that the Debtor's claim to the License Fee is disputed.  The License was revoked, and by statute, the License Fee was forfeited.  Only by prevailing on one of its causes of action to either reverse the revocation of the License or invalidate the forfeiture of the License Fee can the Debtor make any claim to such fee.  Accordingly, a turnover action provides the Debtor with no right to assert a claim to the License Fee.  Count I should therefore be dismissed.

### 2. Count II Should Be Dismissed Because the Alleged Transfer Took Place Outside of the Two-Year Look-Back Period Under Section 548 (a)(1)(B)

In Count II of the Complaint, the Debtor seeks to reverse the purportedly fraudulent revocation of the License under Section 548(a)(1)(B) of the Bankruptcy Code, which applies to "constructive fraudulent transfers."  *See OHC Liquid. Trust v. Nucor Corp*., 325 B.R. 696, 698 (Bankr. D. Del. 2005).  Under Section 548(a)(1)(B), a fraudulent transfer may be avoided only if it was made on or within two years of the debtor's bankruptcy.  Accordingly, in order for the Debtor to assert a claim under Section 548 of the Bankruptcy Code, the alleged transfer must have been made or incurred on or after April 1, 2012 – *i.e.,* two-years before the Petition Date.

The alleged transfer here at issue – the revocation of the License – occurred on December 23, 2010.  Complaint, ¶ 60.  On that date, the Gaming Board's Revocation Order was a final order unless a stay pending an appeal was obtained.  58 Pa. Code § 494a.11(b) ("The filing of an appeal will not stay enforcement of the decision or final order of the Board unless a stay is obtained from the court upon application in accordance with the Rules of Appellate Procedure,

or the Board grants a stay prior to the filing of the appeal"); *see also* 4 Pa. C.S. § 1326(b)

("authorization to conduct the previously approved activity shall *immediately cease* and all fees

paid in connection therewith shall be deemed to be forfeited") (emphasis added).  No such stay

was even sought, much less obtained, by the Debtor.  Accordingly, the revocation was not stayed

or otherwise held in abeyance as a result of the subsequent appeal taken by the Debtor.  Even if a

stay of the Gaming Board's Revocation Order had been obtained, the State Court entered the

State Court Judgment on November 10, 2011, Complaint, Exhibit I, after which the Debtor filed

a Petition for Allowance of Appeal (again without seeking a stay),[24] which was denied by the

Pennsylvania Supreme Court on March 29, 2012.[25]  This date is also outside the two-year

look-back period, and the Debtor chose not to seek reconsideration of that decision.

Notwithstanding the clear language of the Gaming Act and the associated regulations

regarding when a license revocation becomes effective, as well as the Debtor's failure to seek a

stay *at any level of the process,* the Debtor, in an effort to come within the two-year period of

Section 548(a)(1)(B) simply asserts, without supporting authority, that the revocation was not

"final" until April 14, 2012, the alleged last date on which the Debtor could have (but did not)

seek reconsideration of the Pennsylvania Supreme Court's order denying allowance of an appeal.

Complaint, ¶ 72.  In other words, the Debtor contends that the License was not revoked until the

Debtor had exhausted, or declined to pursue, its appellate options.  That contention finds no

support under Pennsylvania law generally or the Gaming Act specifically.  Accordingly, the

---

[24]     Under Pennsylvania law, absent a stay, a judgment from a lower tribunal is final unless and until
it is reversed by a higher tribunal.  *Kuriakose v. Workmen's Compensation Appeal Bd.,* 681 A.2d
1389, 1392 (Pa. Commw. Ct. 1996) .

[25]     *See Philadelphia Entm't & Dev. Partners, L.P. v. Pa. Gaming Control Bd.,* 615 Pa. 146 (2012)
(denial of Petition for Allowance of Appeal).

Debtor has failed to state a claim for relief under Section 548(a)(1)(B), and Count II should be dismissed.

### 3. Counts II, III, and IV Should Be Dismissed Because the Revocation of the License Was Not a Transfer That is Constructively Fraudulent Within the Meaning, Intent, and Underlying Policy of Fraudulent Transfer Law

The Debtor is barred by the relevant look-back periods from seeking to avoid its payment of the License Fee to the Gaming Board in 2007.[26]  The Debtor thus targets the Gaming Board's revocation of the License in 2010 as the fraudulent transfer.  The Debtor's attempt to avoid the lawful prepetition revocation of the License as fraudulent also meets a dead end.  It is well settled in the analogous context of executory contracts that prepetition termination pursuant to a contract's terms and applicable law does not constitute a transfer to which the fraudulent transfer statutes were intended to apply.  The fact that the Debtor's privileges and obligations arose from the License in this case, as opposed to a contract, is a distinction without a difference, because the policy consideration underlying courts' refusal to apply fraudulent transfer law to the prepetition termination of a contract apply with equal force to the prepetition termination of a license.

Additionally, even if, as a policy matter, termination of contracts or licenses would otherwise be within the nominal ambit of fraudulent transfer law, such termination does not result in a "transfer" of any property rights.  When rights to property have been extinguished under applicable law, there is no transfer of the debtor's property, a required element of both federal and state fraudulent transfer law.  Accordingly, the lawful prepetition revocation of the License is not a fraudulent transfer and Counts II, III and IV should be dismissed.

---

[26]     As noted above, Section 548(a)(1)(B) has a look-back period of two years.  The PA Fraudulent Transfer Act has applicable to it four-year look-back period.  12 Pa. C.S. § 5109(1).

