UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| PHILADELPHIA ENTERTAINMENT AND DEVELOPMENT PARTNERS, L.P., | : | |
| | : | |
| DEBTOR. | : | BANKRUPTCY NO. 14-12482-MDC |

| | | |
|---|---|---|
| PHILADELPHIA ENTERTAINMENT AND DEVELOPMENT PARTNERS, L.P., | : | |
| | : | |
| PLAINTIFF, | : | |
| v. | : | ADVERSARY NO. 14-00255-MDC |
| COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF REVENUE, ET AL., | : | |
| DEFENDANTS. | : | |

# **O P I N I O N**

## INTRODUCTION

On May 29, 2014, Philadelphia Entertainment and Development Partners, L.P. (the "Debtor")

filed a seven-count complaint against the Commonwealth of Pennsylvania, Department of Revenue and

the Commonwealth of Pennsylvania (together, the "Commonwealth Parties") seeking, among other

things, to recover for the benefit of the Debtor's creditors (1) a fee in the amount of $50,000,000 (the

"License Fee") paid to the Pennsylvania Gaming Control Board (the "Gaming Board") for a Category 2

slot machine license ("License"), and (2) the value of the License which was revoked pre-petition by the

Gaming Board.[1]

---

[1] The complaint is being prosecuted by Persil Mangeur LLC in its capacity as the trustee of the Liquidation Trust (the "Trustee") for the Estate of the Debtor. Consistent with this Court's Order dated July 28, 2014 [Docket No. 153] (the "Confirmation Order"), a liquidation trust was established and Persil Mangeur LLC was appointed as the liquidation trustee. Confirmation

In response, the Commonwealth Parties filed on August 28, 2014, a Motion to Dismiss, or In the Alternative Abstain (the "Motion") contending that dismissal of the entirety of the Complaint is warranted based on various grounds, including that (i) this Court lacks jurisdiction to adjudicate the Trustee's claims as a result of sovereign immunity; (ii) the Trustee's claims are barred by the *Rooker-Feldman* Doctrine; and (iii) the Trustee failed to state a basis for the relief sought.  As alternative relief, the Commonwealth Parties request that this Court abstain from adjudicating the Trustee's claims.  The Commonwealth Parties contend that abstention is warranted by either the principles of permissive abstention codified by 28 U.S.C. §1334(c)(1) or the *Burford* Abstention Doctrine.[2]

The Trustee opposes dismissal of the Complaint contending that (1) the Commonwealth Parties are not immune from suit; (2) the *Rooker-Feldman* Doctrine is inapplicable; (3) issue and claim preclusion do not bar the Trustee from seeking relief; (4) permissive abstention is inappropriate as the recovery of the License Fee is of central importance to the administration of the Debtor's estate; (5) the *Burford* Abstention Doctrine is inapplicable because the recovery of the License Fee does not implicate Pennsylvania's regulation of gaming; and (6) each count of the seven counts set forth by the Complaint state a plausible claim for relief.

As set forth below, after reviewing the parties' pleadings and consideration of their arguments, the Court will:

1.    Grant the Motion with regard to Count I (turnover pursuant to §542) because the Trustee failed to state plausible claims for relief and the insufficiencies may not be cured by further amendment.

2.    Grant the Motion with regard to Counts II (fraudulent conveyance under §548), III (fraudulent conveyance under §544), and IV (recovery of the value of the license under §550) of the Complaint (collectively with Count I, the "Bankruptcy Claims") because application of the *Rooker-Feldman* Doctrine divests this Court of subject matter jurisdiction to consider the avoidance of the

---

Order, ¶10.  Upon the effective date of the Plan, all estate assets, including any prepetition causes of action held by the Debtor, vested in the Liquidation Trust.

[2] *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

revocation of the License.  To the extent that the fraudulent conveyance actions implicate some transfer

other than the revocation of the License,[3] this Court has also determined that the Trustee failed to state

plausible claims for relief and the insufficiencies may not be cured by further amendment.

3.      Grant the Motion with regard to Counts V (taking without payment of just

compensation), VI (unjust enrichment), and VII (promissory estoppel) (the "State Law Claims"), because

the Commonwealth Parties' sovereign immunity defense deprives this Court of subject matter jurisdiction

to hear the Trustee's non-bankruptcy causes of action.

4.      Refrain from addressing the Commonwealth Parties' request for alternative relief based

upon permissive abstention pursuant to 28 U.S.C. §1334(c)(1), or under the *Buford* Doctrine.  The Court

has addressed the merits of the Commonwealth's sovereign immunity defense and the sufficiency of the

Trustee's causes of action rendering consideration of this request unnecessary.

## PROCEDURAL HISTORY

### The Bankruptcy Case

On March 31, 2014 (the "Petition Date"), the Debtor invoked this Court's jurisdiction by filing a

voluntary petition for Chapter 11 relief together with a pre-packaged plan of reorganization.

Significantly, the Debtor did not list the Commonwealth Parties among its creditors or solicit their

approval of the Plan.  The Commonwealth Parties have not (1) filed a claim against the Debtor; (2) filed

any request for relief in the Debtor's bankruptcy case; or (3) participated in the Debtor's bankruptcy case

in any manner whatsoever except as defendants in this adversary proceeding.

On July 28, 2014, this Court entered the Confirmation Order confirming the First Modified

Chapter 11 Plan of Liquidation of Philadelphia Entertainment and Development Partners, L.P. filed by the

---

[3] In response to the Commonwealth Parties' *Rooker-Feldman* arguments, the Trustee characterized its Complaint as "seek[ing] this Court's determination of whether or not the Commonwealth has unlawfully refused to return the License Fee to the Debtor." Trustee's Memorandum of Law dated September 29, 2014 [Docket No. 19] (the "Trustee's Memorandum"), p.25.  Despite the Trustee's characterization, this Court observes that the Trustee's fraudulent transfer actions (Counts II and III) explicitly seek the avoidance of the revocation of the License and not the avoidance of some subsequent act relating to the alleged refusal of the Commonwealth Parties to refund the License Fee.  Complaint, ¶97.

Debtor on May 27, 2014 [Docket No. 88] (the "Plan").[4]  In addition to contemplating the sale of certain

real property, the Plan calls for the creation of a liquidation trust (the "Liquidation Trust") to collect all

assets of the Debtor for the benefit of the Debtor's creditors.

**The Adversary Action**

As characterized by the Trustee and contemplated by the Plan, the only significant asset to be

administered by the Liquidation Trust consists of the Debtor's alleged interest in the License and the

License Fee.  The Debtor initiated this adversary proceeding by filing the Complaint dated May 29, 2014

(the "Complaint").  In the Complaint, the Debtor asserts seven causes of action in support of its claim that

it is entitled to a payment from the Commonwealth Parties in the amount of $50,000,000 due to the

Commonwealth's failure to refund the License Fee to the Debtor.  The Debtor, and now the Trustee, seeks

(1) Turnover of the License Fee pursuant to §542; (2) Avoidance of the Revocation of the License as a

Fraudulent Transfer as provided by §548(a)(1)(B); (3) Avoidance of the Revocation of the License as a

Fraudulent Transfer as provided by §544(b) and 12 Pa. C.S.A. §5101, *et seq.*; (4) Recovery of the value of

the Revoked License pursuant to §§550 and 551; (5) the Revocation of the License Constitutes a Taking

without Payment of Just Compensation; (6) Retention of the License Fee Caused an Unjust Enrichment;

and (7) Promissory Estoppel resulting from the reservations contained in a letter dated October 16, 2007

(the "October 16 Letter"),[5] prevents the Commonwealth Parties from retaining the License Fee.

The claims against the Commonwealth Parties may be boiled down to the Debtor's, and now the

Trustee's, belief that the revocation of the License was unlawful because revocation was not accompanied

by a refund of the License Fee.  *See, e.g.,* Transcript November 14, 2014, 67:4-5 ("our claim is predicated

upon the failure to return the license fee.").  Based upon this belief, the Trustee asserts that the Debtor's

---

[4] Consistent with the nature of a pre-packaged plan, the Debtor received the prepetition approval of the Plan by a majority of its creditors.  However, its efforts to achieve swift confirmation of its Plan were delayed by a series of issues relating to the Debtor's attempt to retain bankruptcy counsel.

[5] A copy of the October 16 Letter was attached to the Complaint as Exhibit B.

estate is entitled to judgment against the Commonwealth Parties in an amount equal to the License Fee.[6]

In response to the Complaint, the Commonwealth Parties filed the Motion.  In the Motion, the Commonwealth Parties argue that dismissal is warranted pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[7]  Addressing this Court's jurisdiction to hear the matters asserted by the Complaint, the Commonwealth Parties argue (1) application of sovereign immunity renders the Commonwealth Parties immune from suit; (2) application of the *Rooker-Feldman* Doctrine divests this Court of subject matter jurisdiction; (3) substantial public policy concerns, including principles of comity, warrant permissive abstention pursuant to 28 U.S.C. §1334(c)(1); and (4) application of the *Burford* Abstention Doctrine prevents this Court from interfering in Pennsylvania's efforts to regulate the gaming industry.

Addressing the merits of the claims asserted by the Complaint, the Commonwealth Parties make the following arguments: (1) the Trustee's §542 cause of action should be dismissed because the License Fee and/or the License is not the acknowledged property of the Debtor's estate; (2) applicable statutes of limitations require the dismissal of the Trustee's fraudulent conveyance causes of action; (3) the lawful prepetition expiration of the Debtor's rights do not constitute a transfer within the meaning of either §544(b) or §548; (4) the Debtor has not identified a creditor holding an unsecured claim who has standing to assert a cause of action pursuant to §544(b); (5) the Debtor has failed to state a cause of action for a constitutional taking because revocation of the License does not constitute a taking under either Pennsylvania or Federal law; (6) application of Pennsylvania's six-month statute of limitations for quasi-contractual claims brought against the Commonwealth requires dismissal of the Trustee's promissory estoppel and unjust enrichment causes of action; (7) the Trustee has failed to state a cause of action for promissory estoppel because the Complaint does not allege any promises made by the Commonwealth Parties in connection with their acceptance of the License Fee; and (8) the Trustee has failed to state a cause of action for promissory estoppel because the Debtor's alleged reliance on its reservation of rights

---

[6] It is unclear whether the Trustee is seeking only $50 million from the Commonwealth Parties as the Complaint does not request alternative relief.  Rather, it seeks both turnover of the License Fee and a judgment for the value of the License asserted to be at least $50 million.

[7] These rules are made applicable to this matter pursuant to F.R.B.P. 7012.

is unreasonable in light of applicable law[8] that provides that, upon revocation of a license, the license fee

is forfeited.  In the event that this Court did not credit the Commonwealth Parties' Rule 12(b)(1) or

12(b)(6) arguments, the Commonwealth Parties also seeks dismissal pursuant to Rule 12(b)(7) due to the

Trustee's failure to join necessary parties, namely the Pennsylvania Gaming Control Board (the "Gaming

Board") and the Pennsylvania Treasury Department.

     The Trustee filed a Response dated September 29, 2014 (the "Response"), requesting this Court

deny the Motion.[9]  Thereafter, the Defendant filed a Reply Brief dated October 10, 2014 (the

"Commonwealth Parties' Reply"), and the Trustee filed a Sur-Reply Brief dated October 29, 2014 (the

"Trustee's Sur-Reply").

     On November 14, 2014, this Court held a hearing to address the Commonwealth Parties' Motion.

At the close of the Hearing, this Court requested the parties submit briefs addressing two issues.  First,

whether this Court, pursuant to §505(a)(2), lacks authority to adjudicate the Debtor's entitlement to a

refund of the License Fee because the Debtor has not properly requested a refund from the governmental

authority that administers the tax.  Second, whether the omission of reference to §541 in §106 of the

Bankruptcy Code deprives this Court of subject matter jurisdiction over Counts V, VI and VII of the

Complaint.  In the post-Hearing briefs, the parties agreed that §505(a)(2) is inapplicable to this

proceeding because the License Fee is not a tax.  With regard to the second issue, the parties reached

disparate conclusions.  The Commonwealth Parties argued that the absence of §541 from §106 results in

this Court lacking subject matter jurisdiction over Counts V, VI and VII.  Whereas, the Trustee argued

---

[8] 4 Pa. C.S.A. §1326(b).

[9] On October 1, 2014, the Commonwealth Parties filed a Stipulation purporting to authorize the Trustee to file a reply brief and the Commonwealth Parties to file a sur-reply brief as well as to continue the originally-scheduled date for the hearing on the Motion.  As provided by this Court's Judicial Practices and Procedures, parties must obtain permission from this Court before reply briefs will be considered.  To that end, this Court scheduled a conference call for October 3, 2014, to address the parties' request to file reply briefs.  As explained by the Commonwealth Parties, they believed that reply briefs were necessary because it was the Commonwealth Parties' belief that the Trustee, in its Response, asserted a new theory of relief not pled by the Complaint.  Namely, the Commonwealth Parties characterized the Response as requesting a determination that the Debtor holds a statutory right to a refund of the License Fee.  Despite this Court's misgivings, this Court granted leave for additional briefing. To the extent that the Commonwealth Parties are correct and this theory of relief was not asserted by the Complaint, it may not be raised in connection with this Court's adjudication of the Motion.  *See, e.g., Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

that the absence of §541 from §106 is not determinative as it is likely that §541 determinations are

necessarily implicated by the sections enumerated by §106.

## FACTUAL BACKGROUND[10]

After the passage of the Race Horse Development and Gaming Act, 4 Pa. C.S.A. §1101 *et seq.*

(the "Gaming Act"), the Debtor was formed in 2005 for the purpose of acquiring real estate for the

development of a casino.  To this end, the Debtor filed an Application dated December 28, 2005, with the

Gaming Board to obtain a Category 2 gaming license.  A year later, on December 20, 2006, the Gaming

Board announced its intent to award the Debtor one of two gaming licenses available in Philadelphia.

The Gaming Board later memorialized the award in a written decision dated February 1, 2007.

On May 29, 2008, the Gaming Board formally issued the License to the Debtor.  The Debtor was

required by law to pay the License Fee.  4 Pa. C.S.A. §1209(a).[11]  The Trustee alleges that the Debtor

paid the License Fee to the Gaming Board on October 17, 2007.  The Trustee further alleges that, when

the Debtor made payment, it expressly reserved its right to seek repayment of its License Fee by

delivering the October 16 Letter to the Hon. Mary D. Collins, the Chairman of the Gaming Control Board

in which the Debtor purported to reserve its right to seek a refund of the License Fee in the event that the

License was ever revoked.

As alleged by the Commonwealth Parties and consistent with the Gaming Act, the License Fee

was then deposited into the State Gaming Fund within the State Treasury immediately upon payment at

which point it came under the custody and control of the Pennsylvania Treasury Department and not the

---

[10] The Factual Background is based upon the facts alleged in the Complaint, which the Court must accept as true for the purpose of the Motion, and the extensive description of the Debtor's operating history set forth in *Philadelphia Entertainment and Development Partners, L.P. v. Pennsylvania Gaming Control Board*, 34 A.3d 261 (Pa. Cmwlth. 2011) and attached to the Complaint as Exh. I (the "*Commonwealth Opinion*").

[11] In relevant part, the Gaming Act provides:

> [A]t the time of license issuance the board shall impose a one-time slot machine license fee to be paid by each successful applicant for a conditional Category 1, a Category 1 or a Category 2 license in the amount of $50,000,000 and deposited in the State Gaming Fund.

4 Pa. C.S.A. §1209(a).

custody or control of the Department of Revenue.  4 Pa. C.S. §§1208(e) and 1209(d); 72 P.S. §1503.[12]  As

provided by statute, licensees were entitled to a return of the $50,000,000 payment if the Gaming Act was

amended by the General Assembly. 12 Pa. C.S.A. §1209(f).  The Gaming Act did not explicitly provide

for reimbursement of the License Fee in any other circumstances.[13]

 As a condition of the issuance of the License and as required by the Gaming Act, 4 Pa. C.S.A.

§1210(a), the Debtor was required to begin operation of a 1,500 slot casino within one year.  However,

the Debtor was unable to commence operations within that time period.  At the Debtor's request, the

Gaming Board extended the one year deadline until May 29, 2011, subject to certain conditions.  Despite

various efforts, the Debtor was unable to satisfy the conditions or to otherwise commence operations.

 On April 29, 2010, the Gaming Board's Bureau of Investigation and Enforcement ("BIE") filed a

complaint with the Gaming Board seeking revocation of the License (the "BIE Complaint").[14]  In

response to the BIE Complaint, it appears that the Debtor argued that the size of its investment, including

but not limited to the License Fee, warranted additional procedural protections.  On October 5, 2010, the

BIE and the Debtor filed competing motions for summary judgment.  On October 27, 2010, the Gaming

Board held a hearing on the motions.  At the conclusion of this hearing, the Gaming Board took the

---

[12] *See also* Complaint, Exhibit B, p.15.

[13] The Gaming Act does provide for the refund of other taxes paid by licensees.  The Gaming Act provides for the creation within the State Treasury an account for each gaming licensee. 4 Pa. C.S.A. §1401(a).  Significantly, the Gaming Act does not call for the deposit of the $50,000,000 license fee into this account.  Rather, the accounts are funded by the tax on gaming revenue paid after each licensee commences business operations.  If a licensee ceases operations and funds remain in its account, a licensee is entitled to a refund of the remaining funds.  In relevant part, the Gaming Act provides:

 **Return of funds.--**The funds deposited into its account shall not be returned to a slot machine licensee unless
 the slot machine licensee ceases conducting business under its license and relinquishes all rights to do so in
 the future.  In that case, the balance of funds in the account attributable to such licensee, minus any unpaid
 amounts due and payable to the Commonwealth under this part or due and payable under section 1405, shall
 be returned to the licensee.

4 Pa. C.S.A. §1401(d).

[14] It appears that the BIE expressly contemplated that the relief sought by the BIE Complaint constituted proceedings to revoke a $50 million slot license.  As provided by Pennsylvania law, the revocation of the License contemplated the forfeiture of the License Fee.  In relevant part, Pennsylvania law provides:

 In the event of a revocation or failure to renew, the applicant's authorization to conduct the previously
 approved activity shall immediately cease, and all fees paid in connection therewith *shall be deemed to be*
 *forfeited*.

4 Pa. C.S.A. §1326(b) (emphasis added).

motions under advisement.  On November 19, 2010, the Gaming Board denied the Debtor's motion.

However, the Gaming Board withheld its ruling on BIE's motion in order to enable the Debtor time to

submit documents evidencing a transaction that it had entered into with Harrah's Entertainment, Inc. to

salvage the project.  After receipt of the documents, the Gaming Board granted BIE's motion.  Pursuant to

a Decision of the Gaming Control Board, No. 1408-2010 dated December 23, 2010 (the "Revocation

Order"), the Gaming Board revoked the License.[15]

### Review by the Pennsylvania Judiciary

After issuance of the Revocation Order, the Debtor filed a petition with the Commonwealth Court

of Pennsylvania requesting review of the Revocation Order as well as a myriad of prior orders issued by

the Gaming Board with respect to the Debtor's use of the License.  In the *Commonwealth Opinion* issued

November 10, 2011, the Commonwealth Court affirmed the Gaming Board's revocation of the License.