### (i) The Prepetition Termination of a License Pursuant To Applicable Law is Not Covered by Fraudulent Transfer Law

If a court permitted a debtor to "reinstate an otherwise valid prepetition termination of an executory contract," merely by treating the termination as a transfer subject to avoidance "'every validly terminated executory contract [would become] revivable by a debtor by simply initiating bankruptcy proceedings. Such a holding is not only unwarranted, but contrary to the intent of the drafters of the code.'" *In re 421 Willow Corp.*, No. Misc. 03-182, 2003 U.S. Dist. LEXIS 18029, at *15 (E.D. Pa. Oct. 9, 2003) (quoting *In re Coast Cities Truck Sales, Inc.,* 147 B.R. 674, 678 (D.N.J. 1992) *aff'd sub nom Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 5 F.3d 1488 (3d Cir. 1993))*; see also In re Egyptian Bros. Donut, Inc.*, 190 B.R. 26, 31 (Bankr. D.N.J. 1995) (same); *In re Durso Supermarkets, Inc.,* 193 B.R. 682, 700 (Bankr. S.D.N.Y. 1996) ("[T]he commercial ramifications of reading Section 548 too literally so as to allow it to be used to avoid a pre-petition, ordinary course of commercial business, non-collusive termination of an executory contract [or lease] in accordance with its terms when the Debtor has materially defaulted under the contract would be devastating.") (quoting *In re Metro Water & Coffee Servs., Inc.*, 157 B.R. 745 (Bankr. W.D.N.Y. 1993)).[27]   The PA Fraudulent Transfer Act similarly

---

[27]   Construing Section 548 of the Bankruptcy Code to allow for what would amount to be a revival of a terminated contract would also fly in the face of Section 365(c)(3), which provides that a debtor may not assume or assign an executory contract or unexpired lease if such lease is of nonresidential property and has been terminated under applicable non-bankruptcy law prior to the order for relief.  The courts which have addressed the interaction between Sections 365(c)(3) and 548 have found the former the more specific section of the Bankruptcy Code as compared to Section 548 and therefore, it is to be given effect to the extent it conflicts with the more general provisions of Section 548.  *See In re 421 Willow Corp.,* 2003 U.S. Dist. LEXIS 18029, at *11-12 ("[D]ecisions from the courts in this Circuit have addressed this very issue to find that lawful prepetition termination of a contract or lease agreement does not constitute a transfer, with each case reasoning that an overbroad reading of the "transfer" language within the meaning of Bankruptcy Code Sections 547 and 548 would conflict with the specific language of Bankruptcy Code Section 365.")*; In re Egyptian Bros. Donut, Inc.*, 190 B.R. at 30 (holding that debtors could not avoid prepetition termination of franchise agreements since such a consequence requires an overly broad application of Sections 547 and 548, violates the express language of Section 365(c)(3), and significantly and adversely affects ordinary commercial contractual relationships).

provides that "[a] transfer is not fraudulent . . . if the transfer results from . . . termination of a lease upon default by the debtor when the termination is pursuant to the lease and applicable law," thereby making clear that a debtor may not revive a terminated lease through state fraudulent transfer law.  12 Pa. C.S. § 5108(e)(1).

The forgoing cases and statutory provision acknowledge that fraudulent transfer law is not intended to insulate a debtor from the consequences of a breach of its performance obligations.  Likewise, fraudulent transfer law is not designed to increase a debtor's property rights.  Rather, fraudulent transfer laws seek to preserve a debtor's assets.  *See, e.g., In re 130/40 Essex St. Dev. Corp.*, 03-40944, 2008 Bankr. LEXIS 4017, at *14 (Bankr. S.D.N.Y. Oct. 22, 2008) ("Fraudulent conveyance statutes are primarily designed and intended to prevent deprivations that are the result of intentional fraud or constructive fraud resulting from wrongful or unwarranted participation on the part of the debtor, whether by omission or commission."); *In re Durso Supermarkets, Inc.,* 193 B.R. 682, 700 (Bankr. S.D.N.Y. 1996) ("The fraudulent conveyance statutes are intended to prevent an insolvent or undercapitalized debtor's estate and its creditors from being wrongfully deprived of assets which could be otherwise utilized for the payment of creditors.  They are not intended to insure that creditors will never be deprived of a valuable asset.") (citation omitted).  For this reason, the prepetition termination of a contract pursuant to the contract's terms and applicable law does not constitute a fraudulent transfer.  *See, e.g., In re 421 Willow Corp.*, 2003 U.S. Dist. LEXIS 18029, at *15 (denying the debtor's motion for a stay and expedited hearing because it could not show a likelihood of success on its fraudulent transfer claim since a prepetition termination of a lease does not constitute a transfer and finding otherwise would raise "[s]ignificant policy considerations"); *In re Coast Cities Truck Sales, Inc.,* 147 B.R. at 678 (termination of a dealership agreement could not be deemed a

fraudulent transfer); *In re 130/40 Essex St. Dev. Corp.*, 2008 Bankr. LEXIS 4017, at *16 (dismissing the debtor's fraudulent conveyance claims because "a pre-petition non-collusive termination of a commercial lease in accordance with the terms of the lease and statutory procedure 'by reason of a Debtor's material defaults, is, as a matter of law, not a transaction or transfer which is actually or constructively fraudulent within the meaning, intent, and underlying policy of these fraudulent conveyance laws.'") (quoting *In re Metro Water & Coffee Services*, 157 B.R. 742, 746 (Bankr. W.D.N.Y. 1993)); *In re Durso Supermarkets, Inc.*, 193 B.R. at 700-1 (finding that prepetition termination of a lease under its terms and applicable law was not fraudulent and stating that "the termination of the lease, due to [the debtor's] material default, did not wrongfully deprive the creditors of the estate of rights to which they would be entitled.").