The Commonwealth Court confirmed that the Gaming Board acted within its discretion by revoking the

License.  In reaching this outcome, the Commonwealth Court addressed several issues including whether

the Gaming Board's revocation of the license pursuant to a summary judgment motion violated the

Debtor's due process rights.

Significant to this Court's present analysis is the Commonwealth Court's analysis of the Debtor's

procedural due process argument.  Elaborating on the Debtor's due process objection, the Commonwealth

Court recognized that its decision would impact the Debtor's substantial financial interest in the License,

including but not limited to the amount of the License Fee.  In relevant part, the Commonwealth Court

stated:

> PEDP finally argues on appeal that it has a valuable property right in its License, and the
> Board violated PEDP's due process rights where: (1) it entered summary judgment
> against PEDP without conducting an evidentiary hearing and reviewing the evidence in a

---

[15] The Gaming Board is empowered to "[a]t its discretion, to award, revoke, suspend, condition or deny issuance or renewal of slot machine licenses." 4 Pa. C.S.A. §1202(b)(12).  In addition, the Gaming Board "[a]t its discretion, to suspend, condition or deny the issuance or renewal of any license or permit or levy fines or other sanctions for any violation of this part." 4 Pa. C.S.A. §1202(b)(16).  The Gaming Board's decision to revoke the License was premised on the following factual determinations: (1) the Debtor failed to commence construction of its proposed casino; (2) the Debtor failed to maintain financial suitability; and (3) the Debtor violated several prior orders issued by the Gaming Board.

light most favorable to PEDP; (2) the Board's determination was not supported by the record; (3) the Board denied PEDP discovery necessary to support its motion for summary judgment; and (4) *the Board imposed an excessive sanction*.

*Commonwealth Opinion*, 34 A.3d at 275 (emphasis added).

In response to the Debtor's argument that its financial interest in the License warranted greater protections than were afforded it by the Gaming Board, the Commonwealth Court flatly concluded: "PEDP's due process rights were not violated." *Id.* Elaborating on the nature of the "excessive sanction" and whether it evidenced a violation of the Debtor's due process rights, the Commonwealth Court determined:

> [R]evocation was not an excessive sanction under these circumstances. PEDP argues that revocation of its $50 million License as a result of its purported noncompliance was an unreasonably harsh sanction, when lesser sanctions were available and would have sufficed. Certainly, as PEDP points out, lesser sanctions are favored where they achieve the agency's objective. In this case, however, a lesser sanction in the form of a daily $2,000.00 fine was imposed for more than a year, but, even together with the threat of revocation, it did not result in the achievement of the Board's objectives in PEDP's case. Accordingly, the Board did not violate PEDP's due process rights by revoking PEDP's license via summary judgment without a hearing. The Board's determination was supported by the record, it did not deny PEDP discovery in support of its motion for summary judgment, nor was revocation excessive under the circumstances presented.

*Id.* at 279.

The dissent was more explicit in placing the due process arguments in the context of the Debtor's forfeiture of the License Fee. In relevant part, the dissent wrote "*by revoking PEDP's License, PEDP will be required to forfeit a $50 million licensing fee*." *Id.* at 281 (emphasis added).

To explain its conclusion, the Commonwealth Court first addressed the nature of the Debtor's interest in the License and determined it to be a "revocable privilege." *Id.* at *276* (in a footnote, the Commonwealth Court identified the state law governing the inquiry and stated "Section 1102(7) of the Gaming Act, 4 Pa. C.S.A. §1102(7), specifically states that a slot machine license is a privilege..." and "No person holding a license is deemed to have any property rights related to the license.").[16] Significantly, the Commonwealth Court also determined that the Debtor agreed to the conditions placed

---

[16] *See also* Complaint, Exh. H, p.42.

upon the License. *Id.* at 276 n.10 ("the Statement of Conditions placed upon PEDP's License… were agreed to by [the Debtor]").[17]

While it did determine that the Debtor did not hold any property rights in the License, the Commonwealth Court still acknowledged that the Debtor was entitled to "some form of due process." *Id.* at 276. Addressing whether the notice the Debtor received comports with the level of due process required, the Commonwealth Court found that "[i]t is undisputed in this case that PEDP was on notice of the potential revocation of its license for some time." *Id.*

## LEGAL DISCUSSION[18]

In the Complaint, the Trustee asserts seven causes of action in support of its belief that the Debtor is entitled to a payment from the Commonwealth Parties in the amount of $50,000,000 due to the Commonwealth's revocation of the License (an alleged fraudulent conveyance) and failure to refund the License Fee.[19] Of significance, none of the causes of action request declaratory relief consisting of a determination that the Debtor is entitled to a refund of the License Fee. Rather, the Trustee treats the Debtor's entitlement to a refund of the License Fee as the premise for the Trustee's Bankruptcy Claims.

This Court finds that the adjudication of both the Bankruptcy Claims and State Law Claims to be within this Court's general jurisdiction. However, application of sovereign immunity deprives this Court of jurisdiction to address the State Law Claims and application of the *Rooker-Feldman* Doctrine precludes the Trustee from attempting to challenge the prepetition revocation of the License. To the extent the Bankruptcy Claims do not attempt to undo the revocation of the License, this Court has concluded that it may hear and issue a final order adjudicating the Bankruptcy Claims. Finally, this Court has determined

---

[17] Although this Court will not reach the merits of the Trustee's allegations in support of its belief that the Debtor is entitled to a refund of the License Fee, this finding would seem to preclude the Trustee's present "reservation of rights" theory.

[18] To address the sufficiency of the Complaint, this Court will first address its jurisdiction to hear each cause of action. *In re Exide Techs.*, 544 F.3d 196, 220 (3d Cir. 2008); *In re Mullarkey*, 536 F.3d 215, 223 (3d Cir. 2008). Next, the Court will address the Commonwealth Parties' invocation of sovereign immunity and the *Rooker-Feldman* Doctrine as they apply to each cause of action. Finally, the Court will consider the Commonwealth Parties' request for dismissal for failure to state a claim of each cause of action for which the Court has jurisdiction.

[19] Pursuant to a letter dated April 15, 2014, the Trustee requested from the Commonwealth Parties "an immediate refund or return the License Fee to the Debtor." Complaint, Exh. K, p.3.

that the Bankruptcy Claims must be dismissed with prejudice because the Trustee has failed to allege

facts necessary to support its §§542, 544 or 548 causes of action and this Court has determined that the

current implausibility of the Trustee's Bankruptcy Claims cannot be cured by amendment.

## I.       Bankruptcy Subject Matter Jurisdiction[20]

As an initial matter, this Court must first consider whether the Trustee's causes of action are

within the Court's subject matter jurisdiction as defined by 28 U.S.C. §§157 and 1334.  This Court has

exclusive jurisdiction over all property of the debtor as of the commencement of the case, as well as

property of the estate, regardless of where the property is located.  28 U.S.C. §1334(e).  Pursuant to §157,

this Court's jurisdiction is further divided between core and noncore matters.  28 U.S.C. §157(a); *In re*

*Winstar Communications, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009).  In core proceedings, this Court is

authorized to issue final judgments.  In noncore proceedings and if the parties do not consent to the entry

of a final judgment, a bankruptcy court must submit proposed findings of facts and conclusions of law to

the district court for its review and issuance of a final judgment.  28 U.S.C. §157(c)(1); *Winstar*, 554 F.3d

at 405.

Traditionally, a proceeding was core if "it invokes a substantive right provided by title 11 or if it

is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Torkelsen v.*

*Maggio (In re Guild and Gallery Plus, Inc.)*, 72 F.3d 1171, 1178 (3d Cir. 1996); *see also Stoe v. Flaherty*,

436 F.3d 209, 211 (3d Cir. 2006); *Allen v. J.K. Harris & Co., LLC*, 331 B.R. 634, 640–41 (E.D. Pa.

2005).  Whereas, a proceeding is noncore, or "related to," if the proceeding "could conceivably have any

effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.

1984); *see also Exide*, 544 F.3d at 205-06.

Core proceedings include matters that either "arise under" or "arise in" the context of a

---

[20] In attempting to resolve whether the scope of its jurisdiction includes the causes of action pled by the Complaint, this Court acknowledges that the issues presented by the Motion implicate an area of law, the jurisdiction and authority of bankruptcy courts, that, in recent years, has grown substantially uncertain. *See, e.g., Stern v. Marshall*, 131 S.Ct. 2594 (2011) (distinguishing between a bankruptcy court's authority to adjudicate private versus public rights).  The Commonwealth Parties' invocation of sovereign immunity to the causes of action asserted in the Complaint adds an additional level of complication to this already murky area of law. *See, e.g., Central Virginia Community College v. Katz*, 546 U.S. 356, 376-78 (2006).

bankruptcy case. 28 U.S.C. §157(b)(1). A proceeding arises under the Bankruptcy Code if the causes of action to be adjudicated depend upon rules of decision that are incorporated by the Bankruptcy Code from other sources. *See, e.g., In re Sunbridge Capital, Inc.*, 454 B.R. 166, 169, n.16 (Bankr. D. Kan. 2011) (classifying §544 actions as arising under because the rules of decision are supplied by state law that are incorporated by the Bankruptcy Code). Whereas, a proceeding arises in a bankruptcy case if the causes of action to be adjudicated depend upon rules of decision supplied exclusively by the Bankruptcy Code and therefore could not exist outside of a bankruptcy case. *Stoe*, 436 F.3d at 218 ("claims that 'arise in' a bankruptcy case are claims that by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case."). If a proceeding neither arises under the Bankruptcy Code nor arises in a bankruptcy case but will have a conceivable effect on the administration of the estate, then the proceeding is noncore and may only be heard by bankruptcy court. *Pacor*, 743 F.2d at 994.

On their face, the Trustee's Bankruptcy Claims are within this Court's core jurisdiction because they arise under §§542, 544, 548 and 550 of the Bankruptcy Code. For this reason, this Court has the authority to enter a final judgment adjudicating the plausibility of the Trustee's Bankruptcy Claims.[21] On the other hand, the Trustee's State Law Claims are not core proceedings. These causes of action were neither created by the Bankruptcy Code nor incorporated by it. Rather, as the name implies, these causes of action are based upon state law and their adjudication relies exclusively upon state law. As such, they are noncore, or "related to" the Debtor's bankruptcy case because resolution of these causes of action "could conceivably have any effect on the estate being administered in bankruptcy." Because the Commonwealth Parties have yet to consent to the entry of a final judgment, this Court may hear the State Law Claims and then submit proposed findings of facts and conclusions of law to district court for final order. 28 U.S.C. §157(c)(1). However, this Court must still address whether the invocation of sovereign

---

[21] In reaching this conclusion, this Court is careful to distinguish between the bankruptcy causes of action asserted by the Complaint and the non-bankruptcy causes of action upon which the Debtor's alleged interest in the License Fee is premised. As elaborated below, this Court may adjudicate the former but not the latter. If this Court were to allow the Trustee to cloak its non-bankruptcy causes of action with the garb of bankruptcy causes of action, it would render meaningless the "limited subordination of state sovereign immunity" recognized by the Supreme Court. *Central Virginia Community College v. Katz*, 546 U.S. 356, 363 (2006) (recognizing that ratification authorized a "limited subordination of state sovereign immunity in the bankruptcy arena.").

immunity by the Commonwealth Parties or application of the *Rooker-Feldman* Doctrine further affects this Court's jurisdictional analysis.

### A.    Sovereign Immunity[22]

As established by the Eleventh Amendment to the United States Constitution, the States are generally immune from suit in federal court. *See, e.g., Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1996). Sovereign immunity operates to divest federal courts, including bankruptcy courts, of subject matter jurisdiction and to prevent federal courts from entering money judgments against a State. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."). Notwithstanding the immunity provided by the Eleventh Amendment, States can and have waived sovereign immunity. *See, e.g., Gardner v. State of New Jersey*, 329 U.S. 565, 574 (1947). To this end, the Trustee contends that in the bankruptcy context, the Commonwealth Parties' sovereign immunity has been waived by (1) Congress pursuant to §106 of the Bankruptcy Code, and (2) the States' ratification of the Constitution, and specifically the Bankruptcy Clause contained within it, that resulted in a waiver of sovereign immunity in "proceedings brought pursuant to 'Laws on the subject of Bankruptcies.'" *Central Virginia Community College v. Katz*, 546 U.S. 356, 377 (2006) (quoting U.S. Const. Art. I, §8, cl. 4).

The Commonwealth Parties counter that (1) Congress' abrogation under §106 is unconstitutional as determined by the Third Circuit in *Sacred Heart Hosp. of Norristown v. Pa. (In re Sacred Heart Hosp. of Norristown)*, 133 F.3d 237, 242 (3d Cir. 1998),[23] (2) *Sacred Heart* remains the law of this Circuit

---

[22] This Court acknowledges the practical consideration that its disposition of the Commonwealth Parties' sovereign immunity defense, regardless of outcome, is immediately appealable. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993); *In re City of San Bernardino*, Civ. No. 13-01797, 2014 WL 2511096, *4 (C.D. Cal. Jun. 4, 2014).

[23] In *Sacred Heart*, the Third Circuit addressed an appeal from a district court's determination that §106(a) violates the Eleventh Amendment to the United States Constitution. In reaching this result, the district court relied upon the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). Discussing the import of the Supreme Court's *Seminole Tribe* decision, the Third Circuit recognized that Congress may abrogate the States' sovereign immunity only if two conditions are met. First, the relevant statute must "unequivocally express an intent to abrogate state immunity." *Sacred Heart*, 133 F.3d at 242. Second, the statute must have been passed pursuant to section five of the Fourteenth Amendment. *Id.* at 242-43. With regard to §106(a), the Third Circuit had no difficulty concluding it contained an unequivocal abrogation of sovereign immunity. *Id.* However, the Third Circuit found that §106(a) was enacted pursuant to Congress' Bankruptcy Clause power and not section five of the Fourteenth Amendment. *Id.* at 244-45. As a result, the Third Circuit held that "§106(a) is unconstitutional to the extent that it purports to abrogate state sovereign immunity in federal court." *Id.* at 245.

because the Supreme Court has not ruled on the constitutionality of §106 and specifically declined to address this precise issue in *Katz*, (3) sovereign immunity precludes the Trustee's request for the entry of a money judgment against the Commonwealth Parties, and (4) the Commonwealth Parties have not waived sovereign immunity by participating in the Debtor's bankruptcy.

### 1.    Waiver of Sovereign Immunity Under §106

The Supreme Court has issued several decisions regarding waiver of sovereign immunity in the bankruptcy context. *Katz*, 546 U.S. 356; *United States v. Nordic Village Inc*., 112 S.Ct. 1011 (1992); *Hoffman v. Connecticut Department of Income Maintenance*, 494 U.S. 96 (1989). Both *Nordic Village* and *Hoffman* addressed the prior iteration of §106. After Congress amended §106 to address the issues raised by *Nordic Village* and *Hoffman*, the Supreme Court, in *Katz*, was asked to determine whether the Bankruptcy Clause confers upon Congress the authority to abrogate the States' sovereign immunity.

Contrary to the Trustee's characterization of *Katz*, the Supreme Court expressly refused to address the abrogation contained in §106(a). *Katz*, 546 U.S. at 378 ("The relevant question is not whether Congress has 'abrogated' States' immunity in proceedings to recover preferential transfers."). In defining the application of sovereign immunity to Bankruptcy proceedings, the Supreme Court expressly stated that §106 was not relevant to its determination. *Id.* at 379 (stating that "our decision today…" does not rest "on any statement Congress had made on the subject of sovereign immunity."); *see also Killion v. New York Dept. of Taxation and Finance*, Civ. No. 12-027, 2012 WL 1086155 (N.D.N.Y. Apr. 2, 2012) (recognizing that *Katz* did not address the "questioned viability of 11 U.S.C. §106(a)); *In re Ginn-La St. Lucie Ltd., LLLP*, Bky. No. 08-29769, 2010 WL 8756757, *3-5 (Bankr. S.D. Fla. Dec. 10, 2010) (recognizing that *Katz* did not address §106(a)).

Instead, the Supreme Court premised its opinion upon the waiver of sovereign immunity caused by the States' ratification of the Constitution.

> The electable conclusion, then, is that States agreed in the plan of the Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to "Laws on the subject of Bankruptcies."

*Katz*, 546 U.S. at 377.

As this statement illustrates, the Supreme Court concluded the States' waiver was complete upon ratification and not dependent upon subsequent Congressional action.  Reviewing the historical record, the Supreme Court determined that, at the time of ratification, preference actions were understood to be included within the scope of "Laws on the subject of Bankruptcies."  *Id.* at 372 ("those who crafted the Bankruptcy Clause would have understood it to give Congress the power to authorize courts to avoid preferential transfers and to recover the transferred property.").  The Supreme Court was therefore able to conclude that in ratifying the Constitution the States necessarily contemplated and affirmatively waived sovereign immunity with regard to preference actions.

Because *Katz* did not premise its decision on §106 or otherwise address whether the Bankruptcy Clause confers upon Congress the authority to abrogate sovereign immunity, this Court must conclude that the Third Circuit's analysis of the constitutionality of §106 remains the law of this Circuit.  *See, e.g., In re Marshall*, 721 F.3d 1032, 1066 (9th Cir. 2013) (recognizing that the Third Circuit is *still* among the circuit that have determined that §106 is an invalid attempt to abrogate state sovereign immunity); *In re Diaz*, 647 F.3d 1073, 1085 (11th Cir. 2011) ("After *Katz*, then, courts faced with state-sovereign-immunity questions in bankruptcy proceedings should limit their focus to the 'litigation waiver' theory and the 'consent by ratification' theory.").  Until the Third Circuit revisits the issue, this Court is obligated, consistent with the Third Circuit's opinion in *Sacred Heart*, to find that §106(a) of the Bankruptcy Code may not be relied upon by the Trustee to defeat the Commonwealth Parties' assertion of sovereign immunity.  *See, e.g., In re Hammond*, 156 B.R. 943, 947-48 (E.D. Pa. 1993) ("In view of the Supreme Court's reticence, principles of *stare decisis* command this Court to follow the law as set forth by the Court of Appeals for the Third Circuit.").

**2.      Waiver of Sovereign Immunity by Ratification of the Constitution**

Finding that *Sacred Heart* remains the law of this Circuit with regard to the effect of abrogation of State sovereign immunity contained in §106(a), this Court must rely on the analysis contained in *Katz* to determine whether the Commonwealth Parties are entitled to invoke sovereign immunity to defeat this Court's jurisdiction to hear and adjudicate the causes of action asserted in the Trustee's Complaint.  As

explained by the Supreme Court, the States, by ratifying the Constitution, agreed to waive sovereign immunity with regard to "proceedings brought pursuant to 'Laws on the subject of Bankruptcies.'" *Katz*, 546 U.S. at 378. In explaining the scope of the waiver resulting from ratification, the Supreme Court had no difficulty concluding that *in rem* proceedings or proceedings ancillary to a bankruptcy court's *in rem* jurisdiction, otherwise known as *quasi in rem* actions, fell within the scope of "Laws on the subject of Bankruptcies." *Id.* at 373 (recognizing that sovereign immunity is waived with regard to any proceedings necessary to a bankruptcy court's *in rem* jurisdiction).