The fact that the Debtor's privileges and obligations arose from the License in this case, as opposed to a contract, is not relevant for purposes of applying the same analysis here. The License granted certain privileges (in contract terms, rights) to the Debtor while providing for revocation of the License upon failure of, or lack of compliance with, certain conditions (in contract terms, events of default). Equally imbued within the License were both the statutory privilege to operate a gaming facility, *and* the right of the Gaming Board to revoke the Debtor's License upon the Debtor's failure to satisfy its obligations under the Gaming Act or applicable Gaming Board orders or conditions. Indeed, the Commonwealth's statutory and regulatory scheme for slot machine licenses clearly establishes that a license is nothing more than a "revocable privilege," "conditioned upon the proper and continued qualification of the licensee." 4 Pa. C.S. § 1102(7).[28]

---

[28]    As the license is merely a privilege, the license is non-transferable, the licensee may not grant any security interest in the license, and the licensee is restricted to operating the approved project at the approved location. 4 Pa. C.S. §§ 1327-29.

Based on the forgoing, the Gaming Board's right to revoke the Debtor's License in accordance with the Gaming Act was an intrinsic attribute of the Debtor's putative property interest. The Gaming Board's lawful termination of the License, as confirmed by the State Court, therefore did not deprive the Debtor of a property right it was entitled to retain. *See, e.g., Village of Rosement v. Jaffe*, 482 F.3d 926, 937 (7th Cir. 2007) (holding that state gaming board's revocation of the debtor's gaming license extinguished any property rights in the license because "whatever property right the [gaming] license conferred [on the debtor] has always been subject to, or conditioned on, the regulatory powers of the state."). The Debtor enjoyed the privileges of the License subject to remaining compliant with the Gaming Act and the Gaming Board's rules and regulations. Upon the Debtor's failure to remain compliant, it had no more right to the License than a defaulting party to a lawfully terminated contract has to the rights it held thereunder. *See In re Wey,* 854 F.2d 196, 199 (7th Cir.1988) ("Possession of expired rights is the equivalent of the possession of no rights."). And just like a debtor may not revive an executory contract lawfully terminated prepetition – because the debtor has no protectable rights in such contract – the Debtor lost any alleged protectable property interest when it failed to comply with the Gaming Act and the Gaming Board's regulations and orders. In other words, the Debtor's rights under the License were conditional, not absolute, and after the Gaming Board's Revocation Order, the Debtor no longer had any protectable property interest.

To belatedly permit the Debtor to revive the License through federal and state fraudulent transfer law would fly in the face of the purpose and intent of fraudulent transfer laws: to preserve a debtor's legitimate property interests for the benefit of the debtor and its creditors. The License was validly terminated pursuant to the Gaming Act and the Gaming Board's charge to enforce the same, and the State Court affirmed the Gaming Board's Revocation Order. To

now permit the Debtor to revive the License through the fraudulent transfer laws would not preserve the Debtor's property interests, it would grant the Debtor rights which it did not otherwise have under state law, and provide a windfall to the Debtor, its estate, and its creditors to the detriment of the Commonwealth and its tax paying citizens.  Just like a lawful and non-collusive termination of a contract or lease may not be deemed a transfer subject to avoidance under sections 544 and 548, so too a lawful termination of a license should not be subject to avoidance to permit a debtor to recapture that which was lawfully revoked.[29]

>    **(ii)**    **When Rights to Property Have Been Extinguished Under Applicable Law, There is No Transfer of the Debtor's Property**

While policy and statutory interpretation alone are enough for most courts to conclude that the lawful termination of a contract cannot be a fraudulent transfer as a matter of law, certain courts have gone one step further and held that, when rights to property have been extinguished under an executory contract or applicable law, there was no transfer of the debtor's property *at all*, a required element of both federal and state fraudulent transfer law.  *See* 11 U.S.C. § 548(a)(1) ("The trustee may avoid any *transfer* . . . of an interest of the debtor in property.") (emphasis added); 12 Pa. C.S. § 5104 and 5105 ("A *transfer* made or obligation incurred by a debtor is fraudulent as to a creditor.") (emphasis added).  As one court observed:

>    Section 548 has never been construed, nor was it intended, to afford debtors the option of reinstating involuntarily terminated executory contracts.  A necessary element for the relief sought by plaintiff under § 548 is a transfer. . . .  Coast Cities possessed no rights as a matter of law which it could relinquish since the contract between Navistar and the debtor expired by its own terms.

---

[29]    As an additional policy point specific to governmental units, and as set forth below, the License was not a property interest as to which the Debtor is entitled to compensation under the takings clauses of either the Pennsylvania Constitution or the U.S. Constitution as a result of its revocation.  It would be an anomalous policy outcome indeed if fraudulent transfer law could be used against a governmental unit as an "end run" around the unavailability of a takings claim.

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co. (In re Coast Cities Truck Sales, Inc.)*,

147 B.R. at 677-78.  Similarly:

> The termination of the right to perform on an executory contract,
> according to the terms of that contract, differs from a transfer of
> property in this sense: the rights terminated, unlike property, are
> transformed.  At the option of the terminating party, the rights may
> simply disappear, or as with other kinds of property, may be
> dispersed, reconveyed or retained.

*Creditors' Comm. for Jermoo's Inc. v. Jermoo's Inc. (In re Jermoo's Inc.)*, 38 B.R. 197, 204

(Bankr. W.D. Wis. 1984); *see also In re Wey*, 854 F.2d at 199 (upon default under an executory

real estate purchase contract, "what actually occurred when [the debtor] defaulted was an

extinguishment of his Equity interest in the hotel, not a transfer.").

A termination of a debtor's rights under a contract cannot be a transfer because the

debtor's legal right to the property extinguishes when the terms of the contract are not satisfied.

Thus, what actually occurs when a debtor defaults under an agreement is an extinguishment of its

contractual rights, not a transfer.  Likewise here, upon entry of the Gaming Board's Revocation

Order, the Debtor's legal right to operate a gaming facility was lawfully revoked.  There was no

transfer of an interest.   Rather, upon the Gaming Board's revocation of the License, the

"authorization to conduct the previously approved activity . . . immediately cease[d] and all fees

paid in connection therewith [were] deemed to be forfeited."  4 Pa. C.S. § 1326(b).  In other

words, the Debtor's rights were extinguished.