However, the Supreme Court struggled to determine whether a preference action, the subject of the underlying suit in *Katz*, brought pursuant to §547 is an *in rem* proceeding or a *quasi in rem* proceeding. Ultimately, the Supreme Court explicitly refused to characterize the nature of a preference action as *in rem* or *in personam*. *Id.* at 372 ("it is not necessary to decide whether actions to recover preference transfers pursuant to §550(a) are themselves properly characterized as *in rem*."). Instead, the Supreme Court found that preference actions were understood to be among the "Laws on the subject of Bankruptcy" that the States had, as a result of ratification, waived sovereign immunity. *Id.* (preference actions "had been a core aspect of the administration of the bankrupt estates since at least the 18th century.").

Based upon the Supreme Court's refusal to categorize preference actions as implicating a bankruptcy court's *in rem* or *in personam* jurisdiction,[24] this Court reads *Katz* to admit for three categories of proceedings for which the consent by ratification theory applies. The first two categories are easy to identify. If a cause of action is (1) an *in rem* cause of action, or (2) a cause of action that are ancillary to this Court's *in rem* jurisdiction, then this Court may infer that a cause of action was within the scope of the "Laws on the subject of Bankruptcy." *See, e.g., Sheils v. Bucks County Domestic Relations Section*, 921 F.Supp.2d 396, 401 n.4 (E.D. Pa. 2013) ("*Katz* teaches that we must look beyond labels to the function of [a cause of action] to determine whether it authorizes an *in rem* proceeding that is either

---

[24] As observed by the dissent, "the majority… offers no principled basis on which to draw distinctions in future cases." *Katz*, 546 U.S. at 388 n.4.

akin to those at the core of bankruptcy or necessary to effectuate such a jurisdictional exercise.").  The

third category is much more elusive.  *See, e.g., In re Omine*, 485 F.3d 1305, 1313 (11th Cir. 2007)

("While the Supreme Court clarified that it did 'not mean to suggest that every law labeled a 'bankruptcy'

law could, consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity,' it

did not delineate, other than authorizing the Bankruptcy Court's jurisdiction over the preference

avoidance proceedings at issue in *Katz*, where or how that line would be drawn.").  Namely, the third

category consists of causes of action that are neither *in rem* nor *quasi in rem* but are otherwise

proceedings that were understood by the drafters of the Bankruptcy Clause to be within the scope of the

"Laws on the subject of Bankruptcy."  In other words, a State may not invoke sovereign immunity when

the underlying cause of action sounds in "Laws on the subject of Bankruptcy" even if a cause of action is

not an *in rem* proceeding.  In delineating the scope of this third category, this Court recognizes that the

mere inclusion of a cause of action in the Bankruptcy Code will not be sufficient to qualify it.  *See, e.g.,*

*Diaz*, 647 F.3d at 1084 ("some proceedings, although they may arise under the Bankruptcy Code,

nevertheless lack a meaningful nexus to the bankruptcy courts' *in rem* jurisdiction and thus do not fall

within the scope of the States' consent to suit.").[25]  Within this framework, this Court will endeavor to

determine whether the Commonwealth Parties' invocation of sovereign immunity deprives this Court of

jurisdiction to address each cause of action asserted by the Trustee.

### 3.    Application of Sovereign Immunity to the §542 Turnover Action

Turnover actions are expressly designated as core proceedings.  28 U.S.C. §157(a)(2).  Section

542 proceedings are essential to the process of assembling a debtor's estate as defined by §541 of the

---

[25] Although not raised by the parties, this Court cannot help but recognize the similarity between *Stern*'s analysis of the constitutional scope of a bankruptcy court's authority to enter final judgments and *Katz*'s analysis of the scope of the States' waiver of sovereign immunity.  *Stern* stands for the proposition that a bankruptcy court's authority to enter final judgments is limited to the adjudication of causes of action that are derived "from a federal regulatory scheme" or are "completely dependent upon adjudication of a claim created by federal law." *Stern*, 131 S.Ct. at 2614.  Whereas, *Katz* stands for the proposition that the States' ratification of the Bankruptcy Clause resulted in a waiver of sovereign immunity for causes of action derived from "Laws on the subject of Bankruptcies." *Katz*, 546 U.S. at 377.  If the "Laws on the subject of Bankruptcies" may be treated as the equivalent, or at least the source of a "federal regulatory scheme," then it may be said that causes of action within the scope of a bankruptcy court's core jurisdiction may be co-extensive with the scope of causes of action that implicate the States' waiver.  This similarity suggests that if this Court lacks the authority to enter a final judgment on a cause of action, then the States may invoke sovereign immunity as a complete defense to that cause of action.

Bankruptcy Code regardless of whether such property is in the possession of a debtor. *In re Hertzberg*, 521 B.R. 99, 103 (Bankr. W.D. Pa. 2014); *In re Irwin*, 509 B.R. 808, 815 (Bankr. E.D. Pa. 2014); *In re Creative Data Forms, Inc.*, 41 B.R. 334, 336 (Bankr. E.D. Pa. 1984). As confirmed by *Katz*, the fundamental purpose of bankruptcy is the collection of a debtor's estate and distribution of estate assets among the estate's creditors. *Katz*, 546 U.S. at 362 ("the jurisdiction of courts adjudicating rights in the bankrupt estate included the power to issue compulsory orders to facilitate the administration and distribution of the *res*."); *see also* 28 U.S.C. §1334(e)(1) ("The district court in which a case under Title 11 is commenced or is pending shall have exclusive jurisdiction ... of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate...."); *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947) ("The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a *res*."). The *in rem* nature of turnover actions therefore renders sovereign immunity generally inapplicable to turnover actions. Accordingly, the Commonwealth Parties may not invoke sovereign immunity to divest this Court of jurisdiction to address the plausibility of the Trustee's §542 cause of action.[26]

### 4.     Whether the Fraudulent Conveyance Actions Implicate an Identifiable *Res*

While a properly pled §542 cause of action certainly implicates this Court's *in rem* jurisdiction, the same is not true of the Trustee's fraudulent conveyance actions. As elaborated by *Katz*, a State's sovereign immunity is waived if a cause of action is (1) an *in rem* cause of action, or (2) a cause of action that are ancillary to a court's *in rem* jurisdiction.[27] Problematically, the Trustee's Fraudulent Transfer Claims, to the extent they seek avoidance of the revocation of the License, fail to implicate either category as there is no "property" of the Debtor at issue.

---

[26] Due to its deposit into the State Gaming Fund at which point it came under the custody and control of the Pennsylvania Treasury Department, this Court notes that the Debtor's interest in the License Fee is likely not a *res* to which this Court's *in rem* jurisdiction may attached. *Nordic Village*, 503 U.S. at 38-39 (holding that suits to recover a sum of money do not implicate a *res* to which a bankruptcy court's *in rem* jurisdiction could attach); *In re Allen*, 768 F.3d 274, 280 (3d Cir. 2014) (recognizing that when a plaintiff seeks recovery of a sum of money and not particular dollars a bankruptcy court's *in rem* jurisdiction is not implicated).

[27] Whether the fraudulent conveyance actions are within the scope of "Laws on the subject of Bankruptcy" will be addressed in the subsequent section.

Fortunately for this Court, the Commonwealth Court adjudicated the nature of the Debtor's interest in the License. To explain its conclusion that the Debtor's due process rights were not violated by the revocation proceedings conducted by the Gaming Board, the Commonwealth Court addressed the nature of the Debtor's interest in the License and determined it to be a "revocable privilege… to transact business in the Commonwealth." *Commonwealth Opinion*, 34 A.3d at 276 (in a footnote, the Commonwealth Court identified the state law governing the inquiry and stated "Section 1102(7) of the Gaming Act, 4 Pa. C.S.A. §1102(7), specifically states that a slot machine license is a privilege…" and "No person holding a license is deemed to have any property rights related to the license."). Consistent with Supreme Court precedent, a debtor's rights in a revocable privilege to conduct certain activities is not sufficient to invoke a court's *in rem* jurisdiction. *Marrone v. Washington Jockey Club of District of Columbia*, 227 U.S. 633, 636-37 (1913) (holding that a revocable license did not create "a right *in rem*"); *In re Braniff Airways, Inc*., 700 F.2d 935, 942 (5th Cir. 1983) (holding landing slots granted by FAA to debtor are not property and thus not subject to bankruptcy court's jurisdiction); *In re Hook*, Civ. No. 07-00631, 2008 WL 2856454 (D. Colo. Jul. 23, 2008) (affirming bankruptcy court's determination that a license to practice law was not property to which bankruptcy court's *in rem* jurisdiction attached); *Levine v. Brooklyn Nat. League Baseball Club*, 36 N.Y.S.2d 474, 477 (N.Y. Sup. 1942) (recognizing that a revocable license "does not create a right *in rem*").

In confirming that the License does not constitute a *res* to which this Court's *in rem* jurisdiction attaches, this Court places significant weight upon the analysis contained in *Village of Rosemont v. Jaffe*, 482 F.3d 926 (7th Cir. 2007)[28] that addressed a debtor's attempts to prevent a state from engaging in the *postpetition* revocation of a gaming license. In *Village of Rosemont*, the Seventh Circuit addressed the appeal of the dismissal of the creditor's adversary complaint that sought, *inter alia*, the specific performance of the debtor's plan of reorganization pursuant to §105. In relevant part, the debtor's plan

---

[28] Admittedly, *Village of Rosemont*'s procedural posture is somewhat different. In *Village of Rosemont*, the debtor sought bankruptcy relief prior to the revocation of its license. Here, the Debtor sought bankruptcy relief after the revocation of the License and after the revocation was confirmed by the Commonwealth Court. As a result of this difference, the application of the *Rooker-Feldman* Doctrine or preclusion doctrines was not relevant to the disposition of the matters raised in *Village of Rosemont*.

called for the Illinois Gaming Board to refrain from conducting proceedings to revoke the debtor's

gaming license.  Although the Illinois Gaming Board initially consented to the debtor's plan, changes to

its composition led it to reverse its position thereby frustrating the debtor's performance of its confirmed

plan.

      As here, the Illinois Gaming Board was not a creditor of the debtor and had not otherwise

asserted any request for relief in the bankruptcy proceedings.  *Village of Rosemont*, 482 F.3d at 936.  To

the extent it had participated in the debtor's bankruptcy, the Illinois Gaming Board did so by initially

consenting to a suspension of revocation proceedings and to permit, pursuant to the confirmed plan, the

transfer of the debtor's license to a new holder.  Despite these actions, the Seventh Circuit affirmed the

lower courts' determination that "there was no valid abrogation of the state's Eleventh Amendment

immunity and the proceeding was not within the bankruptcy court's *in rem* jurisdiction."  *Id.* at 938.

      In reaching its conclusion that the suit did not implicate a *res* and therefore barred by sovereign

immunity, the Seventh Circuit distinguished the applicability of *Katz.*  In relevant part, the Seventh

Circuit stated:

> If Rosemont is arguing that the Board, by asserting its regulatory authority over the
> license, somehow waived its sovereign immunity in the bankruptcy court, we must reject
> that position.  This is not a case like *Central Virginia Comm. College v. Katz*, 546 U.S.
> 356, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006), in which a state agency was defending an
> action by a trustee to recover a preferential transfer of funds.  There the question was
> simple: who gets the money, the bankruptcy estate or the state agency?  The Board here
> had no claim against Emerald; it was not Emerald's creditor.  Rosemont takes issue with
> the latter proposition because, under the IRGA, if the license is revoked and if the state
> later reissues it to another party, the state will be paid for the new license (and, of course,
> those funds will not be available to pay the prior licensee's creditors).  That possible
> chain of events, however, is not enough to make the state or the Board one of *Emerald's*
> creditors.  *Nor do we accept the argument that we should treat Emerald's license as a res
> with respect to which the bankruptcy court had the authority to displace the state's police
> power.*  If the question were merely who was entitled to a license that was not subject to
> revocation, we would have a different case.  But whatever property right the license
> conferred has always been subject to, or conditioned on, the regulatory powers of the
> state.  *Nothing in the bankruptcy laws permits the court to enjoin the Board, a state
> regulatory agency, from exercising the police powers of the state to regulate the
> gambling industry.*

*Village of Rosemont*, 482 F.3d at 936-37 (emphasis added).

In reaching this result, the Seventh Circuit relied upon Illinois's police powers as codified by Illinois Riverboat Gambling Act. The Seventh Circuit observed that "[n]othing in the IRGA even hints at the idea that a gambling license, once granted, is a vested right in the hands of the operator." *Village of Rosemont*, 482 F.3d at 937. In evaluating similar language in the Gaming Act, the Commonwealth Court reached an identical conclusion regarding the discretion of the Gaming Board. *Commonwealth Opinion*, 34 A.3d at 275 ("the Board has sole regulatory authority over the conduct of gaming and related activities in the Commonwealth, vesting broad discretion with the Board to administer all aspects of the gaming industry in Pennsylvania."). Going further, the Commonwealth Court expressly determined that "PEDP's License has been deemed by the General Assembly and the Board a revocable privilege." *Id.* at 276.

Due to the parallel status of gaming licenses under Pennsylvania and Illinois law, this Court agrees with the Seventh Circuit's analysis and determines that the Debtor's alleged interest in the License may not be considered a *res* to which this Court's *in rem* jurisdiction may attach. As confirmed by the *Commonwealth Opinion*, the Gaming Board acted within its discretion when it acted to revoke the License. *See, e.g., Chasensky v. Walker*, Civ. No. 11-1152, 2012 WL 1287659, *3 (E.D. Wis. Apr. 16, 2012) (holding that the adjudication of a debtor's employment claims against a state does not implicate a bankruptcy court's *in rem* jurisdiction). If, as determined by the Seventh Circuit, the Bankruptcy Code does not provide any means for a bankruptcy court to enjoin the revocation of a gaming license,[29] it would follow that Bankruptcy Code does not provide any means for this Court to order the Gaming Board to avoid the revocation of the License or to otherwise restore the License or its alleged value to the Debtor.

5.    **Whether the Fraudulent Conveyance Actions Implicate the "Laws on the subject of Bankruptcy"**

Without a *res* to which this Court's *in rem* jurisdiction may attach, this Court must attempt to determine whether the Fraudulent Conveyance Actions implicate the third category of legal actions for which sovereign immunity was waived as a result of ratification. In other words, this Court must

---

[29] *Village of Rosemont*, 482 F.3d at 937.

determine whether fraudulent conveyance actions were, at the time of ratification, also understood to be among the "Laws on the subject of Bankruptcy." *See, e.g., Sheils*, 921 F.Supp.2d at 401 (recognizing that *Katz* premised its holding upon the abrogation caused by ratification of the Bankruptcy Clause); *In re DBSI, Inc.*, 463 B.R. 709, 714 (Bankr. D. Del. 2012) ("Instead of looking to whether the actions at issue were based on the court's *in rem* jurisdiction, or distinguishing amongst various other appellations, *Katz* teaches us to look to whether the Framers would have understood Congress to have the power to authorize the court take the actions in question.").[30]

Courts applying *Katz*, relying on its language limiting its holding to a "limited sphere," have acknowledged that its holding may not extend to all causes of action identified as "bankruptcy" causes of action.[31]  Similarly, the mere fact that Congress has "labeled" a cause of action as relating to bankruptcy by including it within the core jurisdiction of a bankruptcy court is not sufficient to establish that the States may not invoke sovereign immunity as a defense.  *Katz*, 546 U.S. at 378 n.15 (recognizing that the labeling of an action as "a 'bankruptcy' law does not control whether the States acquiesced to suit").  *Katz* recognizes that some bankruptcy actions, despite being labeled as such, are nevertheless outside of the scope of the States' waiver resulting from ratification.  *See, e.g., Sheils*, 921 F.Supp.2d at 401 n.4.  While *Katz* does establish that *in rem* and *quasi in rem* actions are within the understood scope of the Bankruptcy Clause, it fails to include any guidance for addressing those bankruptcy actions, other than preference actions, that are not obviously *in rem* or *quasi in rem*.  *Katz*, 546 U.S. at 388 n.4 ("the majority… offers no principled basis on which to draw distinctions in future cases."); *Omine*, 485 F.3d at

---

[30] Absent the possibility of waiver caused by ratification, the Trustee would not be able to bring a fraudulent conveyance action against the Commonwealth Parties.  Pursuant to the Pennsylvania Sovereign Immunity Act, the Commonwealth enumerated the classes of actions for which it has consented to suit. 42 Pa. C.S.A. §8522.  None of the nine exceptions waive sovereign immunity with regard to tortious misconduct.  *Knauss v. Shannon*, Civ. No. 08-1698, 2010 WL 569829, *15 (M.D. Pa. Feb. 12, 2010) (recognizing "§8522… does not provide an exception for willful misconduct").  The retention of a fraudulent transfer is considered an intentional tort.  *See, e.g., Gambone v. Lite Rock Drywall*, 288 Fed. Appx. 9, 14 (3d Cir. 2008) (recognizing that participation in a fraudulent conveyance "is a species of the intentional tort of fraud).  Therefore, the Trustee's fraudulent conveyance actions would not fit among any of exceptions enumerated by the Pennsylvania Sovereign Immunity Act.  *See, e.g., Orozoco v. Pa. Dept. of Corrections*, 2014 WL 117475 (Pa. Cmwlth. Jan. 14, 2014) (recognizing that an action premised upon an intentional tort committed by a Commonwealth official is barred by sovereign immunity).

[31] Conversely, at least one Court has relied on *Katz* to acknowledge that its rationale may extend to causes of action that do not arise "under the Bankruptcy Code."  *Sheils*, 921 F.Supp.2d at 401 (applying *Katz* to determine whether sovereign immunity applied to the garnishment provisions of the Consumer Protection Act, 15 U.S.C. §1673).

1313 (recognizing that *Katz* "did not delineate, other than authorizing the Bankruptcy Court's jurisdiction over the preference avoidance proceedings at issue in *Katz*, where or how that line would be drawn."); *Sheils*, 921 F.Supp.2d at 401 (recognizing that *Katz* "cabined its holding").

Undoubtedly, fraudulent conveyance actions have existed since at least the time of ratification. *In re Cybergenics Corp.*, 226 F.3d 237, 242 (3d Cir. 2000) ("This creditors' remedy is age-old.").  However, this Court cannot conclude that the contemporaneous existence of fraudulent conveyance actions and the States' ratification of the Bankruptcy Clause indicates that the States necessarily understood the former to be implicated by the latter.  Short of time travel, the Supreme Court offered no guidance as to how a bankruptcy court may attempt to identify causes of action that may have been "labeled" by Congress as bankruptcy actions but may nevertheless remain outside the scope of "Laws on the subject of Bankruptcies."  As a result, this Court cannot divine an easy answer to the question of whether fraudulent conveyance actions are within the scope of Laws on the subject of Bankruptcies.  Without any guideposts, the best this Court can do is determine whether fraudulent conveyance actions are sufficiently similar to preference actions so as to have been understood by the States, at the time of ratification, to have been also within the scope of the "Laws on the subject of Bankruptcy."