Accordingly, whether this Court holds that the lawful revocation of the License cannot be

a fraudulent transfer as a matter of law based on policy and statutory interpretation grounds, or

that the revocation of the License was not a transfer at all, Counts II, III and IV should be

dismissed.

**4.      Count III Should Be Dismissed Because No Actual Creditor with Actual Standing Under State Law Was or Could Be Alleged**

In Count III, the Debtor seeks to reverse the revocation of the License under Section 544(b) of the Bankruptcy Code as a fraudulent transfer under Pennsylvania's version of the Uniform Fraudulent Transfer Act, 12 Pa. C.S. §§ 5101, *et seq.* (the "**PA Fraudulent Transfer Act**").  Complaint, ¶¶ 105-110.  Section 544(b) of the Bankruptcy Code permits "the trustee [or debtor-in-possession] [to] avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is *voidable under applicable law by a creditor holding an unsecured claim* that is allowable under section 502."  11 U.S.C. § 554(b) (emphasis added).  In light of the statutory language, courts have held that:

> The avoidance power provided in section 544(b) is distinct from others because a trustee or debtor in possession can use this power *only* if there is an unsecured creditor of the debtor that *actually* has [standing to assert] the requisite nonbankruptcy cause of action.

*In re Cybergenics Corp.,* 226 F.3d 237, 243 (3d Cir. 2000) (emphasis added).  Said somewhat differently:

> [S]ection 544(b) does not create a substantive right to avoid transfers.  Instead, it merely creates a status and allows applicable nonbankruptcy law to determine the rights that accrue as a result of the created status.

*Grubbs Const. Co. v. Fla. Dep't of Revenue (In re Grubbs Constr. Co.)*, 321 B.R. 346, 350 (Bankr. M.D. Fla. 2005) (citations omitted).

Two consequences flow from the unique nature of a cause of action under 544(b), which is in effect a derivative action.  The first consequence is a pleading requirement.  A debtor in an action under Section 544(b) must actually "allege the existence of an actual creditor with an allowable claim that could have avoided" the transfer at issue.  *D'Angelo,* 475 B.R. at 438; *see also, In re Sverica Acquisition Corp., Inc.*, 179 B.R. 457, 465 (Bankr. E.D. Pa. 1995) (holding

that it is critical "that Defendants have proper notice of the identity of the alleged creditor in order that they might confirm or deny the validity of that entity's claim").  The Debtor here has failed to make any such allegation in the Complaint, and Count III is therefore subject to dismissal on that basis alone for failure to state a claim.  *See D'Angelo,* 475 B.R. at 438 (dismissing claim under Section 544(b) for failure to allege actual creditor with an allowable claim).  The second consequence is that even if such a creditor were alleged, the Debtor still bears the burden of proving that such creditor exists, and that such creditor *could have avoided* the revocation of the License under state law.  *See Cybergenics,* 226 F.3d at 243 (requiring that the actual creditor have actual standing); *see also  Jurista v. Amerinox Processing, Inc.,* 492 B.R. 707, 734 (D. N.J. 2013) (stating that to "avoid a transfer under section 544(b), the trustee must prove by a preponderance of the evidence that there is a (1) creditor, (2) holding an allowable unsecured claim, and (3) there is a transfer of an interest of the debtor in property, (4) that is voidable under state law) (citing *In re Forbes,* 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007)).

In Pennsylvania, there can be no such creditor, because sovereign immunity prohibits a claim against the Commonwealth or its agencies under the PA Fraudulent Transfer Act.  As a general proposition, the Commonwealth has, by statute, affirmed its immunity from suit.  *See* 1 Pa. C.S. § 2310.  While the Commonwealth has waived sovereign immunity for certain specified negligence actions, *see* 42 Pa. C.S. § 8522, and in connection with certain contractual claims, *see* 62 Pa. C.S. § 1702, neither of these waivers encompasses actions to recover a fraudulent transfer. Accordingly, there is no creditor that would have standing to bring the avoidance action that the Debtor purports to assert in Count III under Section 544(b), and therefore the Debtor lacks standing to do so as well.

The *Katz* waiver of sovereign immunity with respect to *in rem* causes of action does not change this result.  The issue here is the statutory construction of 544(b), which, under the authority of *Cybergenics*, requires an actual creditor to have actual standing.[30]  This in turn depends not on whether the Defendants waived sovereign immunity with respect to Section 544(b) (which is where the *Katz* waiver, if applicable at all, would apply), but whether they waived sovereign immunity with respect to the *PA Fraudulent Transfer Act*.  There is nothing in *Katz*, which based its *in rem* waiver analysis on the presence of the Bankruptcy Clause in the Constitution at the time of state ratification, that suggests that by ratification of the Constitution, the states waived sovereign immunity with respect to *state* fraudulent transfer statutes that are nowhere to be found in the Constitution.  *See Dillworth v. Ginn (In re Ginn-La St. Lucie Ltd., LLP),* No. 08-29769-BKC-PGH, 2010 Bankr. LEXIS 6325, at *25-30 (S.D. Fla. December 10, 2010).  Accordingly, Count III must be dismissed for failure to state a claim, regardless of whether the Debtor were to allege the existence of an actual creditor in its Complaint.[31]

---

[30]    Relying on the language of Section 106(a), and its specific inclusion of actions under Section 544(b), some courts have held – as a matter of harmonizing the interpretation of the two statutes -- that the requirement articulated in *Cybergenics* of actual standing is, in effect, eliminated if the impediment to standing is sovereign immunity.  *See, e.g., In re C.F. Foods, L.P.*, 265 B.R. 71, 84-86 (Bankr. E.D. Pa. 2001) (Carey, J.); *Zazzali v. Swenson (In re DBSI, Inc.)*, 2011 Bankr. LEXIS 791, at *6 (Bankr. D. Del. Feb. 11, 2011); *In re Pharm. Distrib. Servs., Inc.*, 455 B.R. 817, 821 (Bankr. S.D. Fla. 2011).  These cases, however, involved federal defendants, as to which Section 106(a) remains a valid *waiver* of sovereign immunity, even as it is, in this Circuit, an invalid *abrogation* of sovereign immunity as to the states.  Accordingly, although the interplay of Sections 106(a) and 544(b) is relevant to the issue of statutory construction in cases involving federal defendants, it is not relevant here.  Moreover, the one circuit level decision addressing the interplay between the two sections reached the result opposite to that of the cases allowing the 544(b) action to proceed.  *See In re Equip. Acquisition Resources*, 742 F.3d 743, 748 (7th Cir. 2014) ("Nothing in Section 106(a)(1) gives the trustee greater rights to avoid transfers than the unsecured creditor would have under state law").