Fraudulent conveyance actions differ from preference actions in at least two significant respects. First, fraudulent conveyance actions exist independent of Congressional action.  Fraudulent conveyance actions "are quintessentially suits at common law…," *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989), that are creatures of state law that were incorporated into bankruptcy cases by Congress' passage of §§544 and 548.  *In re Agriprocessors, Inc.*, 479 B.R. 835, 842 (Bankr. N.D. Ia. 2012) ("Although §544 incorporates state law to provide the 'rules of decision,' the claim still arises under §544 which is a federal bankruptcy cause of action stemming from the bankruptcy itself."); *In re Universal Marketing, Inc.*, 459 B.R. 573, 576 (Bankr. E.D. Pa. 2011) ("Even though §544 incorporates state law to provide the 'rules of decision,' a §544 claim is a federal bankruptcy cause of action."); *In re Grubbs Const. Co.*, 321 B.R. 346, 350 (Bankr. M.D. Fla. 2005) ("section 544(b) does not create a substantive right to avoid transfers.").  Whereas, preference actions do not exist independent of Congressional action.  *In re Tyler*,

24

493 B.R. 905, 914 (Bankr. N.D. Ga. 2013) ("No such action exists outside of federal bankruptcy law; Congress created the right for a trustee or debtor-in-possession to assert the right to recover an avoidable preference."); *West v. Freedom Med., Inc. (In re Apex Long Term Acute Care-Katy, L.P.)*, 465 B.R. 452, 463 (Bankr. S.D. Tex. 2011) ("The cause of action for preferential transfers is established by the Bankruptcy Code."). To this day, a creditor's right to recover fraudulent conveyance exists outside of bankruptcy.

To the extent fraudulent conveyance actions are incorporated into Bankruptcy proceedings, they are incorporated for reasons of administrative convenience. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (empowering a trustee with the creditors' right to bring fraudulent conveyance actions "prevents independent avoidance actions by creditors that might prejudice the estate and rival creditors."); *In re Nat'l Forge Co.*, 326 B.R. 532, 554 (W.D. Pa. 2005) (stating that the purpose of vesting a bankruptcy trustee with the creditors' right to bring fraudulent conveyance actions is "to avoid a multiplicity of piecemeal litigation"). Being premised *on creditors' rights* and not a debtor's property interests, fraudulent conveyance actions are therefore further distinguishable from preference actions. *See, e.g., Apex*, 465 B.R. at 463 n.3 (stating adjudication of §547 actions is "more akin to a determination that a particular asset falls within the provisions of §541").

Second, unlike preference actions, the adjudication of fraudulent conveyance actions does not necessarily implicate the claims resolution process. *See, e.g., Northern Pipe Line Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (distinguishing "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power ... from the adjudication of state created private rights"). As recognized in *Katz*, preference actions are part and parcel of the claim resolution process. *Katz*, 546 U.S. at 371-72 (recognizing that a preference action "operates to bar that claim until the preference is turned over"); *see also Apex*, 465 B.R. at 463 ("The entire purpose of the [preference] action, then, is to enforce the Bankruptcy Code's equality of distribution"). To prevail on a preference action, a trustee must establish as one of the elements of its cause of action that the preferential transfer resulted in a creditor receiving a greater distribution than it would have otherwise received through the

25

Bankruptcy Code's distribution scheme.  11 U.S.C. §547(b)(5)(C).[32]  In addition, the remedy imposed

entitles the recipient of a preferential payment to receive a distribution from the estate.  If a payment to a

creditor is avoided, a creditor will become the holder of a claim against the estate in the amount of the

avoided payment.  11 U.S.C. §502(h); *In re Quebecor World (USA), Inc.*, 491 B.R. 363, 367 n.2 (Bankr.

S.D.N.Y. 2013) ("A successful preference case will result in the creation of a claim against the estate for

the losing creditor who, while not entitled to retain the preferential payment, will nonetheless be entitled

to recover pro rata in distributions as an unsecured creditor").

      The same is not true of fraudulent conveyance actions.  None of the rules of decision incorporated

by §544 or §548 implicate the Code's distribution scheme.  As recognized by the Supreme Court in

*Granfinanciera*, the Trustee's fraudulent conveyance causes of action "more nearly resemble state-law

contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do

creditors' hierarchically ordered claims to a pro rata share of the bankruptcy *res*."  *Granfinanciera*, 492

U.S. at 56.  In addition, the recipient of an avoided fraudulent conveyance receives a claim against the

estate only if the transferee can establish that it acted in good faith under §548(c).  *In re Foundation for

New Era Philanthropy*, 201 B.R. 382, 393 n.1 (Bankr. E.D. Pa. 1996).

      These differences between preference actions and fraudulent conveyance actions may be distilled

to an essential concept, *the legitimacy of the alleged debt*.  On the one hand, preference actions do not

challenge the legitimacy of the debt owed to the creditor.  *Apex*, 465 B.R. at 463 ("Preferential transfers

are payments for legitimate debts.").  Rather, preference actions are concerned with ensuring the equal

treatment of similarly situated creditors.  *In re Molded Acoustical Products, Inc.*, 18 F.3d 217, 224 (3d

Cir. 1994) (recognizing preference actions are intended to promote "the paramount bankruptcy policy of

the equitable treatment of creditors");*Gillman v. Scientific Research Prods. Inc. of Del. (In re Mama

D'Angelo, Inc.)*, 55 F.3d 552, 554 (10th Cir. 1995) (recognizing the purpose of a §547(b) action is "to

---

[32] Because Congress has supplied the rules of decision, it may be said that preference actions implicate public rights because they are "completely dependent upon adjudication of a claim created by federal law."  *Stern*, 131 S.Ct. at 2614 (distinguishing public and private rights).

secure an equal distribution of assets among creditors of like class").  On the other hand, fraudulent

conveyance actions do not address whether a transfer caused a creditor to obtain more than her fair share

of the bankruptcy estate.  Rather, fraudulent conveyance actions are premised upon the alleged

illegitimacy of the underlying debt.  They address whether a transfer constitutes an attempt by a debtor to

hide assets as a part of a scheme to defraud her legitimate creditors.  *See, e.g., In re Lease-A-Fleet, Inc.*,

155 B.R. 666, 672-73 (Bankr. E.D. Pa. 1993) ("It has long been recognized that debtors often attempt to

evade the payment of legitimate debts by concealing or transferring property.").

Drawing on these differences, this Court could rely on the independent existence of fraudulent

transfer actions in the common law and their lack of a direct relation to the claims resolution process to

conclude that fraudulent transfer actions are sufficiently dissimilar from preference actions so as not to be

among the "Laws on the subject of Bankruptcy."  However, the Supreme Court has, in other contexts,

largely treated the two causes of action as interchangeable.  In both *Granfinanciera* and *Lagenkamp*, the

Supreme Court addressed the application of the Seventh Amendment to a bankruptcy court's adjudication

of these actions.  The issue of whether both actions implicated a party's Seventh Amendment jury trial

right was an issue that long divided bankruptcy courts and was ultimately resolved in the affirmative by

the Supreme Court.  *See, e.g., Langenkamp*, 498 U.S. at 45 (holding that a party who has not submitted a

proof of claim is entitled to a jury trial on preference actions); *Granfinanciera*, 492 U.S. at 36 (holding

that a party who has not submitted a proof of claim is entitled to a jury trial on fraudulent conveyance

actions).  Pursuant to this line of cases, the Supreme Court concluded that fraudulent conveyance actions

and preference actions were legal actions when the defendant had not filed a proof of claim.

*Langenkamp*, 498 U.S. at 45 ("If a party does not submit a claim against the bankruptcy estate, however,

the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to

recover a monetary transfer"); *Granfinanciera*, 492 U.S. at 49 ("Respondent's fraudulent conveyance

action plainly seeks relief traditionally provided by law courts or on the law side of courts having both

legal and equitable dockets.").[33]  As legal actions outside of a bankruptcy court's equitable jurisdiction, a defendant retained a right to jury trial.

Relying on the status of fraudulent conveyance actions as involving the adjudication of private rights, the Supreme Court held that the Congressional designation of fraudulent conveyance actions as core proceedings did not divest a defendant in a fraudulent conveyance action filed in a bankruptcy court of its right to a jury trial.  As it did in *Katz*, the Supreme Court in *Granfinanciera* reached its result by conducting a survey of law as it was applied in the later 18th century.  *Granfinanciera*, 492 U.S. at 43-44.  In relevant part, the Supreme Court summarized its findings as follows:

> Respondent adduces no authority to buttress the claim that suits to recover an allegedly fraudulent transfer of money, of the sort that he has brought, were typically or indeed ever entertained by English courts of equity when the Seventh Amendment was adopted…  We therefore conclude that respondent would have had to bring his action to recover an alleged fraudulent conveyance of a determinate sum of money at law in 18th-century England, and that a court of equity would not have adjudicated it.

*Id.* at 44-47.

Finally, the Supreme Court placed weight on the fact that the defendant in *Granfinanciera* had not filed a proof of claim against the estate.

> Because petitioners here… have not filed claims against the estate, respondent's fraudulent conveyance action does not arise "as part of the process of allowance and disallowance of claims."  Nor is that action integral to the restructuring of debtor-creditor relations.  Congress therefore cannot divest petitioners of their Seventh Amendment right to a trial by jury.

*Id.* at 58-59.

More recently, the Supreme Court has reaffirmed its position that fraudulent conveyances are outside a bankruptcy court's core jurisdiction.  In *Arkison*, the Supreme Court addressed the issue of the "statutory gap" created by *Stern*'s exclusion of private rights from the matters deemed core by §157(b)(1).  *Executive Benefits Insurance Agency v. Arkison*, 134 S.Ct. 2165 (2014).  As predicted by many courts, the

---

[33] The Trustee is seeking a judgment in the amount of $50,000,000 representing (i) the amount of the License Fee and (2) the alleged value of the License.  Consistent with *Granfinanciera*, this Court acknowledges that the relief sought by the Trustee sounds in law and not equity.  *Granfinanciera*, 492 U.S. at 49 n.7 ("Because dollars are fungible… a complete remedy is available at law, and equity will not countenance an action when complete relief may be obtained at law.").

Supreme Court explained those causes of action that had been improperly designated as core proceedings and that they were therefore subject to the procedures governing a bankruptcy court's related-to jurisdiction. *Id.* at 2173. Applying this framework to the fraudulent conveyance action that formed the basis of the suit, the Supreme Court was careful not to decide whether fraudulent conveyance claims are "*Stern* claims." *Id.* at 2174. However, the Supreme Court had no difficulty concluding that "the fraudulent conveyance claims in this case are 'not core'" and "fraudulent conveyance claims are self-evidently 'related to a case under title 11.'" *Id.* at 2174.

The Supreme Court's prior classification of fraudulent conveyance actions and preference actions as "legal actions"[34] takes on additional significance when viewed through the lens of *Katz*. As noted, *Katz* refused to categorize preference actions as either *in rem* or *quasi in rem* proceedings. On its face, *Katz* also appears to walk back from the Supreme Court's prior designation of preference actions as legal actions. *See, e.g., Apex*, 465 B.R. at 462 n.2 ("this Court concludes that *Katz* broke significantly from *Katchen*[35] and *Schoenthal*.").[36] Despite this apparent departure, *Katz* omits any reference to *Katchen* or *Schoenthal* let alone a discussion of a party's Seventh Amendment rights in a preference action. Perhaps in light of the Supreme Court's prior precedent, the Supreme Court saw no need to reiterate what appears to be settled law. For this reason, this Court must conclude that the Supreme Court intended to leave its prior precedent intact.

In an effort to harmonize the outcome of *Katz* with the Supreme Court's prior precedent, this Court acknowledges the significance of a creditor's filing of a proof of claim. As elaborated in *Lagenkamp*, the filing of a proof of claim has the effect of transforming what is otherwise a legal action into an equitable action to which no jury trial right attaches.

[B]y filing a claim against a bankruptcy estate the creditor triggers the process of

---

[34] It has long been recognized that legal actions countenance the recovery of money damages whereas equitable actions "will always, by its decree, declare the rights, interest, or estate…" *Clews v. Jamieson*, 182 U.S. 461, 479 (1901) (addressing trust law).

[35] *Katchen v. Landy*, 86 S.Ct. 467 (1966).

[36] *Schoenthal et al. v. Irving Trust Co.*, 53 S.Ct. 50 (1932).

"allowance and disallowance of claims," thereby subjecting himself to the bankruptcy
court's equitable power.  If the creditor is met, in turn, with a preference action from the
trustee, that action becomes part of the claims-allowance process which is triable only in
equity.  In other words, the creditor's claim and the ensuing preference action by the
trustee become integral to the restructuring of the debtor-creditor relationship through the
bankruptcy court's *equity jurisdiction*.  As such, there is no Seventh Amendment right to
a jury trial.  If a party does not submit a claim against the bankruptcy estate, however, the
trustee can recover allegedly preferential transfers only by filing what amounts to a legal
action to recover a monetary transfer.  In those circumstances the preference defendant is
entitled to a jury trial.

*Langenkamp*, 498 U.S. at 45 (emphasis in original and citations omitted).

For whatever reason, the Supreme Court did not address in *Katz* whether the State entities filed

proofs of claim in the debtor's underlying bankruptcy.  However, a review of the underlying history

establishes that the state entities did in fact file proofs of claim.[37]  Therefore, in accordance with *Katchen*

and rationale articulated in *Langenkamp*, this Court may infer that the preference action underlying the

*Katz* proceeding ceased to retain its status as a legal action to which a jury trial right attaches.  Perhaps

this fact explains why the Supreme Court saw no need to address either *Katchen or Lagenkamp* when, in

*Katz*, it elaborated upon the nature of the preference actions as being within the "Laws on the subject of

Bankruptcy."

In comparison, the Commonwealth Parties have not filed a proof of claim.  As such, the

Commonwealth Parties remain, if they demand it, entitled to a jury trial on the fraudulent conveyance

causes of action pled in Counts II and III of the Complaint.  *See, e.g., Kaliner v. MDC Systems Corp.,*

*LLC*, 2012 WL 5400045, *2 (E.D. Pa. Nov. 5, 2012) ("this Court concludes that *Kaliner's* fraudulent

conveyance claim asserts a 'private right,' and that the LLC has a right to a jury trial."); *Northwestern*

*Institute of Psychiatry, Inc. v. Travelers Indem. Co.*, 272 B.R. 104, 111 (E.D. Pa. 2001) (recognizing that

party timely asserted jury demand by including it in its answer); Fed. R. Civ. P. 38.  Accordingly, the

Commonwealth Parties' retention of their jury right may serve as yet another reason to conclude that,

despite the Supreme Court's similar treatment of the two causes of action in the Seventh Amendment

---

[37] *See* Claim No. 3-1 filed in *In re Wallace's Bookstores, Inc.*, Bky. No. 01-50545 (Bankr. E.D Ky.).

context, the Trustee's fraudulent conveyance actions are distinguishable from the preference actions addressed in *Katz*.

The historical role of juries in bankruptcy proceedings suggests that fraudulent conveyance proceeding were not understood to be within the scope of the States' waiver caused by ratification. As a result of *Granfinanciera* and in attempts to implement its holding, Congress authorized bankruptcy courts pursuant to the Bankruptcy Reform Act of 1994 to conduct jury trials. Prior to the passage of this enabling legislation, the authority of bankruptcy courts to conduct jury trials was uncertain and the majority of circuits concluded that bankruptcy courts lacked this authority. *Compare Ben Cooper, Inc. v. Ins. Co. of Pa. (In re Ben Cooper, Inc.)*, 896 F.2d 1394 (2d Cir. 1990) *with In re Stansbury Poplar Place, Inc.*, 13 F.3d 122 (4th Cir. 1993); *In re Kaiser Steel Corp.*, 911 F.2d 380, 392 (10th Cir. 1990); *In re Grabill Corp.*, 967 F.2d 1152 (7th Cir. 1992); *In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169 (6th Cir. 1992); *In re United Missouri Bank, N.A.*, 901 F.2d 1449 (8th Cir. 1990). Those circuits that held that bankruptcy courts could conduct jury trials concluded that bankruptcy courts may conduct jury trials in core proceedings but not noncore proceedings. *See, e.g., Ben Cooper*, 896 F.2d at 1403. The majority of circuits reached their conclusion by reference to the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. 98-353, 98 Stat. 333. As stated by the Fourth Circuit in *Stansbury*, "there is a consensus that the 1984 Act contains no express statutory authority for the bankruptcy court to conduct jury trials." *Stansbury*, 13 F.3d at 127.

The courts explained this omission by reference to Congress's historical understanding of the role of bankruptcy courts. As explained by the Tenth Circuit:

> We are also persuaded by the absence of any express provision authorizing jury trial before bankruptcy judges. Congress in the past has provided expressly for jury trials in the Article I context. *See* 28 U.S.C. §636(a)(3), (c)(1) (authorizing United States magistrates to conduct jury trials with the consent of the parties). The absence of such a provision, particularly when Congress chose to expressly grant such authority in the analogous provisions for United States magistrates, is particularly compelling.

> Congress had no specific intent to vest bankruptcy judges with the authority to conduct jury trials. Until *Granfinanciera, it was possible for Congress to presume that jury trial rights would not extend to core proceedings*. As such, no authority to conduct such trials needed to be granted.

*Kaiser Steel Corp.*, 911 F.2d at 391-92 (emphasis added).

To summarize, these circuits concluded that Congress did not grant bankruptcy courts the authority to conduct jury trials because Congress understood jury trials to be generally unavailable in bankruptcy proceedings. Similarly, this Court *may* infer that, as a matter of historical record, the authority to conduct jury trials was not contemplated by the States as being necessary to the administration of Bankruptcy law. *See, e.g., United Missouri Bank*, 901 F.2d at 1453 ("there was no statutory authority for bankruptcy judges to conduct jury trials under the 1898 Act, and the procedural rules governing the bankruptcy courts did not grant this authority until 1973."). If bankruptcy courts were not understood in 1984 as being tribunals with the authority to conduct jury trials, it is doubtful that 200 years prior the States would have understood the bankruptcy laws to require tribunals with the authority to conduct jury trials. Accordingly, this Court may infer that the States would not have anticipated the waiver of sovereign immunity caused by ratification would apply to causes of action requiring juries.

Returning to the framework elaborated by *Katz*, the States by ratifying the Constitution, and the Bankruptcy Clause in particular, agreed to a waiver of sovereign immunity with regard to the "Laws on the subject of Bankruptcies." As elaborated, there are sufficient differences between preference actions and fraudulent conveyance actions to justify treating each differently. Chief among those differences being the designation of fraudulent conveyance actions as non-core. *Arkison*, 134 S.Ct. at 2174. However, those differences would be immaterial if the States, at the time of ratification, understood both, despite their differences, to be within the scope of the "laws on the subject of Bankruptcies." Unfortunately for this Court, few courts have addressed whether fraudulent conveyance actions were within the Framer's understanding of the laws on the subject of Bankruptcies.