[31]    *But see David Cutler Indus., Ltd. v. Pa Dep't of Revenue (In re David Cutler Industries, Ltd.)*, 471 B.R. 110 (Bankr. E.D. Pa. 2012), in which the court, relying on *DBSI*, held that an avoidance action against the Department of Revenue could be maintained under Section 544(b) notwithstanding that sovereign immunity would be a bar to an action by any actual creditor.  The court in *David Cutler* appears not to have been properly advised by the parties regarding applicable law, and the decision should not be followed by this Court.  In particular, it appears the

5. **Count V Should Be Dismissed Because Revocation of the License Did Not Constitute a Taking Requiring Compensation Under Either the Pennsylvania Constitution or the U.S. Constitution**

Article I, Section 10 of the Pennsylvania Constitution provides, in relevant part:

> [N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.

PA. CONST., Art. 1, § 10.

Similarly, the Fifth Amendment of the U.S. Constitution, made applicable to states by the Fourteenth Amendment, provides, in relevant part:

> No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. CONST., Amend. 5 (with Pa. Const., Art. 1, § 10, the "**Takings Clauses**").  In each instance, by their terms these constitutional sections are triggered by a "taking" of "private property."

Pennsylvania can, and does, regulate gaming in the Commonwealth.  This it is free to do, as there is no constitutional right to gamble.  *See United States v. Edge Broad. Co.,* 509 U.S. 418, 426 (1993) ("gambling . . . implicates no constitutionally protected right"); *see also Commonwealth v. Wida*, No. CR-79-27, 1979 Pa. Dist. & Cnty. Dec. LEXIS 189, at **6-7 (C.P. Northumberland Cty., Pa., June 20, 1979) and cases cited therein.  Gaming licenses in Pennsylvania, as set forth above, are issued in accordance with the terms and conditions of the Gaming Act, which was enacted as an exercise, among other things, of the Commonwealth's police power.  *See* 4 Pa. C.S. § 1102.  Such licenses, including the License, are subject to

---

parties did not draw the court's attention to the fact that *DBSI* involved a federal defendant, or that Section 106(a) under *Sacred Heart Hospital* is an invalid *abrogation* of state sovereign immunity, because in reaching its decision, the court observed that, "I find it compelling that 11 U.S.C. § 106(a) expressly incorporates all of § 544 – *subsections (a)* and *(b)* both – in abrogating the power of a governmental unit to assert sovereign immunity."  *David Cutler,* 471 B.R. at 112, n.4 (emphasis in original).  The language of Section 106(a) is not relevant to an interpretation of Section 544(b) for purposes of an action under 544(b) against a state governmental unit.

extensive terms and conditions, statutory and otherwise, and are revocable in the event that such

terms and conditions are not met:

> The [Gaming Board] shall have the power and its duties shall be
> to: (1) . . . revoke . . . any license . . . if the board finds in its sole
> discretion that a licensee . . . failed to comply with the provisions
> of this part or the rules and regulations of the board and that it
> would be in the public interest to . . . revoke . . . the license.

4 Pa. C.S. § 1207(1).  Gaming Licenses themselves are a qualified and revocable privilege to

conduct gaming activities strictly in furtherance of and consistent with the policies of the

Gaming Act:

> Participation in limited gaming authorized . . . by any licensee . . .
> shall be deemed a privilege, conditioned upon the proper and
> continued qualification of the licensee or permittee and upon the
> discharge of the affirmative responsibility of each licensee to
> provide the regulatory and investigatory authorities of the
> Commonwealth with assistance and information necessary to
> assure that the policies declared by this part are achieved.
>
> Strictly monitored and enforced control over all limited gaming
> authorized by [the Gaming Act] shall be provided through
> regulation, licensing and appropriate enforcement actions of
> specified locations, persons, associations, practices, activities,
> licensees and permittees.

4 Pa. C.S. § 1102(7 – 8).

Moreover, the grant of the license does not give rise to a property interest in the license

under Pennsylvania law.  *See* 58 Pa. Code § 421a.1(a) ("A license . . . issued by the Board is a

revocable privilege[, and] [n]o person holding a license . . . is deemed to have any property rights

related to the license").  Consistent with the lack of any such property interest, the Gaming Act

prohibits the sale or transfer of the license or the grant of any security interest in the license, *see*

4 Pa. C.S. § 1327-28, and there is no statutory entitlement to compensation in the event that a

license is revoked.  *See* 4 Pa. C.S. § 1326(b) (upon the Gaming Board's revocation of a license,

the "authorization to conduct the previously approved activity shall immediately cease and all fees paid in connection therewith shall be deemed to be forfeited.").

Case law makes clear that revocation or other deprivation of a government issued license with these attributes is not a taking of private property entitling the licensee to compensation under the Takings Clauses.  For example, in *Replogle v. Commonwealth*, 514 Pa. 209 (Pa. 1987), the Pennsylvania Supreme Court addressed a challenge to the constitutionality of Section 472 of Pennsylvania's Liquor Code, 47 Pa. Code § 4-472, which permits municipalities to opt to ban the issuance or renewal of liquor licenses.  The challenge was brought by the holder of a liquor license whose license was not renewed after the municipality in which he operated exercised this option.  The holder contended that because the option could be exercised without the payment of compensation under the Takings Clauses, the statutory provision was unconstitutional.  *Replogle*, 514 Pa. at 210-12.  The court framed the issue before it as "whether appellant had a property right in the renewal of the license."  *Id.*  It concluded he did not.