Based upon this Court's research, this Court has identified only two courts that have squarely addressed whether ratification divests the States of sovereign immunity from fraudulent conveyance

actions.[38]  Muddling matters, the two decisions reached disparate results.  *Compare DBSI*, 463 B.R. at

714 ("While *Katz* dealt with preferential transfers, whereas here I deal with fraudulent transfers, the

parallel is clear.") *with Ginn*, 2010 WL 8756757, at *3-5 (holding that consent by ratification applied to

§548 actions but not to §544(b) actions because §544(b) "does not create a substantive right to avoid

transfers").[39]  In *DBSI*, the bankruptcy court canvassed various historical sources to conclude that, like

preference actions, fraudulent conveyance actions were understood by the Framers "to give Congress the

power to authorize courts to avoid fraudulent transfers and to recover the relevant property."  *DBSI*, 463

B.R. at 714.  Whereas, in *Ginn*, the bankruptcy court relied upon the potential non-uniformity of state law

fraudulent conveyance actions to conclude States did not waive sovereign immunity with regard to

§544(b) yet did with regard to §548.  *Ginn*, 2010 WL 8756757, *5.

Of the two approaches, this Court believes the court in *DBSI* to have employed an approach

consistent with *Katz*.  In *DBSI*, the Bankruptcy Judge Walsh addressed whether the fraudulent

conveyance actions brought by a litigation trust were defeated by the sovereign immunity defense

invoked by the taxing authorities of a variety of States who had been named as defendants.  *DBSI*, 463

B.R. at 711 ("The principal question presented here is whether the Movant States sovereign immunity

was abrogated for suits under §544(b)(1)…").  Recognizing that *Katz* stands for the proposition that any

abrogation of sovereign immunity resulted from the States' ratification of the "plan of the Convention,"

Bankruptcy Judge Walsh held that, like preference actions, fraudulent conveyance actions were within the

scope of the Bankruptcy Clause as understood by the Framers.  *DBSI*, 463 B.R. at 714-15 ("those who

crafted the Bankruptcy Clause … would they have understood that Clause to give Congress the power to

---

[38] Other courts have addressed whether the States and their subdivisions are immune from suits brought pursuant §544(b) and §548.  *See, e.g., In re Redf Marketing, LLC*, Bky. No. 12-32462, 2015 WL 1137661 (Bankr. W.D.N.C. Mar. 10, 2015); *In re Lewiston*, 528 B.R. 387 (Bankr. E.D. Mich. 2015).  However, they have done so in the context of §106.  As a result of the applicability of the Third Circuit's *Sacred Heart* decision to this Court's consideration, this Court therefore finds those cases unpersuasive.

[39] This Court does not agree that the distinction between fraudulent transfer actions brought pursuant to §544(b) or §548 is material.  It cannot be that Congress can render sovereign immunity inapplicable simply by restating within the Bankruptcy Code the elements of a state law cause of action.  Such a result would appear to run afoul of the *Katz*'s instruction that bankruptcy courts look beyond Congressional labels to determine whether a cause of action implicates sovereign immunity.  *Katz*, 546 U.S. at 378 n.15.

authorize courts to avoid fraudulent transfers and to recover the relevant property."). Just as the Supreme

Court did in the context of preference actions, Bankruptcy Judge Walsh canvassed historical sources to

reach his conclusion.[40] However, reference to his conclusion does not erase this Court's concerns

regarding the potential significance of the substantial differences between the two causes of action.

      Perhaps the differences between fraudulent conveyance actions and preferences actions are

sufficient for this Court to conclude that the former are not necessarily within the rule elaborated by *Katz*.

These differences may warrant the conclusion that *Katz*'s conclusions regarding preference actions are

inapplicable to fraudulent conveyance actions. However, the evidence is ambiguous at best. *Compare*

*Arkison*, 134 S.Ct. at 2174 ("fraudulent conveyance claims are self-evidently 'related to a case under title

11.'") *with Granfinanciera*, 492 U.S. at 56 (stating fraudulent conveyance claims "more nearly resemble

state-law contract claims"). This Court cannot, with any certainty, infer from these differences that the

States' did not understand, at the time of ratification, the adjudication of fraudulent transfer actions as

being outside the "Laws on the subject of Bankruptcies." As Justice White observed in the dissent in

*Granfinanciera*, "[o]ther scholars have looked at the same history and come to a different conclusion…

[and] the historical evidence thus in equipoise." *Granfinanciera*, 492 U.S. at 84-88. Without concrete

guidance, this Court is unwilling to premise the outcome of this dispute upon inferences as to what or

what not the States, at the time of ratification, may have understood of the scope of the Bankruptcy

Clause to be. Because any determination this Court makes on the issue of sovereign immunity will

ultimately be subject to *de novo* review by the District Court, this Court believes it prudent to refrain from

premising its disposition of the Fraudulent Conveyance Actions upon an obscure area of law. Instead,

this Court will address the other issues raised by the Motion with regard to application of the *Rooker-*

*Feldman* Doctrine to this Court's jurisdiction and the plausibility of the Trustee's Fraudulent Conveyance

Actions.

---

[40] In addition, Bankruptcy Judge Walsh relied upon the inclusion of §544 within §106(a) to buttress this result. For whatever
reason, he included no discussion of the Third Circuit's *Sacred Heart* opinion to explain his conclusion that the abrogation of
state sovereign immunity contained in §106(a) was effective.

6.      Application of Sovereign Immunity to the Trustee's State Law Claims

The Commonwealth Parties are entitled to invoke sovereign immunity to deprive this Court of subject matter jurisdiction to address the Trustee's State Law Claims (Counts V, VI and VII of the Complaint).  This Court has no difficulty concluding that sovereign immunity deprives this Court of subject matter jurisdiction to hear the Trustee's non-traditional bankruptcy causes of action.  *See, e.g., Shieldalloy Metallurgical Corp. v. New Jersey Dept. of Environmental Protection*, 743 F.Supp.2d 429, 439 (D.N.J. 2010) (limiting *Katz* to "claims created by the Bankruptcy Code"); *In re Audley*, 275 B.R. 383, 389-90 (10 Cir. BAP 2002) (holding that *Rooker-Feldman* Doctrine divested bankruptcy court of jurisdiction to hear debtor's constitutional due process claims relating to alleged infirmities in state court proceedings).  Consistent with the outcome in *Village of Rosemont*,[41] this Court will dismiss without prejudice the Trustee's state law causes of action asserted in Counts V, VI and VII of the Complaint. *Emerald Casino, Inc. v. Illinois Gaming Bd.*, Civ. No. 05-6625, 2006 WL 644487, *7 (N.D. Ill. Mar. 8, 2006) ("The bankruptcy court's dismissal of the state law claims was without prejudice and prevents Emerald only from pursuing injunctive relief on those claims in federal court.  Emerald still may pursue those claims in state court.").

B.      The *Rooker-Feldman* Doctrine[42]

The *Rooker-Feldman* Doctrine provides that federal courts lack subject matter jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).  The *Rooker-Feldman* Doctrine arises from 28 U.S.C. §1257 and posits that "federal district courts and federal courts of appeals lack jurisdiction to review or reverse a state court judgment on the merits." *In re James*, 940 F.2d 46, 53 (3d Cir. 1991) (holding that bankruptcy court lacked jurisdiction to address merits of state

---

[41] *Village of Rosemont v. Jaffe*, 482 F.3d 926 (7th Cir. 2007).

[42] The *Rooker-Feldman* Doctrine is named for *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

court forfeiture proceeding). The Doctrine recognizes that "appellate review of the state-court judgment [is] a task entrusted by statute solely to the Supreme Court." *Great Western Mining & Mineral Co., Inc. v. Fox Rothschild LLP*, 615 F.3d 159, 164 (3d Cir. 2010); *Easley v. New Century Mortg. Corp.*, 394 Fed. Appx. 946, 948 (3d Cir. 2010); *Perkins v. Beltway Capital, LLC*, 773 F.Supp.2d 553, 557 (E.D. Pa. 2011). As stated by the Third Circuit in *Great Western*, a federal court lacks jurisdiction only if (1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgment; (3) the judgment was rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgment. *Great Western*, 615 F.3d at 166; *In re D'Angelo*, 475 B.R. 424, 442 (Bankr. E.D. Pa. 2012). Whether the relief sought in a federal action is "inextricably intertwined" with a prior state court judgment is not determinative of a court's jurisdiction.[43] Rather, the Third Circuit has characterized the phrase "inextricably intertwined" to be merely "a descriptive label" of claims that are identified by the four-part test. *Great Western*, 615 F.3d at 169. Generally speaking, the Doctrine provides that federal courts lack jurisdiction to adjudicate claims when the adjudication of such claims would have the effect of reviewing the merits, or otherwise negating, an existing state court judgment.[44]

It is frequently said that the *Rooker-Feldman* Doctrine has little or no relevance to matters involving the exercise of substantive bankruptcy rights. In exercise of the powers provided by the Bankruptcy Code, a debtor may invoke this Court's jurisdiction "to avoid state judgments." *In re*

---

[43] *Reiter v. Washington Mut. Bank*, 455 Fed. Appx. 188, 191 n.4 (3d Cir. 2011) (recognizing that, although district court reached the correct result, its discussion of whether the plaintiff's claims were "inextricably intertwined with the state court adjudications" was, as a result of *Great Western*, an incorrect statement of the *Rooker-Feldman* Doctrine); *In re Stewart*, 473 B.R. 612, 633 (Bankr. W.D. Pa. Bankr. 2012) (recognizing that in *Great Western* the Third Circuit "exchanged the 'inextricably intertwined' language associated with *Rooker-Feldman* in favor of the four part test").

[44] This Court notes that it does not intend to suggest that application of the *Rooker-Feldman* Doctrine is co-extensive with the application of issue or claim preclusion. *See, e.g., Lemonds v. St. Louis County*, 222 F.3d 488, 494 (8th Cir. 2000) ("federal plaintiffs cannot by artful pleading obtain a hearing of disguised state court appeals that would otherwise be subject to a *Rooker-Feldman* bar."); *Telesco v. Telesco Fuel and Masons' Materials, Inc.*, 765 F.2d 356, 362-63 (2d Cir. 1985) ("Merely raising an alternative theory of recovery, which may still be raised in state court, is not enough to differentiate the federal suit from the state suit."); *Marran v. Marran*, 376 F.3d 143, 149 (3d Cir. 2004) ("The *Rooker-Feldman* doctrine bars lower federal courts from exercising jurisdiction over a case that is the *functional equivalent* of an appeal from a state court judgment.") (emphasis added); *Smalis v. Allegheny County Bd. Of Property Assessment, Appeal & Review*, 2014 WL 2039964 (W.D. Pa. May 16, 2014) ("federal district courts lack subject matter jurisdiction over challenges that are *the functional equivalent* of an appeal of a state court judgment") (emphasis added).

*Knapper*, 407 F.3d 573, 583, n.22 (3d Cir. 2005); *see also In re Sasson*, 424 F.3d 864, 871 (9th Cir. 2005)

("In the exercise of federal bankruptcy power, bankruptcy courts may avoid state judgments in core

bankruptcy proceedings, may modify judgments, and, of primary importance in this context, may

discharge them.") (citations omitted); *In re Funches*, 381 B.R. 471, 484-85 (Bankr. E.D. Pa. 2008).

Despite this consensus, the scope of this Court's jurisdiction, as delineated by the *Rooker-Feldman*

Doctrine, remains an area of frequent litigation.[45]

With regard to the adjudication of the parties' respective rights and obligations, the *Rooker-*

*Feldman* Doctrine applies.  A federal court may not reappraise the determination of the parties' rights

contained in a prior state court order.  For example, if a state court has determined a debtor to be liable for

a certain amount of damages, a debtor may not invoke bankruptcy causes of action to obtain a

recalculation of the damages owed to the state court plaintiff as of the date of the prior state court order.

*Fielder v. Credit Acceptance Corp.*, 188 F.3d 1031, 1035 (8th Cir. 1999) ("A state court judgment

upholding a damage claim necessarily includes a determination of the damages to be awarded… [and is]

precisely the kind of lower federal court appellate review that *Rooker-Feldman* bars.").

With regard to the subsequent efforts to enforce the parties' respective rights embodied by the

prior state court order, the *Rooker-Feldman* Doctrine is inapplicable.  *See, e.g., Gage v. Wells Fargo*

*Bank, NA AS*, 521 Fed. Appx. 49, 50-51 (3d Cir. 2013) (confirming that district court lacked jurisdiction

to consider challenges to the entry of a foreclosure judgment but not the sheriff's subsequent efforts to

enforce it).  A debtor may invoke bankruptcy causes of action to undo the efforts of a judgment creditor to

enforce a state court judgment.  *See, e.g.,* 11 U.S.C. §522(f).  Accordingly, the *Rooker-Feldman* Doctrine

---

[45] The Court observes that the frequency of the invocation of the *Rooker-Feldman* Doctrine appears to be the results from a misunderstanding of the effect of what it means to "avoid," pursuant to the exercise of bankruptcy causes of action, a state court judgment.  This misunderstanding results from a failure to distinguish between the avoidance of the entry of a state court order and the avoidance of the subsequent enforcement of the same order.  A prior state court order constitutes an adjudication of the parties' respective rights and obligations as of the date of the entry of the prior state court order.  *See, e.g., ISN Bank v. Rajaratnam*, 83 A.3d 170, 176 (Pa. Super. 2013) ("A judgment is the final determination of the rights and obligations of the parties in a case"); 2 Pa. C.S. §101 (defining "adjudication").  Once a party's rights have been determined, that party may then take steps to enforce those rights.

does not prevent a debtor from invoking the powers provided by the Bankruptcy Code to modify the remedies available to a judgment creditor against a debtor and her property.

The dichotomy between the entry of a state court judgment adjudicating the parties' respective rights to property and a party's subsequent efforts to enforce its adjudicated rights is best illustrated by reference to mortgage foreclosure proceedings.[46]  To commence a foreclosure action, a mortgagee must file a complaint that sets forth, *inter alia*, where the mortgage is recorded and the amount outstanding on the mortgage.  Pa. R.C.P. 1147.  If the mortgagee establishes that it is entitled to relief, the state court will then enter a foreclosure judgment that establishes, as of the date of the entry of the order, the amount of the arrearages due and the mortgagee's entitlement to the remedy of foreclosure.  A state court foreclosure judgment therefore has the limited effect of confirming the validity of the mortgagee's lien, the amount due *as of the date of the judgment* and recognizing that the mortgagee is entitled to enforce it against the mortgagor.  Accordingly, the entry of the foreclosure judgment, by application of the *Rooker-Feldman* Doctrine, divests bankruptcy courts of subject matter jurisdiction to consider causes of action challenging a mortgagee's standing or attempting to otherwise negate the mortgagee's entitlement to collect the amounts due pursuant to the underlying mortgage as of the date of the judgment.  *Gage*, 521 Fed. Appx. at 50-51 (recognizing that the claims were an attack on the merits of the underlying foreclosure judgment and therefore barred by the *Rooker-Feldman* Doctrine); *In re Madera*, 586 F.3d 228, 232 (3d Cir. 2009) ("granting rescission would amount to finding that no valid mortgage existed, which would negate the foreclosure judgment, as a mortgage foreclosure action depends upon the existence of a valid mortgage."); *Perkins*, 773 F.Supp.2d at 559 (holding that "claim for rescission would

---

[46] This Court acknowledges that it is well settled that the *Rooker-Feldman* Doctrine bars bankruptcy courts from considering non-bankruptcy claims that seek to invalidate a mortgage that is subject to a prepetition state court default judgment.  *See, e.g., Sherk v. Countrywide Home Loans, Inc.*, Civ. No. 08-5969, 2009 WL 2412750 (E.D. Pa. Aug. 5, 2009) (holding that Fair Debt Collection Practices Act claim was barred by the *Rooker-Feldman* Doctrine); *Easley v. New Century Mortg. Corp.*, Civ. No. 08-4283, 2009 WL 2256692 (E.D. Pa. Jul. 28, 2009) (holding that rescission claim was barred by the *Rooker-Feldman* Doctrine); *Andrew v. Ivanhoe Financial, Inc.*, Civ. No. 07-729, 2008 WL 2265287 (E.D. Pa. May 30, 2008) (holding that TILA, HOEPA and RESPA claims were barred by *Rooker-Feldman* Doctrine); *Stewart*, 473 B.R. at 630 (holding that debtors' TILA claim was barred by the *Rooker-Feldman* Doctrine and concluding that debtor lacked derivative standing to assert §544 claim); *Calabria v. CIT Consumer Group (In re Calabria)*, 418 B.R. 862 (Bankr. W.D. Pa. 2009).  However, these decisions uniformly address whether a debtor may invalidate a mortgage lien under non-bankruptcy law.  They do not address whether *Rooker-Feldman* Doctrine divests a bankruptcy court from hearing a debtor's bankruptcy causes of action.

negate the default judgment in the state court foreclosure action and render it unenforceable"); *Douglas v. Saxon Mortgage, et al.*, 395 B.R. 880, 890 (Bankr. W.D. Pa. 2008) ("the conclusion that the grant of rescission would negate the foreclosure action is the 'death knell' of the claim seeking the rescission."); *In re Cooley*, 365 B.R. 464, 473 (Bankr. E.D. Pa. 2007) (same); *In re Randall*, 358 B.R. 145, 159 (Bankr. E.D. Pa. 2006) (holding that Truth in Lending Act rescission claim barred by *Rooker-Feldman* Doctrine); *Piotrowski v. Federman and Phelan LLP*, Civ. No. 05-1455, 2005 WL 3118031, *4 (M.D. Pa. Nov. 22, 2005) (holding that claim that bank lacked standing to bring the foreclosure action due to improper assignment would necessarily negate a state court's judgment); *Holler v. Fairbanks Capital Corporation Servicing Center (In re Holler)*, 342 B.R. 212, 221-222 (Bankr. W.D. Pa. 2006) (holding that after entry of state court default judgment *Rooker-Feldman* Doctrine barred consideration of claim that bank was not owner of mortgage).