In so doing, the court first noted that there was no constitutional right to sell liquor, and "'[t]he conduct of such business is lawful only to the extent that it is made so by the Liquor Code.'"  *Id.* at 212 (quoting from *Tahiti Bar Inc., Liquor License Case,* 395 Pa 322 (Pa. 1959)).  In other words, a liquor license is a privilege, not a right, and can be conditioned.  Next, the court pointed to the conditional nature of a liquor license, and the absence in the applicable code provisions to a right to compensation in the event that the license was revoked or not renewed:

> A liquor license issue pursuant to the provisions of the Liquor Code is encumbered by the conditions of the Code.  The license may be taken away under conditions prescribed by law without compensation to the licensee.  Likewise, the ability to seek the granting of a license or the right to a renewal of an existing license may be taken away without compensation.

*Replogle,* 514 Pa. at 213-14.   Finally, the court observed that the municipal option to ban issuance or renewal of a liquor license without compensation, as a specific provision of the Liquor Code, "was a condition consented to by the appellant when he applied for and accepted the license."  *Id.* at 216.  More emphatically, the court held that:

> The appellant's license was issued subject to the condition that the inhabitants of the township could vote to ban liquor sales at some future time.  Now that the electorate has exercised that right, the appellant will not be heard to demand compensation.

*Id.* at 217.  *See also Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1374 (Fed. Cir. 2004) (denying compensation for cancellation of a fishery permit, finding the holder had no property interest in the permit because "he could not assign, sell, or transfer his swordfishing permit, because it did not confer exclusive fishing privileges, and because the government at all times retained the right to revoke, suspend, or modify it.").

As was the case with the license in *Replogle,* (i) there is no right to conduct gaming activities in Pennsylvania, (ii) the privilege to do so via a gaming license is conditional, (iii) those conditions include the ability to revoke the license without compensation, and (iv) a gaming license is specifically not a property right by statute, and cannot be sold or transferred. Accordingly, the Debtor should "not be heard to demand compensation," under the Takings Clauses for the Gaming Board's revocation of the License, and Count V of the Complaint should be dismissed for failure to state a claim.

**6.      Counts VI and VII Should Be Dismissed Because They Must Be Asserted Before the Pennsylvania Board of Claims and Because the Applicable Statute of Limitations To Do So has Expired[32]**

Counts VI and VII of the Complaint, claims for damages for unjust enrichment and promissory estoppel, respectively, both assert quasi-contract causes of action against the Defendants.  *Dep't of Health v. Data-Quest, Inc.*, 972 A.2d 74, 80 (Pa. Commw. Ct. 2009) (promissory estoppel is a quasi-contract claim under Pennsylvania law); *Smock v. Commonwealth*, 496 Pa. 204, 208 (1981) (unjust enrichment is in the nature of a quasi-contract claim).  Pennsylvania has enacted a limited waiver of sovereign immunity for suits asserting contract or quasi-contract claims, requiring, however, that any such suits be brought before the Commonwealth's Board of Claims, which has exclusive jurisdiction in the first instance over contractual and quasi-contractual claims arising against the Commonwealth or any Commonwealth agency.  *See* 62 Pa. C.S. § 1724(a); *Data-Quest*, 972 A.2d at 80 (claim for damages for promissory estoppel was subject to the exclusive jurisdiction of the Commonwealth's Board of Claims); *Smock*, 496 Pa. at 208 (claim for damages for unjust enrichment was subject to the exclusive jurisdiction of the Commonwealth's Board of Claims) (decided under 62 Pa. C.S. § 1724(a)'s precursor, 72 P.S. § 4651-4); *accord Emp. Ins. Of Wausau v. Com., Dep't of Transp.*, 581 Pa. 381, 395 (2005) (the jurisdiction of the Board of Claims extends to all cases instituted in the form of contract actions, including specifically quasi-contract claims) (decided under 62 Pa. C.S. § 1724(a)'s precursor, 72 P.S. § 4651-4).

The legislation that provides the limited waiver of sovereign immunity for contractual and quasi-contractual claims also contains an express limitations period.  Such legislation

---

[32]     Expiration of the applicable statute of limitations may be asserted as a ground for dismissal under Federal Rule 12(b)(6) if such expiration is clear from the facts alleged in the complaint.  *See Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975))

specifies that any such claims must be filed with the Board of Claims within six-months after the claim accrues.   62 Pa. C.S. § 1724(a).   This requirement functions as a six-month statute of limitations for contract and quasi-contract claims against the Commonwealth or its agencies. *Smock,* 496 Pa. at 209-10 (dismissing contract and quasi-contract claims against the Commonwealth's Department of Public Welfare for revocation of nursing home license because such claims were not timely filed before the Board of Claims within six months of the revocation).

Here, the Debtor's unjust enrichment and promissory estoppel claims are premised on the revocation of the License without a refunding of the License Fee.   Complaint, ¶ 124 and 134. The License was revoked on December 23, 2010.   Complaint, ¶ 60.   The six-month statute of limitation for the commencement of actions before the Board of Claims therefore required the Debtor to file its claims with the Board of Claims on or before June 23, 2011 – approximately three-years before the Debtor commenced its bankruptcy case.[33]   Accordingly, Counts VI and VII should be dismissed.