However, the adjudication evidenced by the entry of a foreclosure judgment does not cause a sale or otherwise cause a transfer of interests between the mortgagor and mortgagee. *See, e.g., Funches*, 381 B.R. at 497 ("The entry of judgment is a simply procedural prerequisite to a foreclosure sale"); *Suy v. St. Edmond's Federal Savings Bank (In re Suy)*, Bky. No. 01-0593, 2001 WL 1677040, *2 (Bankr. E.D. Pa. Dec. 6, 2001) ("A judgment entered in a mortgage foreclosure action is purely a judgment against the land, whose sole purpose is to effect the judicial sale of the mortgaged property."); *Fleet Real Estate Funding Corp. v. Smith*, 530 A.2d 919, 925 (Pa. Super 1987) (recognizing that a mortgage foreclosure judgment is purely an *in rem* judgment for the purpose of effecting the judicial sale of the mortgaged property). To cause a transfer of the mortgagor's interest, the mortgagee must take the additional step of scheduling and consummating a sheriff's sale. Because it is the subsequent sheriff's sale and not the foreclosure judgment that causes a transfer, bankruptcy courts addressing a debtor's invocation of bankruptcy causes of action to set aside the sheriff's sale are untroubled by *Rooker-Feldman* considerations. For example, a debtor may avoid a transfer caused by a sheriff's sale if the sale price is

less than the reasonably equivalent value of the property.[47]  *See, e.g., Matter of Besing*, 981 F.2d 1488

(5th Cir. 1993) (addressing only whether issue preclusion resulting from foreclosure judgment warranted

dismissal on the merits of the debtor's §548 fraudulent transfer cause of action); *Butler v. Lomas and

Nettleton Co.*, 862 F.2d 1015 (3d Cir. 1988).

### 1.     Application of the *Rooker-Feldman* Doctrine to the Revocation of the License

Applying these principles to this Court's jurisdiction to address the Trustee's causes of action,

this Court agrees with the parties that application of the *Rooker-Feldman* Doctrine prevents this Court

from considering whether the License was properly revoked prior to the Debtor's filing for Bankruptcy

relief.  As the parties are well aware and the Trustee does not appear to contest,[48] the *Rooker-Feldman*

Doctrine precludes the Trustee from attempting to challenge the prepetition revocation of the License.

The Debtor lost in state court.  To the extent the Trustee alleges that some interest in the License inured to

the benefit of the estate, the Trustee would be complaining of injuries caused by the Revocation Order

that was subsequently confirmed by the *Commonwealth Opinion*.[49]  The Revocation Order and the

*Commonwealth Opinion* were entered prepetition.  Finally, if this Court was to determine that the Debtor

held an interest in the License or some right to be compensated for its value, this Court would necessarily

---

[47] In the *Great Western* framework, the debtor is not complaining of an injury caused by a state court judgment but of an injury caused by a deficiency in the sale process.

[48] In response to the Defendants' *Rooker-Feldman* arguments, the Trustee argued that the issues presented by the Complaint, namely the Debtor's right to a refund of the License Fee, was not litigated before the Gaming Board or the Commonwealth Court.  *See, e.g.*, Transcript November 14, 2014, 57:9-59:112 ("It's not the issue which we are raising here… We could have gone to the state court and said we're… entitled to a refund…. that issue never was litigated and never could have been litigated… until there was a revocation.").

[49] From the Debtor's own statements and the findings contained in the *Commonwealth Opinion*, this Court may determine that the second prong is satisfied.  Absent the entry of the Revocation Order, the Debtor would not have suffered the injury it now seeks to redress.  To support its fraudulent transfer cause of action, the Debtor states "On April 14, 2012, the License was involuntarily transferred from the Debtor to the Commonwealth by virtue of the Revocation Order becoming final and not further appealable."  Complaint, ¶95.  The Debtor even defines the revocation of the License caused by the Revocation Order as the transfer the Debtor seeks to avoid.  Complaint, ¶99 ("The revocation of the License was a transfer for which the Debtor received no value from the Commonwealth (the "Transfer").").  Because its counsel has previously acknowledged as much, the Debtor cannot contest that this injury was caused by the Revocation Order.  As recognized by Judge McCullough in his dissent,

> [A]s counsel for PEDP noted at argument, by revoking PEDP's License, PEDP will be required to forfeit a $50 million licensing fee paid to the Board.  By affirming the Board's final order, the Majority, in essence, confirms the application of a summary forfeiture process with regard to a sizable property interest ($50 million fee), without a hearing.

*Commonwealth Opinion*, 34 A.3d at 281.

be required to review the merits of the earlier state court decisions. Accordingly, each prong of the *Great Western* test are satisfied and this Court is thereby prevented from addressing or otherwise modifying the prepetition revocation of the Debtor's interest in the License. For this reason, this Court may not review whether the License terminated prepetition and therefore did not inure to the benefit of the Debtor's estate.

In an effort to avoid this conclusion, the Trustee frames its various actions implicating the Debtor's alleged interest in the License as not seeking the restoration of the License but rather seeking compensation for the loss of value of the License.[50] However, the issue of revocation of the License and the issue of the Debtor's right to be compensated for its value are not independent. Each is opposite sides of the same coin. *See, e.g., Manley v. City of Chicago*, 236 F.3d 392, 396 (7th Cir. 2001) ("the plaintiff could not repackage its claim originally brought in state court in the form of a federal complaint… because the injury that [the plaintiff] complained of-the loss of its liquor license-stemmed directly from the state court judgment upholding the revocation of the license."). The Debtor cannot escape the effect of the *Commonwealth Opinion* upholding the revocation of the License by the Gaming Board by seeking from this Court relief consisting of the monetary value of License. Addressing similar facts, the Seventh Circuit agreed that federal claims seeking damages in the amount of the value of a license are the functional equivalent of a prior state court adjudication of whether a license should be revoked.

---

[50] By arguing that Revocation Order did not address the Debtor's right to be compensated for the value of the License, the Trustee is confusing the *Rooker-Feldman* Doctrine with the claim/issue preclusion. While substantial conceptual overlap does exist between the *Rooker-Feldman* Doctrine and claim/issue preclusion, the Trustee's argument goes too far. Unlike issue/claim preclusion, the *Rooker-Feldman* Doctrine does not require an identity of issues. *See, e.g., Johnson v. Orr*, 551 F.3d 564, 568 (7th Cir. 2008) (recognizing that the exact causes of action asserted by a plaintiff is not determinative and a court must "look beyond the four corners of the complaint to discern the actual injury claimed by the plaintiff"); *Mac Pherson v. State Street Bank and Trust Co.*, 452 F.Supp.2d 133, 137 (E.D.N.Y. 2006) (recognizing that *Rooker-Feldman* Doctrine requires federal court to look at the "substance" of a complaint to determine whether it is functionally an appeal of a state-court judgment). A plaintiff may not avoid application of the *Rooker-Feldman* Doctrine by simply repackaging their state court claims in federal causes of action. *Marran v. Marran*, 376 F.3d 143, 149 (3d Cir. 2004) ("The *Rooker-Feldman* doctrine bars lower federal courts from exercising jurisdiction over a case that is the *functional equivalent* of an appeal from a state court judgment.") (emphasis added); *Lemonds v. St. Louis County*, 222 F.3d 488, 494 (8th Cir. 2000) ("federal plaintiffs cannot by artful pleading obtain a hearing of disguised state court appeals that would otherwise be subject to a *Rooker-Feldman* bar."); *Telesco v. Telesco Fuel and Masons' Materials, Inc.*, 765 F.2d 356, 362-63 (2d Cir. 1985) ("Merely raising an alternative theory of recovery, which may still be raised in state court, is not enough to differentiate the federal suit from the state suit."); *Smalis v. Allegheny County Bd. of Property Assessment, Appeal & Review*, 2014 WL 2039964 (W.D. Pa. May 16, 2014) ("federal district courts lack subject matter jurisdiction over challenges that are the functional equivalent of an appeal of a state court judgment") (emphasis added); *Long v. Wolfe*, Civ. No. 06-0633, 2006 WL 1371093 (W.D. Pa. May 18, 2006); *Proctor & Gamble Co. v. Alberto-Culver Co.*, Civ. No. 99-1158, 1999 WL 319224, at *5 (N.D. Ill. Apr. 28, 1999).

In essence, Maple Lanes seeks to undo the effect of the revocation of its liquor license by collecting an amount of damages from Messer for the alleged violation of its constitutional rights equal to the monetary value of the license. The *Rooker-Feldman* doctrine does not permit this result.

If a federal court were to award the relief Maple Lanes seeks in the form of monetary damages equal to the value of the liquor license, this result would effectively reverse the state court judgment upholding the revocation of the liquor license. There is little difference between awarding Maple Lanes the monetary value of the license and the license itself. Because the district court lacked subject matter jurisdiction in this case, we VACATE the order dismissing the complaint for failure to state a claim and REMAND with instructions to dismiss for lack of jurisdiction.

*Maples Lanes, Inc. v. Messer*, 186 F.3d 823, 825-26 (7th Cir. 1999).

Despite the criticism of the "inextricably-intertwined" standard offered by the Third Circuit in its *Great Western* decision, the Third Circuit still recognizes that *Rooker-Feldman* divests federal courts of jurisdiction to hear claims that are the "functional equivalent" of claims that were the subject of the prior adjudication. *Howe v. Litwack*, 2014 WL 4199634, *2 (3d Cir. Aug. 26, 2014) (reciting favorably *Maran*'s "functional equivalent" language). Reference to the arguments made by the Debtor before the Gaming Board and the Commonwealth Court emphasizes the functional equivalence of the Debtor's right to retain the License and its right to be compensated for its value. As evidenced by the text of the *Commonwealth Opinion*, all parties not only contemplated the forfeiture of the value of the License but premised their arguments upon the eventuality. Relying on the significant value of its property interest in the License, the Debtor argued to the Commonwealth Court that the Gaming Board erred by denying the Debtor's due process rights. *See, e.g., Commonwealth Opinion*, 34 A.2d at 279 (addressing Debtor's argument that revocation of the License was an excessive sanction due to the value of the License). The Debtor specifically argued that its due process rights, implicated by its substantial interest in the value of the License, prohibited the Gaming Board from revoking the License pursuant to a summary judgment motion. The Debtor argued that the significance of its interest demanded it be afforded an evidentiary hearing.

To consider, as the Trustee now advocates, that the forfeiture of the value of the License was not addressed in the prior state court proceeding is to indulge a patently counterfactual argument. This Court

concludes that the adjudication of the Debtor's right to compensation for the loss of the License is the

functional equivalent of the adjudication of Debtor's right to retain the License.  With regard to the

Debtor's interest in the License or any value that it may have lost as a result of its revocation, the relief

sought by the Complaint would have the effect of undoing the Revocation Order or the *Commonwealth*

*Opinion*.  *Great Western*, 615 F.3d at 173; *see also D'Angelo v. J.P. Morgan Chase Bank, N.A.*, 475 B.R.

424, 442-43 (Bankr. E.D. Pa. 2012) ("So long as the federal plaintiff effectively seeks to negate the force

of the judgment, it is not possible for the federal court to exercise jurisdiction without exercising appellate

review of the validity of the state court judgment.").  As a result, this Court lacks subject matter

jurisdiction to consider any causes of action that allege the Debtor is entitled to compensation for the loss

of any value caused by the revocation of the License.

> ### 2. Application of the *Rooker-Feldman* Doctrine to the Trustee's Entitlement to a Refund of the License Fee

In order to escape application of the *Rooker-Feldman* Doctrine, the Trustee attempts to

distinguish between this Court's adjudication of the value of the Debtor's interest in the License from this

Court's adjudication of the Debtor's right to a refund of the License Fee.  With regard to the latter, the

Trustee argues that the prior orders issued by the Gaming Board and affirmed by the Commonwealth

Court do not address or otherwise implicate whether the Debtor is entitled to a refund.  The Trustee

characterizes the prior orders as addressing whether the License should be revoked and whether the

Gaming Board abused its discretion by revoking the License.  Whereas, the Trustee argues that, in this

adversary proceeding, it seeks a determination, among other things, of the Debtor's property rights in the

License Fee.  As phrased by the Trustee, "the Plaintiff seeks this Court's determination of whether or not

the Commonwealth has unlawfully refused to return the License Fee to the Debtor."  Trustee's

Memorandum, p.25.

On their face, the Trustee's arguments appear disingenuous.  At all times, the Debtor appears to

have understood that the Gaming Board's consideration of the BIE Complaint necessarily implicated the

forfeiture of the License Fee.  As evidenced by the *Commonwealth Opinion*, the parties expressly

contemplated that the loss of any property interest the Debtor may have held in the License Fee was a

natural and inevitable consequence of any adjudication that resulted in the revocation of the License.

*Commonwealth Opinion*, 34 A.3d at 277 ("PEDP was aware of the orders and understood the

consequences of failure to comply with said orders.").  As this Court has noted, the dissent explicitly

placed the Debtor's due process arguments in the context of the Debtor's potential forfeiture of the

License Fee.  *Id.* at 281 ("by revoking PEDP's License, PEDP will be required to forfeit a $50 million

licensing fee.").

However, this Court must admit that, while it appeared to be an implicit understanding of all the

parties, the issue of the Debtor's right to a refund of the License Fee was not addressed by the prior state

court litigation.  From the record before this Court, it appears that no court has addressed the effect of the

reservations contained in the October 16 Letter or whether the Gaming Act may be otherwise construed to

provide for the Debtor's entitlement of a refund of the License Fee upon revocation of the License.  As a

result and to the extent that the Trustee has characterized its turnover action and fraudulent conveyance

actions as implicating something other than any loss of value caused by the revocation of the License, this

Court will address whether the Trustee has managed to state a plausible theory of relief with regard to the

Debtor's entitlement to a refund of the License Fee and whether any insufficiency in the Complaint may

be cured through amendment.

## II.    The Plausibility of the Trustee's Remaining Causes of Action, Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss, "all civil complaints must now set out sufficient factual matter to

show that the claim is facially plausible."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

As required by Rule 8(a)(2), a valid complaint must contain "a short and plain statement of the claim

showing that the pleader is entitled to relief."  F.R.C.P. 8(a)(2).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  To determine whether

a claim is facially plausible, the Third Circuit has explained that its courts should conduct a two-part

analysis to determine whether a claim survives the Rule 12(b)(6) motion.  *Fowler*, 578 F.3d at 210.  First,

this Court must distinguish between the factual and legal elements of the claim.  Second, this Court must

determine whether based upon the facts alleged the plaintiff has a plausible claim for relief.  *Fowler*, 578

F.3d at 210 *quoting Iqbal*, 129 S.Ct. at 1950.  This Court must accept as true all factual allegations

contained in the complaint and construe all reasonable inferences drawn therefrom in the light most

favorable to the plaintiff.  *Iqbal*, 129 S.Ct. at 1937; *Morse v. Lower Merion Sch. Dist*., 132 F.3d 902, 906

(3d Cir. 1997); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994); *Rogin

v. Bensalem Township*, 616 F.2d 680, 685 (3d Cir. 1980).

Pursuant to the pleading requirements of Fed. R. Civ. P. 8, this Court will not afford legal

conclusions couched as factual allegations a presumption of truth.  *Iqbal*, 129 S.Ct. at 1951; *American

Casein Company, et al. v. Geiger (In re Geiger)*, Adv. No. 10-0228, 2010 WL 3932274, at *1 (Bankr.

E.D. Pa. Sept. 29, 2010).  In identifying the facts alleged by a complaint, this Court must distinguish

between (1) well-plead allegations and (2) mere conclusory allegations.  With regard to the former, this

Court must accept as true all well-plead allegations and construe all reasonable inferences drawn

therefrom in the light most favorable to the plaintiff.  *Iqbal*, 129 S.Ct. at 1949; *Morse*, 132 F.3d at 906;

*Jordan*, 20 F.3d at 1261; *Rogin*, 616 F.2d at 685.  With regard to the latter, this Court must disregard and

afford no weight to "threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements."  *Fowler*, 578 F.3d at 210 *quoting Iqbal*, 129 S.Ct. at 1949 ("[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice.).  If this

Court finds that the allegations of the Complaint are insufficient and that insufficiency may be cured by

the inclusion of additional pleading, this Court must permit the Trustee to file an amended complaint.

*Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).  However, if this Court finds that

amendment would be futile, this Court may dismiss the Complaint with prejudice.  *Oran v. Stafford*, 226

F.3d 275, 291 (3d Cir. 2000).

### A.    Count I - Turnover, §542

In Count I of the Complaint, the Trustee requests that this Court order the Commonwealth to

turnover the License Fee.  This Court has determined that the Trustee has failed to state a claim for the

relief sought.  The Complaint does not include sufficient allegations to establish that the Commonwealth

Parties are in possession of undisputed property of the Debtor's estate.  *See, e.g., In re Student Fin. Corp.*,

335 B.R. 539, 554 (D. Del. 2005) (holding that "to state a claim for turnover of property under §542, a

plaintiff must allege that transfer of the property has already been avoided or that the property is

otherwise the undisputed property of the bankruptcy estate."); *In re Conex Holdings, LLC*, 518 B.R. 792,

801 (Bankr. D. Del. 2014) ("A properly pleaded complaint asserting a claim for turnover must allege an

undisputed right to recover the claimed debt."); *In re Rite Way Elec., Inc*., 510 B.R. 471, 484 (Bankr. E.D.

Pa. 2014) ("Numerous courts have held that a turnover is not proper where a bona fide dispute exists.").

Rather, Count I constitutes an improper attempt to avoid the application of sovereign immunity and to

obtain the adjudication of the Debtor's underlying non-bankruptcy causes of action that the Trustee

believes entitles the Debtor to a refund of the License Fee.  *See, e.g., Braunstein v. McCabe*, 571 F.3d

108, 122 (1st Cir. 2009) ("A turnover action is not an action to recover damages for the taking of estate

property but an action to recover possession of property belonging to the estate at the time of the filing.");

*In re CIS Corp*., 172 B.R. 748, 760 (S.D.N.Y. 1994) (stating that the language of §542(b) creates "a

strong textual inference that an action should be regarded as a turnover only when there is no legitimate

dispute over what is owed to the debtor"); *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir.

1991) (holding trustee failed to state a §542 claim because it "cannot use the turnover provisions to

liquidate contract disputes or otherwise demand assets whose title is in dispute"); *In re Soundview Elite

Ltd*., 543 B.R. 78, 97-98 (Bankr. S.D.N.Y. 2016).

       Section 542(a) requires an entity in possession of property of the estate to deliver said property,

or the value of it, to the administrator of a debtor's estate.  To state a claim for turnover pursuant to

§542(a),[51] the Trustee must have alleged facts that would establish: (1) the Commonwealth Parties are in

---

[51] In relevant part, §542(a) reads:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession,
> custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of
> this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account

possession, custody or control of; (2) property of the estate; (3) during the case; and (4) the property is not

of inconsequential value or benefit to the estate. *Irwin*, 509 B.R. at 815. To be entitled to relief, the

Trustee must have alleged an undisputed right to recover the alleged property. *Conex Holdings*, 518 B.R.

at 801-02; *In re Asousa Partnership*, 264 B.R. 376, 384 (Bankr. E.D. Pa. 2001). If a legitimate dispute as

to ownership of the property exists, §542(a) relief is unavailable. *In re Jamuna Real Estate LLC*, 365

B.R. 540, 568 (Bankr. E.D. Pa. 2007) ("the estate may not demand turnover of property subject to a

dispute."); *Creative Data*, 41 B.R. at 336 ("[I]f the debtor does not have the right to possess or use the

property at the commencement of the case, a turnover action cannot be a tool to acquire such rights."). Of

particular significance to the nature of the Trustee's allegations, §542(a) may not be used as a means to

adjudicate a debtor's underlying rights in property. If a debtor does not possess a present and undisputed

right to possess or use the property as of the commencement of a bankruptcy case, §542(a) may not be

used to acquire such rights. *In re Pali Holdings, Inc.*, 488 B.R. 841, 852 n.39 (Bankr. S.D.N.Y. 2013); *In

re FLR Co., Inc.*, 58 B.R. 632, 634 (Bankr. W.D .Pa. 1985).