### 7.   Count VII Should Also Be Dismissed Because the Debtor Cannot Establish Promissory Estoppel Under Pennsylvania Law

In Count VII, the Debtor seeks to recover the $50 million License Fee under the doctrine of promissory estoppel.   Complaint, ¶ 130-31.   The Debtor alleges that it paid the $50 million License Fee "on the condition that it would be able to seek the 'repayment of its License Fee, and interest thereon,' if 'extraordinary delays or difficulties occur[ed] or future circumstances develop[ed] that cause[d] its License or the project to be jeopardized or extraordinarily harmed.'" *Id.* at ¶ 130 (citing the Debtor's Fee Letter, attached as Exhibit B to the Complaint).   Because the

---

[33]   The Debtor appears to contend that no limitations periods began to run until April 14, 2012. Complaint, ¶ 72.   Even if this were the case, which Defendants dispute as a matter of law, Counts VI and VII were time barred after October 14, 2012.

"Commonwealth accepted payment of the Debtor's License Fee without objection to the Debtor's asserted right and intention to seek the repayment of its License Fee," the Debtor alleges that it reasonably relied upon a conditional acceptance of the fee by the Commonwealth when paying the fee. *Id.* at ¶ 131.

To prevail on a promissory estoppel claim under Pennsylvania law, the Debtor must establish that:  (i) the Defendants made a promise that they should have reasonably expected would induce action or forbearance on the part of the Debtor, (ii) the Debtor actually took action or refrained from taking action in reliance on the promise, and (iii) injustice can be avoided only be enforcing the promise. *C & K Petroleum Prod., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (applying Pennsylvania law); *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000). The promise must be certain and explicit so that the full intention of the parties may be ascertained to a reasonable certainty. *Ankerstjerne v. Schlumberger Ltd.,* Civ. A. No. 03-3607, 2004 U.S. Dist. LEXIS 9927, at *5 (E.D. Pa. May 12, 2004).  The existence of a broad and vague implied promise is insufficient to maintain an action for promissory estoppel. *C&K Petroleum Prods., Inc.,* 839 F.2d at 192.

As a threshold matter, the Debtor does not allege (nor can it) that the Defendants made any promises, much less *explicit* promises, in connection with the Debtor's payment of the License Fee.  Indeed, the Debtor's Fee Letter was addressed to the Gaming Board, not to the Defendants.  As significantly, a party's silence is not sufficient to establish promissory estoppel. *See Luther v. Kia Motors Am., Inc.,* 676 F. Supp. 2d 408, 421 (W.D. Pa. 2009) (stating that, although the Pennsylvania Supreme Court has not determined if a promise inferred from a party's conduct or silence is sufficient to establish promissory estoppel, the Third Circuit, in

applying Pennsylvania law, has held that there can be no justifiable reliance without an express

promise).

Moreover, because the Gaming Act expressly provides that, upon revocation of a license,

the license fee is forfeited, 4 Pa. C.S. § 1326(b), the Debtor's purported reliance on its

reservation of rights in the Fee Letter was unreasonable as a matter of law.  *See, e.g., FDIC v.*

*Harrison*, 735 F.2d 408, 413 (11th Cir. 1984) (stating that when a government agent's actions

exceed the scope of authority, or are contrary to statute or regulation, the doctrine of promissory

estoppel cannot apply); *Revay v. Cleveland State Univ*., No. 2002-04003-AD, 2003 Ohio Misc.

LEXIS 74 (Ohio Ct. Claims Jan. 7, 2003) (holding that promissory estoppel does not apply to

any representations made by a state college financial aid office that are contrary to federal

regulations); *Pittsburgh Baseball Inc. v. Stadium Auth. of City of Pittsburgh,* 630 A.2d 505, 509

(Pa. Commw. Ct. 1993) (reliance on the express promise of the city's Mayor to provide $4.2

million to keep the Pittsburgh Pirates in Pittsburgh was not reasonable because the Mayor did not

have the legal authority to bind the city).

Finally, even if the Debtor could establish that an explicit promise was made, and that its

reliance on such promise was reasonable, the Debtor suffered no loss as a result of such reliance

when paying the License Fee.  Had the Debtor not paid the License Fee, the Gaming Board was

authorized to obtain the License Fee by drawing down on the Debtor's letter of credit, at which

point the Debtor would have owed $50 million to the bank issuing the letter of credit.  4 Pa. C.S.

§ 1313(c); 58 Pa. Code § 441a.5.  Accordingly, whether or not a promise was made, and whether

or not it was reasonably relied upon, the Debtor incurred no loss that it would otherwise have

avoided.  This precludes an action for promissory estoppel.  *See Vigilante v. Statharos,* No. 08-

cv-3408, 2009 U.S. Dist. LEXIS 12322, at *3 (E.D. Pa. Feb. 16, 2009) ("Pennsylvania courts

have found that damages for promissory estoppel are limited to expenses and losses incurred in reliance on the actionable promise") (citing *Lobolita, Inc. v. N. Pocono Sch. Dist.,* 562 Pa. 380, 755 A.2d 1287, 1292 n.10 (Pa. 2000)).

Accordingly, for lack of a promise, for lack of reasonable reliance, and for lack of any actionable loss, Count VII should be dismissed.

### 8.     The Complaint Should Be Dismissed As to the Department of Revenue for Failure to State a Claim on all Counts

Even if Counts I through VII would otherwise state claims against a proper defendant, even a cursory reading of the Complaint makes clear that the Department of Revenue is not that defendant.  Of the acts, omissions, and unjust benefits alleged in the Complaint as the basis for the various causes of action alleged, the Department of Revenue did not do, did not fail to do, and was not the recipient of, any of them.

First, the Department of Revenue did not revoke the License, and did not become a holder of the License after revocation.   Accordingly, Counts II, III, IV, and V asserting fraudulent transfer and unconstitutional taking necessarily fail to state a claim against the Department of Revenue.

Second, the Department of Revenue did not have an opportunity to respond to the purported reservation of rights in the Debtor's Fee Letter, because it was not sent the letter.  The Debtor sent that letter to the Gaming Board.  Complaint, ¶ 19.  Thus, even if a claim for promissory estoppel could have arisen with respect to a recipient of the Debtor's Fee Letter, the Department of Revenue did not receive it.   Accordingly, Count VII asserting promissory estoppel necessarily fails to state a claim against the Department of Revenue.