 In evaluating the substance of the Trustee's allegations to determine the plausibility of the

Trustee's turnover action, this Court is not obligated to credit the Trustee's characterization of the cause

of action as a turnover action within this Court's core jurisdiction. *See, e.g., In re LiTenda Mortg. Corp.*,

246 B.R. 185, 195 (Bankr. D.N.J. 1999) ("Not infrequently, the purpose of the examination is to

determine whether the alleged core turnover action is, in reality, a non-core state law contractual

dispute."). This Court may look to the substance of the Trustee's allegations to determine whether the

action does implicate §542. *In re CIS Corp.*, 172 B.R. at 756 (recognizing that a court may "look beyond

the labels to the substance of the action in order to discover whether it can be fairly said to arise under the

bankruptcy code and falls within the bankruptcy court's core jurisdiction"). In addition, this Court will

not credit the Trustee's conclusions of law regarding the effect of the reservation of rights or the absence

---

for, such property or the value of such property, unless such property is of inconsequential value or benefit to
the estate.

11 U.S.C. §542(a).

of statutory language foreclosing the Debtor's entitlement to a refund of the License Fee. *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").

Section 541(a) defines property of the estate as all property "wherever located and by whomever held," including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §541(a)(1). In determining the scope of a debtor's estate, this Court is obligated to adopt an expansive view. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983); *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993) ("In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of §541."). In the bankruptcy context, the debtor's estate is frequently referred to as the *res* to be administered by the Bankruptcy court. *See, e.g., Shieldalloy*, 743 F.Supp.2d at 439 (finding that, post-confirmation, there is no bankruptcy estate and therefore no *res* to which *in rem* jurisdiction could attach); *In re Lake Worth Generation, LLC*, 318 B.R. 894, 902 (Bankr. S.D. Fla. 2004) ("In bankruptcy cases, the *res* includes a debtor's property and the debtor's estate, over which the bankruptcy court has exclusive jurisdiction."); *In re Metromedia Fiber Network, Inc.*, 299 B.R. 251, 273 (Bankr. S.D.N.Y. 2003) ("The debtor's estate is a *res*."). The effect of §542 is to confirm that property within the scope of §541 yet not within the debtor's possession nevertheless inures to the benefit of her estate. Here, the Trustee alleges that, as of the Petition Date, the Debtor retained some interest in the License Fee that inured to the benefit of the Debtor's estate. Problematically, the mere possession of some equitable interest in property is not sufficient to sustain a turnover action. *In re Flanagan*, 415 B.R. 29, 48 (D. Conn. 2009) ("Until a trustee exercises her authority under the Bankruptcy Code to assert the equitable claim to property, that property cannot be fairly considered property of the estate subject to the trustee's turnover authority."). To explain why this alleged interest may not be the basis of a §542 action, this Court will now address its understanding of the Debtor's interest in the License Fee as of the Petition Date.

**The Debtor's Interest in the License Fee**

The Trustee seeks an order compelling the Commonwealth to pay "its matured debt, for the return of the License Fee." Complaint, ¶93. As an initial matter, this Court observes that actions to recover a sum of money generally do not implicate a court's *in rem* jurisdiction. A *res* is conventionally understood to consist of an interest in a specific object. *Haymond v. Lundy*, Civ. No. 99-5048, 2002 WL 1964336, *6 (E.D. Pa. Aug. 23, 2002) ("a necessary condition to *in rem* jurisdiction is a *res*-a defined piece of property."). However, when a litigant attempts to recover a sum of money, rather than a particular pot of money, a bankruptcy court's *in rem* jurisdiction is not implicated. *Nordic Village*, 503 U.S. at 38-39 (holding that suits to recover a sum of money do not implicate a *res* to which a bankruptcy court's *in rem* jurisdiction could attach); *In re Allen*, 768 F.3d 274, 280 (3d Cir. 2014) (recognizing that when a plaintiff seeks recovery of a sum of money and not particular dollars a bankruptcy court's *in rem* jurisdiction is not implicated). Even if this Court was to characterize the License Fee as a particular pot of money, this Court does not find that the Trustee has alleged that the Debtor holds a direct interest in the License Fee let alone a "matured debt" with the meaning of §542(b). *In re Smith*, Bky. No. 13-17204, 2014 WL 7745851, *7 (Bankr. N.D. Oh. Dec. 1, 2014) ("Any claim the debtors have for a refund of the exempt funds is not a matured debt or one that is payable by demand or order."); *In re William Ross, Inc.*, 199 B.R. 551, 554 (Bankr. W.D. Pa. 1996) ("§542(b) should apply to debts of governmental entities only if such debts have already become liquidated (*i.e.*, reduced to judgment).").

In support of its position that the Debtor possesses an undisputed interest in the License Fee, the Trustee makes two arguments. First, the Trustee argues that the Debtor's reservation of rights entitles it to a refund of the License Fee. Alternatively, the Trustee argues that the subsequent amendment of the Gaming Act gives rise to the inference that prior version entitled the Debtor to reserve a right to a refund of the License Fee. Both arguments do not establish a direct interest in the License Fee. Rather, the Debtor's alleged interest is better understood as an interest in causes of action that, after adjudication, may or may not give rise to an interest in a damages award that, may or may not, be measured by reference to the amount of the License Fee.

As the Trustee acknowledged, the Trustee's theory of relief consists of the Trustee's belief that, as a result of the revocation of the License, the Debtor is entitled to a refund of the License Fee. Transcript November 14, 2014, 67:4-5 ("our claim is predicated upon the failure to return the License Fee."); 137:8-9 (stating the Debtor's right to the License Fee is premised upon its demand for a refund and its reservation of rights); Complaint, Exh. K.  As stated in the Trustee's Memorandum, "[t]he Debtor has demanded the return of its License Fee; however, the Commonwealth has improperly refused to do so."  Trustee's Memorandum, p.1.  Alternately, the Trustee has characterized the "fundamental issue" presented by the Complaint as being "whether or not the Commonwealth has improperly refused to return to the Debtor the License Fee to which it is entitled by reason of such revocation."  Trustee's Memorandum, p.2.

From this Court's review of the Trustee's allegations, the Trustee's allegations are more akin to common law contract claims than bankruptcy causes of action.  For example, the Trustee makes several assertions that support this inference.  For example, the Trustee argues that the License Fee was paid "[i]n exchange and *in consideration* for the issuance of a license…"  Trustee's Memorandum, p.4 (emphasis added).  Later, the Trustee contends that "the issue before this Court is whether or not the Commonwealth has an obligation to return the License Fee paid by the Debtor expressly *in consideration* of the issuance to it of the License."  Trustee's Memorandum, p.29 (emphasis added).  The parties do not contest that the Debtor made a demand for a return of the License Fee or that the Debtor reserved its right to a refund when it originally paid the License Fee.  Neither fact gives rise to the inference that the License Fee constitutes the undisputed property of the Debtor.  At best, the Trustee may argue from these facts that it is entitled to a refund.  However, the existence of a colorable claim to property does not establish undisputed ownership for purposes of a §542 proceeding.  *See, e.g., Cline v. Kaplan*, 323 U.S. 97, 98 (1944) (discussing a bankruptcy court's jurisdiction to adjudicate disputes regarding a debtor's interest in property).

Reference to the Trustee's promissory estoppel cause of action, one of the theories the Trustee advances to establish the Debtor's alleged undisputed interest in the License Fee, underscores the

50

disputed nature of the alleged debt.  The Trustee alleges that when the Debtor paid the License Fee it

reserved its right to seek a refund of the License Fee if the License was later revoked.  The Trustee argues

that by accepting the License Fee without disputing or otherwise acknowledging the Debtor's attempt to

reserve a right to a refund the Commonwealth agreed to the terms of the reservation of rights.  *See, e.g.,*

Transcript November 14, 2014, 241:19-242:16.  Problematically, the Trustee wholly fails to explain how

the Gaming Board's silence gives rise to an enforceable obligation.

Typically, promissory estoppel actions are premised upon the existence of an express promise.

*See, e.g., Nabisco, Inc. v. Ellison*, Civ. No. 94-1722, 1994 WL 622136, *7 (E.D. Pa. Nov. 8, 1994)

(granting motion to dismiss promissory estoppel action based on plaintiff's failure to allege the existence

of an express promise).  The Pennsylvania Supreme Court has acknowledged *in dicta* that promissory

estoppel may be based upon silence.  *Fried v. Fisher*, 196 A. 39, 41 (Pa. 1938) ("a person may be

estopped by his conduct, his statements, or even his silence, if another has thereby been induced to act to

his detriment…").  Despite this language, the Third Circuit has reached an opposite result.  Relying on the

requirement that the reliance be reasonable, the Third Circuit has determined that reliance upon an

implied promise to be *per se* unreasonable.

> Promissory estoppel would be rendered meaningless if this Court were to allow *C & K* to
> maintain an action for detrimental reliance based on the alleged existence of such a broad
> and vague implied promise.  Since there is no express promise by *Equibank* that could
> justifiably be relied upon, we will affirm the district court's dismissal of *C & K's* claim
> based on detrimental reliance.

*C & K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (upholding dismissal of

promissory estoppel claim due to failure to allege express of an express promise) (citations omitted).

Despite the Commonwealth Parties' reliance on the Third Circuit's decision in *C & K Petroleum*,

the Trustee did not address the application of the Third Circuit's decision to its promissory estoppel cause

of action.  Rather, the Trustee relies on two other decisions by the Third Circuit to establish that an

explicit promise is not necessary: (1) *Bradley v. Pittsburgh Board of Education,* 913 F.2d 1064 (3d

Cir. 1990) and (2) in *RJ Holdings, Inc. v. County of Montgomery,* 670 F.3d 420 (3d Cir. 2011).

Neither case is applicable.

In *Bradley*, the Third Circuit addressed whether a plaintiff's reservation of right to later have his federal civil rights claims adjudicated by a federal court immunized his subsequent suit on those federal rights from the preclusionary effect of the prior state court proceeding. *Bradley*, 913 F.2d at 1071-72. Known as an "*England* Reservation,"[52] the Third Circuit determined that the plaintiff, by informing the state court of the existence of his federal claims and his preference to litigate them in federal court, properly reserved his federal claim for federal adjudication. *Bradley*, and its discussion of the preclusionary effect of an *England* Reservation, is wholly irrelevant to the Trustee's allegations.

*RJ Holdings* is similarly inapplicable. In the decision, the Third Circuit elaborated upon its *Bradley* decision in light of the Supreme Court's intervening decision in *San Remo Hotel v. City & County of San Francisco*, 545 U.S. 323 (2005). The Third Circuit determined that it need not rule on the continued viability of an *England* Reservation. The Third Circuit explained:

> Regardless of whether Plaintiffs' statement was valid as an *England* reservation, it provided notice to Defendants of Plaintiffs' intent to split their state and federal claims. And Plaintiffs reiterated their intent to reserve their federal claims in filings before the Pennsylvania Commonwealth Court and the Pennsylvania Supreme Court. Defendants' failure to object constitutes implied consent under Pennsylvania law. Thus, pursuant to 28 U.S.C. §1738, we faithfully apply Pennsylvania law in concluding that Plaintiffs' claims are permitted.

*RJ Holdings*, 670 F.3d at 428-29.

The Trustee's reliance on *Bradley* and *RJ Holdings* is clearly misplaced given that neither case supports in any manner whatsoever the Trustee's contention that the Third Circuit has recognized that promissory estoppel claims may be based upon a party's failure to object to a reservation of rights. Neither decision has any relevance to the doctrine of promissory estoppel nor the Third Circuit's determination in *C & K Petroleum* that reliance upon an implied promise is *per se* unreasonable. Whether or not the Third Circuit's determination in *C & K Petroleum* trumps the dicta

---

[52] The source of the "*England* Reservation" is the Supreme Court's decision in *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964).

contained in the Pennsylvania Supreme Court's *Fried* opinion, this discussion serves to illustrate that, until the Trustee's promissory estoppel action is adjudicated by a court of competent jurisdiction, the License Fee may not be characterized as a matured debt subject to turnover within the meaning of §542. The fact that the Trustee may have stated a cause of action for recovery pursuant to a theory of promissory estoppel may not be relied upon to conclude that Commonwealth Parties are, prior to the adjudication of the Trustee's theory of promissory estoppel, required to turnover the License Fee.

      To buttress its reservation of rights theory, the Trustee argues that the subsequent amendment of the Gaming Act gives rise to the inference that the prior version of the Gaming Act did not foreclose the Debtor's reservation of its right to a refund of the License Fee.  However, an examination of this argument further undermines the Trustee's entitlement to §542 relief.  As characterized by the Trustee, the January 2010 amendments to the Gaming Act added language that required all licensees to waive their right to a refund of a license fee.  Trustee's Memorandum, p.13.  Despite the absence and in apparent contradiction to the language of §1326(b) of the Gaming Act, the Trustee asks this Court to infer from later amendments to the Gaming Act that, at the time the Debtor paid the License Fee, the legislature intended applicants to be entitled to reserve their right to a refund of any license fees paid to the Gaming Board.  The Trustee does not argue that the legislature intended the amendments to have a retroactive effect.  *See, e.g., Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988).  In addition, the Trustee acknowledges that, at the time the Debtor paid the License Fee, the Gaming Act contained no language conferring a right to a refund.  Rather, the Trustee argues that this Court must infer from the legislature's subsequent addition of language explicitly foreclosing a licensee's right to reserve a refund of its license fee that such reservations of rights were intended to be enforceable under the original version of the Gaming Act.  Trustee's Memorandum, p.42-43.

      Even if this Court found the Gaming Act to be ambiguous, the Trustee's proffered interpretation of the effect of the 2010 amendments is not entitled to a presumption of truth.  Matters of statutory interpretation are questions of law.  *Stissi v. Interstate & Ocean Transp. Co.*, 765 F.2d 370, 374 (2d Cir. 1985) ("When a decision turns on the meaning of words in a statute or regulation, the decision is one of

law which must be made by the court."). Moreover, the subsequent amendment does not require this

Court infer that the prior version of the Gaming Act permitted a licensee to reserve its right to refund. It

is equally plausible that the legislature intended the subsequent amendments *to clarify its original intent*.

*See, e.g., Brown v. Thompson*, 374 F.3d 253, 259 n. 2 (4th Cir. 2004) ("[C]ourts regularly view a conflict

in the courts with regard to the proper interpretation of a statute-as existed with MSP here-as an indication

that Congress passed a subsequent amendment to clarify rather than change existing law."); *People of*

*Three Mile Island Through Three Mile Island Alert, Inc. v. Nuclear Regulatory Com'rs*, 747 F.2d 139,

146 n.14 (3d Cir. 1984) (recognizing that a subsequent statutory amendment may be for the purpose of

"merely clarifying [a statute's] original intent").

To the extent the Gaming Act does explicitly address the effect of revocation upon a licensee's

interest in its license fee, the text further undermines the Trustee's position. As explicitly provided by

statute, licensees were entitled to a return of the $50,000,000 payment if the Gaming Act was amended by

the General Assembly. 12 Pa. C.S.A. §1209(f). On its face, the statute does not provide for

reimbursement of the License Fee in any other circumstance. To the contrary, it appears that the Gaming

Act unambiguously provides that, upon revocation of a license, a license fee is forfeited. 4 Pa. C.S.A.

§1326(b). In relevant part, the Gaming Act provides:

> In the event of a revocation or failure to renew, the applicant's authorization to conduct
> the previously approved activity shall immediately cease, and *all fees* paid in connection
> therewith shall be deemed to be forfeited.

*Id.* (emphasis added).

The Trustee argues that §1326(b) is inapplicable to the instant dispute because the section only

applies to fees paid in connection with the renewal of a license and not the issuance. Trustee's Sur-Reply

Brief dated October 29, 2014 [Docket No. 26] (the "Trustee's Sur-Reply"), p.1-4. This argument once

again demonstrates that the allegations of the Complaint do not establish that the License Fee constitutes

the undisputed property of the Debtor. Not only has the Trustee failed to cite to any basis for this Court

to find the Gaming Board's interpretation of §1326(b) to be clearly erroneous,[53] the Trustee's

interpretation of §1326(b) is at odds with established principle of statutory interpretation that the

enumeration of one case excludes another.  *See, e.g., Perlin v. Hitachi Capital America Corp.*, 497 F.3d

364, 370 (3d Cir. 2007) (explain that "the expressed item and the unmentioned item should be understood

to go "hand in hand," thus supporting a sensible inference that Congress must have meant to exclude the

unmentioned item"); *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1223 (Pa. 2002) ("We

must infer that, under the doctrine of *expressio unius est exclusio alterius*, the inclusion of a specific

matter in a statute implies the exclusion of other matters.").

At best, the Trustee's various legal arguments regarding the Debtor's entitlement to a refund of

the License Fee are just that, arguments.  *See, e.g., Rajala v. Gardner*, 709 F.3d 1031, 1038 (10th Cir.

2013) ("It follows that a mere allegation, without any showing of merit, cannot create 'equitable title.'").

No matter how strenuously the Trustee may make its arguments, this Court must admit, at least at this

stage of the litigation, that reasonable minds may differ as to the application of the Gaming Law to the

Debtor's alleged property interest in the License Fee.  Indubitably, the Debtor's alleged interest in a

refund of the License Fee is subject to a bona fide dispute and therefore, the Complaint allegations cannot

establish the existence of a matured debt.  *B.D.W. Associates v. Busy Beaver Bldg. Ctrs.*, 865 F.2d 65, 66

(3d Cir. 1989) (stating a bona fide dispute exists as a result of "a meritorious contention as to the

application of law to undisputed facts").

If the Trustee ultimately discredits the interpretation of the Gaming Act proffered by the

Commonwealth Parties, the Trustee may someday establish that the Debtor is entitled to a refund of the

License Fee.  However, those determinations have not been made and cannot be made by this Court.

Therefore, §542 may not be invoked as a vehicle for the adjudication of the Debtor's disputed state law

claims.  *See, e.g., Pali Holdings*, 488 B.R. at 852 n.39 ("the turnover power can be improperly invoked,

---

[53] "It is well settled that an administrative agency's interpretation of a statute is given controlling weight unless it is clearly
erroneous."  *Riverwalk Casino, LP v. Pennsylvania Gaming Control Board*, 926 A.2d 926, 940 (Pa. 2007) (addressing appeal of
Gaming Board approval of the Debtor's License application).

especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable."). Until they are adjudicated, the Trustee is not entitled to §542 relief.[54] Just as Congress cannot cause an action to fall within a bankruptcy court's core jurisdiction by simply labeling it as such, the Trustee may not either. By characterizing the adjudication of the Debtor's interests in the License Fee as a turnover action, the Trustee has improperly attempted to cloak its State Law Claims with the trappings of a core proceeding.[55]

**B.      Counts II & III - Fraudulent Conveyances, §544(b) & §548[56]**

Pursuant to Counts II and III, the Trustee seeks avoidance of the revocation of the License as a fraudulent transfer as provided by §548(a)(1)(B) and avoidance of the revocation of the License as a fraudulent conveyance as provided by §544(b) and 12 Pa. C.S.A. §5101, *et seq.* ("PUFTA")[57] (the "Fraudulent Conveyance Claims").