Finally, there is no allegation that the Department of Revenue was the beneficiary of the License Fee so as to be unjustly enriched by its retention, or that it is the custodian of any funds

to whom a turnover order could be directed.  Indeed, in accordance with the Gaming Act, the License Fee had to be deposited into the State Gaming Fund within the State Treasury immediately upon payment, 4 Pa. C.S. § 1209(d), at which point it came under the custody and control of the Pennsylvania Treasury Department (the "**Treasury Department**"), not of the Department of Revenue.  *See* 4 Pa. C.S. § 1208(e); 72 P.S. § 1503, 3832.  Because the Department of Revenue was not the beneficiary of the License Fee, nor a custodian to whom a turnover order could be directed, Counts I and VI asserting turnover and unjust enrichment necessarily fail to state a claim against the Department of Revenue.

D.      **If this Court has Jurisdiction, Does not Abstain, and Does not Dismiss the Complaint for Failure to State a Claim, the Gaming Board and the Treasury Department are Necessary Parties to Any Trial on the Merits under Rule 19, and Failure to Join Such Parties Would Subject This Matter to Dismissal Under Rule 12(b)(7).**

Federal Rule 12(b)(7) authorizes a party to move to dismiss an action based upon the "failure to join a party under Rule 19."  *See BML Group, Inc. v. U.S. Pizza, Inc.*, 1989 U.S. Dist. LEXIS 11330 (E.D. Pa. 1989) (dismissal under Rule 12(b)(7) is appropriate "when there is an absent person without whom complete relief cannot be granted or whose interest in the dispute is such that to proceed in his absence might prejudice him or the parties already before the court.") (quoting Wright & Miller, *Federal Practice and Procedure: Civil* § 1589 (1969)).

Federal Rule 19(a) requires, among other things, the joinder of a party (i) when that party "claims an interest relating to the subject of the action and is so situated that the disposition of the action in that person's absence may . . . as a practical matter impair or impede that person's ability to protect that interest," FED. R. CIV. P. 19(a)(1)(B)(i), or (ii) if in the absence of the party, "the court cannot accord complete relief."  FED. R. CIV. P. 19(a)(1)(A).  In determining whether "as a practical matter," absent parties have interests that will be affected by the outcome of the

litigation, the court must engage in "a case-by-case, fact specific inquiry." *Kessler v. Pollick*, 851 F. Supp. 687, 691 (E.D. Pa. 1994).

### 1.   The Gaming Board

In this proceeding, notwithstanding the plethora of causes of action being asserted, it is the action of the Gaming Board in revoking the License that serves as the core issue in the case. Moreover, the Gaming Board has the responsibility for regulating all activities related to gaming in Pennsylvania.  4 Pa. C.S. § 1202(a)(1); *Pa. Gaming Control Bd. v. City Council of Phila.*, 593 Pa. 241, 247 (2007) (city precluded from using local ordinances to nullify Board's broad authority).  The extensive powers and discretion vested in the Gaming Board by the Gaming Act could be substantially impaired by an adverse ruling on the merits in this proceeding, including in particular the power to revoke a slot machine license for violations of the Gaming Act, the Gaming Board's regulations, or the Gaming Board's orders and conditions.  4 Pa. C.S. §§ 1202(b)(12), 1207(1), 1326(b), 1518(c)(1)(iii).  As a consequence, this action, were it to proceed, could, "as a practical matter impair" the interests of the Gaming Board. *See, e.g. John T. v. De Cty. Intermediate Unit,* 2000 U.S. Dist. LEXIS 6169 at *8 (E.D. Pa. May 8, 2000) (finding the Pennsylvania Department of Education to be a necessary party in an action where, following an adverse ruling, among other things, it "may be required to change its policies.").

### 2.   The Treasury Department

As set forth above, the Treasury Department is the custodian of the State Gaming Fund, and is responsible for any transfers out of the Gaming Fund.  4 Pa. C.S. § 1403(a) ("There is hereby established the State Gaming Fund within the State Treasury."); 4 Pa. C.S. § 1408(e) (the State Treasurer is responsible for transfers out of the State Gaming Fund).  The Treasurer thus has a custodial interest in the State Gaming Fund under the Gaming Act.  By statute, the License Fee was deposited into the State Gaming Fund.  4 Pa. C.S. § 1209(d).  Any money judgment

awarded by this Court, or any "return" of the License Fee, would have to be paid by the Treasury

Department out of the State Gaming Fund.  Accordingly, the Treasury Department would be a

necessary party for this Court to "accord complete relief."

**IV.**

**<u>CONCLUSION</u>**

For the foregoing reasons, the Defendants respectfully request that this Court grant the

Motion to Dismiss and dismiss the Complaint with prejudice for lack of subject-matter

jurisdiction.  If this Court holds that it has such jurisdiction over the adversary proceeding, the

Defendants respectfully request that this Court abstain from hearing the Debtor's claims.  If this

Court addresses the merits, the Court should then dismiss each Count of the Complaint pursuant

to Federal Rule 12(b)(6).

Dated: August 28, 2014           **BALLARD SPAHR LLP**
       Philadelphia, Pennsylvania

                                  _/s/ Vincent J. Marriott, III_
                                 Vincent J. Marriott, III (I.D. No. 41457)
                                 Tobey M. Daluz (I.D. No. 60685)
                                 Adrian R. King, Jr. (I.D. No. 69315)
                                 Jon T. Pearson (I.D. No. 317409)
                                 1735 Market Street, 51st Floor
                                 Philadelphia, PA 19103
                                 Tel:  (215) 665-8500
                                 Fax:  (215) 864-8999

                                 *Counsel for Commonwealth of Pennsylvania,
                                 Department of Revenue and the Commonwealth of
                                 Pennsylvania*