---

[54] Axiomatically, any prepetition cause of action, by virtue of §541, inures to the benefit of a debtor's estate. *See, e.g., In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) ("A cause of action that is 'property of the estate' is properly pursued by the bankruptcy trustee because it inures to the benefit of all creditors."). However, the fact that a cause of action is property of a bankruptcy estate cannot be relied upon for determining whether its adjudication implicates a bankruptcy court's *in rem* jurisdiction. The Debtor's interests in causes of action that may entitle it to a refund of the License Fee may not be considered a *res* to which this Court's *in rem* jurisdiction may attach. While the Debtor's interest in a cause of action does inure to the benefit of its estate, it cannot be said that that interest constitutes a *res* that implicates this Court's *in rem* jurisdiction. A cause of action cannot be within the scope of the "Laws on the subject of Bankruptcy" simply due to the fact that it inures to the benefit of a debtor's estate. Otherwise, the rule enunciated by *Katz* would be hopelessly unmanageable and would necessarily run afoul of the "limited" abrogation of sovereign immunity resulting from ratification. *Katz*, 546 U.S. at 377 (recognizing the subordination of state sovereignty was "within a limited sphere").

[55] The Trustee's attempts to use its turnover action as a "Trojan Horse" for the adjudication of the Debtor's underlying state law causes of action underscores the viability of the Defendants' sovereign immunity defense. While sovereign immunity does not prevent this Court from determining whether the Trustee has stated claim, sovereign immunity would serve as a defense to this Court's adjudication of the underlying state law causes of action that the Trustee's has attempted to cloak in the guise of a §542 action. *In re Zywiczynski*, 210 B.R. 924, 933 (Bankr. W.D.N.Y. 1997) ("This Court holds that its conducting of sufficient inquiry to permit it to determine whether the C.D. is subject to §542 turnover does not violate the Eleventh Amendment. To that extent, the State's motion to dismiss is denied. To the extent that the Complaint seeks more as against the State, the Complaint is dismissed.").

[56] Because the governing legal standards under §544(b) and 548(a) are largely identical, the Trustee's causes of action under both section are addressed concurrently. *See, e.g., In re Estate of Graven*, 64 F.3d 453, 455-56 (8th Cir. 1995) ("While the bankruptcy code sections involved in the two cases are different… the governing legal standards are identical."); *In re International Auction and Appraisal Services LLC*, 493 B.R. 460, 468 (Bankr. M.D. Pa. 2013); *In re Xyan.Com, Inc.*, 299 B.R. 357, 363 (Bankr. E.D. Pa. 2003). Under Pennsylvania law, the only difference between the two is the applicable statute of limitations that, under state law, is four years as opposed to the two-year period provided by the Bankruptcy Code.

[57] In its Complaint, the Trustee does not state under what sections of PUFTA it intends to proceed. However, from the Trustee's reference to the fact that the alleged transfer "was made by the Debtor without receiving a reasonably equivalent value," this Court will infer that the Trustee intended to invoke §5105 of PUFTA.

Pursuant to both counts, the Trustee seeks to avoid the revocation of the License on the basis of constructive fraud that allegedly occurred as a result of the Commonwealth Parties' failure, subsequent to the revocation of the License, to refund the License Fee.  As stated, this Court has determined that application of the *Rooker-Feldman* Doctrine divests this Court of jurisdiction to address any cause of action that attempts to avoid the revocation of the License.  Notwithstanding the plain language in the Trustee's Complaint seeking to avoid the revocation of the License as a fraudulent transfer,[58] the Trustee contends that the Complaint is not seeking avoidance of the revocation of the License.  Rather, the Trustee argues that the Complaint seeks avoidance of the transfer of the License Fee that was caused by the failure of the Commonwealth Parties to refund the License Fee after the revocation of the License became effective.  Assuming the Trustee's characterization is correct and the Fraudulent Conveyance Claims do not implicate the revocation of the License, this Court will address the plausibility of this alternate reading of the Complaint.

Despite the early stage of this litigation, few if any facts are in dispute.  *See, e.g.,* Transcript November 14, 2014, 16:5-7 (acknowledging that the principal facts are not in dispute); 47:21-23 (same).  Rather, the only issues dividing the parties relate to their respective interpretations of applicable law as applied to whether the Debtor was entitled to a refund of the License Fee subsequent to the revocation of the License.  From this Court's review of applicable law, this Court has determined that, to the extent the Complaint states a claim based upon the failure of the Commonwealth Parties to refund the License Fee, the Trustee has failed to state a fraudulent conveyance claim pursuant to either §544(b) or §548.  Specifically, the Trustee has failed to plead facts that would establish that a transfer[59] of the License Fee occurred during the applicable look-back periods.  Contrary to the Trustee's arguments, the revocation of the License did not cause a transfer of the License Fee.  The transfer of the License Fee occurred on October 17, 2007, when the Trustee alleges that the Debtor paid the License Fee to the Gaming Board.

---

[58] *See, e.g.*, Complaint, ¶¶97-104.

[59] The term "transfer" is defined by the Bankruptcy Code to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an interest in property."  11 U.S.C. §101(54)(D).

The Commonwealth's subsequent retention of the License Fee after revocation may not be considered a "transfer" simply because the Trustee believes applicable law entitles the Debtor to a refund.  As with §542, the Trustee may not use §544(b) and §548 as a Trojan Horse to obtain the adjudication of the Debtor's underlying non-bankruptcy causes of action.

To avoid a constructively fraudulent conveyance pursuant to §548(a)(1)(B), the Trustee must have pled facts that would establish: (1) the estate had an interest in property; (2) the property was transferred within two years of the bankruptcy filing; (3) the debtor was insolvent at the time of the transfer or was made insolvent as a result of the transfer; and (4) the debtor received less than reasonably equivalent value in exchange for the transfer.  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994); *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210-11 (3d Cir. 2006); *Fidelity Bond and Mortgage Co. v. Brand*, 371 B.R. 708, 719-20 (E.D. Pa. 2007) ("The constructive fraud provisions of the PUFTA and the Bankruptcy Code should be construed and interpreted uniformly because consistency between the two statutes was a goal of those who drafted the PUFTA and who have since interpreted it.").  Whereas, under §5105 as incorporated by §544(b), the Trustee must have pled the same set of facts except that the transfer must have occurred with a four-year lookback period.  12 Pa. C.S.A. §5109(2).  The only material difference between the two causes of action is the applicable look-back period.  *See, e.g., In re David Cutler Industries, Ltd.*, 502 B.R. 58, 66 n.10 (Bankr. E.D. Pa. 2013) ("While PUFTA has a four (4) year 'reachback,' §548 of the Bankruptcy Code only has a two (2) year 'reachback.'").  Under §548(a)(1)(B), the transfer must have occurred within a two-year lookback period.

**Timing of the Alleged Transfer**

The term "transfer" is defined by the Bankruptcy Code to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an interest in property."  11 U.S.C. §101(54)(D).  The Debtor filed its Chapter 11 Petition on March 31, 2014, one year and 351 days after the Trustee alleges the transfer occurred and six years and five months after the Commonwealth Parties allege that the transfer occurred.  The Commonwealth Parties argue that the alleged transfer occurred October 17, 2007, the date the Debtor paid the License Fee to the Gaming Board.  Whereas, the

Trustee argues that the transfer "occurred" on April 14, 2012, upon the Debtor's failure to seek

reconsideration of the Pennsylvania Supreme Court's order denying the allowance of the Debtor's appeal

of the *Commonwealth Opinion*.[60]  The Trustee has offered no analysis for why expiration of its appellate

rights should control the date of the transfer.  A close examination of the Trustee's arguments confirms

that the entry of the Revocation Order, its confirmation by the *Commonwealth Opinion* and the

subsequent expiration of the Debtor's appellate rights did not cause a transfer of an interest of the Debtor

in property.

Beginning with the entry of the Revocation Order and culminating with the exhaustion of the

Debtor's appellate rights, this Court has determined that none of these events caused a transfer of an

interest of the Debtor let alone a transfer of the License Fee.  The Trustee alleges the Debtor paid the

License Fee to the Gaming Board on October 17, 2007.  Upon payment to the Gaming Board, ownership

of the License Fee passed to the Commonwealth and the Debtor no longer held a direct interest in the

License Fee.  *In re Kalmar*, 18 B.R. 343, 345 (Bankr. E.D. Pa. 1982) ("Ownership of the funds passed to

the debtor when the funds were transferred.  He could not, therefore, fraudulently convert his own

property.").  Consistent with statute, the License Fee was then deposited into the State Gaming Fund

within the State Treasury immediately upon payment, 4 Pa. C.S. §1209(d), at which point it came under

the custody and control of the Pennsylvania Treasury Department not of the Department of Revenue.

4 Pa. C.S. §1208(e); 72 P.S. §1503.  Ownership of the License Fee passed when it was paid to the

Gaming Board.  *See, e.g., In re Belfry*, 862 F.2d 661, 662 (8th Cir. 1988) ("Payment of a contract price in

exchange for the recipient to undertake an obligation of future performance transfers ownership of the

money to the recipient.); *In re American Business Financial Services, Inc.*, Bky. No. 05-10203, 2012 WL

3778857, (Bankr. D. Del. Aug. 30, 2012) (holding that party failed to state a claim for conversion because

"he has failed to show control, ownership, or an immediate right to possession of the funds in question at

the time of the alleged conversion."); *Commonwealth v. Bartello*, 301 A.2d 885, 886 (Pa. Super. 1973)

---

[60] The date the Gaming Board entered the Revocation Order was December 23, 2010.

("in a simple contract providing for certain services at certain prices that where there is a transfer of money, within the contract price, even in advance of a due date, that title as well as possession passes and only a contractual obligation remains.").

Accordingly, the effect of the Revocation Order as confirmed by the Confirmation Order and the Commonwealth Parties' subsequent retention of the License Fee was not to cause a transfer of interests between the parties.  Rather, the effect was to adjudicate the parties respective interests and to determine the right to relief to which the parties were therefore entitled.  *See, e.g., ISN Bank*, 83 A.3d at 176 ("A judgment is the final determination of the rights and obligations of the parties in a case"); 2 Pa. C.S. §101 (defining "adjudication").  The Revocation Order either caused the expiration of the Debtor's interests in the License and License Fee or, as the Trustee contends, triggered a condition precedent to the Debtor's right to demand a refund of the License Fee.  Transcript of November 14, 2014 Hearing ("Transcript November 14, 2014"), 51:4-8 ("Up until the time that the revocation became final, we could not ask for the License Fee back."); 51:12-16 ("we could have gone into state court after the Supreme Court ruling and asked the state court to consider the refund of the License Fee."); 71:7-15 (stating revocation "is the predicate upon which our claim is based that we're entitled to the license fee back."); 76:22-24 ("you first have to have revocation in order to be entitled to a refund of your fee."); 77:1-2 ("without a revocation, we're not entitled to a refund of our fee"); 77:9-10 ("you could go to Commonwealth Court and ask the Commonwealth Court to rule on that issue"); 81:25-82:1 (same).  Contrary to the Trustee's arguments, neither constitutes a transfer.  *See, e.g., In re EBC I, Inc.*, 382 Fed. Appx. 135, 137 (3d Cir. 2010) (recognizing that the termination of contractual rights is not a "transfer"); *In re Wey*, 854 F.2d 196, 199 (7th Cir. 1988) ("When a termination is pursuant to the terms of a contract, there is no transfer.").  Whether or not the Commonwealth Parties became obligated to return the License Fee upon revocation of the License, the failure of the Commonwealth Parties to return the License Fee may not be characterized as a transfer.  It merely constitutes the continuation of the status quo.

To the extent the Debtor holds any interest in a refund of the License Fee, the Debtor obtained this interest *upon payment* of the License Fee to the Gaming Board *on October 17, 2007.  See, e.g., Wey,*

854 F.2d at 199 (addressing plausibility of preference claim to avoid forfeiture of down payment).  The

entry of the Revocation Order and the expiration of the Debtor's appellate rights did not cause a transfer

of this interest.  Accepting as true the Trustee's reading of the Gaming Act and the effect of its reservation

of rights, the entry of the Revocation Order simply caused the maturation of the Debtor's alleged right to

demand a refund of the License Fee.  Transcript November 14, 2014, 81:12-82:1 ("the Debtor's right to

the -- to seek the return of the license fee did not *ripen* until April 14, 2012 and prior to that time, could

not have been asserted…") (emphasis added), 173:5-7 (stating that upon revocation, the Debtor's right to

a refund of the License Fee "matured"), 176:10-19 (same); Trustee's Sur-Reply Brief dated October 29,

2014, p.6 ("the [Debtor's] claims for return of the Fee *only ripened* upon the Debtor's exhaustion of all

appellate rights challenging the revocation.") (emphasis added).  Crediting the Trustee's legal arguments,

this Court concludes that, upon payment of the Licensee Fee to the Gaming Board that occurred on

October 17, 2007, the Debtor obtained a contingent right to a refund of the License Fee. *See, e.g., In re*

*McConnell*, 934 F.2d 662, 664 (5th Cir. 1991) (holding that transfer occurred when debtor tendered down

payment); *Wey*, 854 F.2d at 199 (same).  The Commonwealth's obligation to refund the License Fee

would become an enforceable obligation upon the occurrence of a future event, the revocation of the

License.  The respective obligations of the parties were therefore set on October 17, 2007.  Consistent

with the Trustee's theory of relief, the Debtor's existing interest merely ceased to be contingent upon the

exhaustion of its appellate remedies.  With regard to the Trustee's capacity to allege the existence of a

transfer occurring within the relevant look-back periods, the Trustee's argument regarding the "ripening"

of the Debtor's claim for a return of the License Fee is therefore self-defeating.  Accordingly, this Court

may conclude that no transfer of an interest of the Debtor occurred within the look-back period of either

§544(b) or §548(a).

### Whether the Debtor Received Less Than Reasonably Equivalent Value

Even if this Court found that the allegations of the Complaint established the existence of a

transfer of the License Fee within the applicable look-back periods, the Trustee has failed to allege

sufficient facts to establish that the Debtor received less than reasonably equivalent value in exchange for

its payment of the License Fee to the Commonwealth.  The Trustee contends that the *Commonwealth Opinion* caused a transfer of the License for which they received no value.  However, the Trustee does not allege that, at the time the Debtor paid the License Fee to the Commonwealth, all parties did not contemplate that this investment would generate a positive return.  As a result, this Court must conclude that the Trustee cannot plead any facts that would establish that the Debtor received less than reasonably equivalent value in exchange for its payment of the License Fee.  *In re R.M.L., Inc.*, 92 F.3d 139, 151-52 (3d Cir. 1996) (recognizing that money spent of a losing investment may not be recovered as a fraudulent transfer).

In *R.M.L.*, the Third Circuit addressed the appeal of a bankruptcy court's determination that the payment and retention of $387,461.96 by Mellon Bank in connection with a failed loan facility constituted a constructively fraudulent conveyance.  The bankruptcy court premised is determination that the debtor did not receive value on the fact that the proposed loan never closed.  From this fact, the bankruptcy court concluded that the debtor did not receive any value in exchange for the transfer.  *In re R.M.L., Inc.*, 187 B.R. 455, 467 (Bankr. M.D. Pa. 1995) ("The Mellon loan never closed; therefore the primary anticipated source of value from the transaction failed.").  On appeal, the Third Circuit rejected this conclusion stating that the existence of value must be determined according to the circumstances extant at the time of the transfer.  The Third Circuit determined that at the time the payments were made, all parties recognized that the investment held the possibility of generating a positive return.  *R.M.L.*, 92 F.3d at 152 ("so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred.").  The same is true here.  The Trustee does not allege or otherwise contest that, at the time the Debtor paid the License Fee, it did not anticipate this investment would generate a positive return.  Consistent with *R.M.L.*, this Court must conclude that, according to the facts alleged by the Trustee, the Trustee cannot establish that the Debtor received less than equivalent value in exchange for its payment of the License Fee.

### C.      Count IV - Recovery of the Avoided Transfer, §§550 & 551

Because this Court has determined that the Complaint fails to state a plausible cause of action

pursuant to §§542, 544 and 548, this Court must dismiss the Trustee's §§550 and 551 actions. *Universal Marketing*, 459 B.R. at 580 (recognizing that the viability of §550 action depends upon underlying §544 action). Absent a viable cause of action under §542, 544(b) and 548, the Trustee may not obtain relief pursuant to §§550 and 551. *In re Syntax-Brillian Corp.*, 573 Fed. Appx. 154, 158 (3d Cir. 2014) (recognizing a §550 cause of action is dependent upon "the viability of a successful fraudulent transfer claim under §548"); *Universal Marketing*, 459 B.R. at 580 (same).

## CONCLUSION

This Court does not doubt that the Trustee possesses a reasonable basis to believe that, pursuant to the State Law Claims in the Complaint, the Debtor is entitled to a refund of the License Fee. However, each of these underlying causes of action are premised upon the Debtor's alleged rights under applicable state law and are not within the surrender of sovereign immunity resulting from the Commonwealth's ratification of the Constitution. *See, e.g., Metromedia*, 299 B.R. at 283-84 (holding that "surrender of immunity in the plan of the convention resulting from the uniformity requirement in Article I, Section 8, Clause 4" does not extend to bankruptcy proceedings that are premised upon a debtor's state law rights). Until a court of competent jurisdiction adjudicates the viability of the State Law Claims or otherwise establishes the Debtor's alleged entitlement to a refund, the Trustee's assertion of its Bankruptcy Claims is, at best, premature. If this Court were to adopt the Trustee's logic, it would obliterate the distinction between core and noncore matters that serves as the bedrock of bankruptcy jurisdiction. Moreover, if this Court were to allow the Trustee to cloak its State Law Claims with the garb of bankruptcy causes of action, it would render meaningless the "limited subordination of state sovereign immunity" recognized by the Supreme Court in *Katz*. *Katz*, 546 U.S. at 363 (recognizing that ratification authorized a "limited subordination of state sovereign immunity in the bankruptcy arena."). If sovereign immunity prevents this Court from adjudicating the underlying state law causes of action that the Trustee believes entitle the Debtor to recovery, it cannot be true that simply repackaging those nonbankruptcy actions in the guise of bankruptcy causes of action would lead to a different result.

Consistent with this memorandum, this Court will enter an order dismissing with prejudice

Counts I through IV of the Complaint.  With regard to Counts V through VII, this Court will enter an order dismissing those counts without prejudice to the Trustee's capacity, if any, to pursue those claims in a court of competent jurisdiction.

BY THE COURT:

_____
MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

DATED:  APRIL 8, 2016