UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| PHILADELPHIA ENTERTAINMENT AND DEVELOPMENT PARTNERS, L.P., | : | |
| | : | |
| DEBTOR. | : | BANKRUPTCY NO. 14-12482-MDC |
| | | |
| PHILADELPHIA ENTERTAINMENT AND DEVELOPMENT PARTNERS, LP D/B/A FOXWOODS CASINO PHILADELPHIA | : : | |
| PLAINTIFF, | : | |
| v. | : | ADVERSARY NO. 14-00255-MDC |
| COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF REVENUE, ET AL., | : | |
| DEFENDANTS. | : | |

# O P I N I O N

## I.   INTRODUCTION

On April 8, 2016, this Court entered an Opinion and Order that, *inter alia*, granted the

Defendants'[1] *Motion to Dismiss Adversary Complaint or, in the Alternative, Abstain* (the

"Motion to Dismiss")[2] and dismissed Counts II, III, and IV of the Complaint, which are the

Plaintiff's[3] claims against the Defendants under §§544, 548, and 550 of the Bankruptcy Code[4]

---

[1] The Defendants are the Commonwealth of Pennsylvania Department of Revenue and the Commonwealth of Pennsylvania.

[2] Adv. Pro. Docket No. 13.

[3] The Complaint is being prosecuted by Persil Mangeur LLC (the "Plaintiff," and together with the Defendants, the "Parties") in its capacity as the trustee of the Liquidation Trust for the estate of Philadelphia Entertainment and Development Partners, L.P. (the "Debtor").

[4] 11 U.S.C. §§101, *et seq.*

and the Pennsylvania Uniform Fraudulent Transfer Act (the "PUFTA")[5] (collectively, the

"Fraudulent Transfer Claims"), on the grounds that the *Rooker-Feldman* doctrine divested this

Court of jurisdiction to decide them.  *See Philadelphia Entertainment & Development Partners,*

*LP v. Dept. of Revenue (In re Philadelphia Entertainment & Development Partners, LP)*, 549

B.R. 103 (Bankr. E.D. Pa. 2016) ("*Philadelphia Entertainment I*"). That dismissal was affirmed

by the United States District Court for the Eastern District of Pennsylvania (the "District Court")

but reversed by the United States Court of Appeals for the Third Circuit (the "Circuit Court").

*See Philadelphia Entertainment & Development Partners, LP v. Dept. of Revenue (In re*

*Philadelphia Entertainment & Development Partners, LP)*, 879 F.3d 492 (3d Cir. 2018) (the

"*Circuit Court Opinion*").  The Circuit Court concluded that the *Rooker-Feldman* doctrine does

not bar this Court from adjudicating the Fraudulent Transfer Claims, because in doing so, this

Court does not need to review or reject the 2011 judgment of the Commonwealth Court of

Pennsylvania (the "Commonwealth Court") denying the Debtor's appeal of the revocation of its

slot machine license (the "License") by the Pennsylvania Gaming Control Board (the "Gaming

Control Board").

The Circuit Court instructed that, on remand, the District Court, or alternatively this

Court, address (i) whether claim or issue preclusion bars judicial review of the Plaintiff's claim

that revocation of the License was a constructively fraudulent transfer under §§548(a)(1)(B) and

544 of the Bankruptcy Code and the PUFTA; and if not, (ii) whether the Plaintiff has stated a

claim that the revocation of the License was a constructively fraudulent transfer under

§§548(a)(1)(B) and 544(b) of the Bankruptcy Code and the PUFTA; and (iii) whether the

sovereign immunity granted to States by the Eleventh Amendment bars judicial review of the

---

[5] 12 Pa. C.S.A. §§5101, *et seq.*

2

Plaintiff's claim that revocation of the License was a constructively fraudulent transfer under §§548(a)(1)(B) and 544(b) and the PUFTA (collectively, the "Issues on Remand").  On April 19, 2018, the District Court entered an order remanding the case to this Court for resolution of the Issues on Remand. On August 16, 2018, the District Court returned the record to this Court to allow such resolution to proceed.

For the reasons set forth herein, the Court finds that (1) the Plaintiff's Fraudulent Transfer Claims are not barred by claim or issue preclusion; (2) the Plaintiff's Fraudulent Transfer Claims are barred by sovereign immunity, and (3) even if sovereign immunity were inapplicable to the Fraudulent Transfer Claims, the Plaintiff has failed to state a claim against the Defendants under §§548(a)(1)(B), 544, and 550 of the Bankruptcy Code and the PUFTA because the License did not constitute the property or an asset of the Debtor under applicable Pennsylvania state law.

## II.      POST REMAND FACTUAL AND PROCEDURAL BACKGROUND[6]

On August 28, 2018, the Court issued an Order[7] scheduling a status hearing on the issues to be addressed following remand for September 21, 2018 (the "Status Hearing").  At the Status Hearing, the Court ordered the Parties, in light of the *Circuit Court Opinion*, to submit supplemental briefs in support of their respective positions regarding the Issues on Remand (the "Briefs on Remand").  The Parties submitted the Briefs on remand as ordered.[8]

On November 20, 2018, the Court held oral argument (the "Hearing") on the Issues on

---

[6] The factual and procedural background of the present dispute has been set forth extensively in the prior opinions of this Court, the Circuit Court, and the Commonwealth Court.  *See Philadelphia Entertainment I*, 549 B.R. at 111-117; *Circuit Court Opinion*, 879 F.3d at 495-498; *Philadelphia Entertainment & Development Partners, L.P. v. Pa. Gaming Control Board*, 34 A.3d 261, 263-267 (Pa. Commw. Ct. 2011), *petition for allowance of appeal denied*, 615 Pa. 146 (2012) (the "*Commonwealth Court Opinion*").  The Court therefore will not recite them fully again here and will limit its discussion *infra* to the facts and background relevant to its analysis of the legal issues to be determined.

[7] Adv. Pro. Docket No. 74.

[8] Adv. Pro. Docket Nos. 84, 85, 89.

Remand.  At the Hearing and in their Brief on Remand, the Defendants argued that (a) the

Fraudulent Transfer Claims should be dismissed because they are barred by the Defendants'

sovereign immunity, (b) the Fraudulent Transfer Claims should be dismissed for failure to state a

claim because the Debtor did not have a property interest in the License, and therefore the

Plaintiff could not meet a threshold element of the Fraudulent Transfer Claims, and (c) the

Fraudulent Transfer Claims are barred by the doctrine of claim preclusion.[9]  In its Brief on

Remand and the Hearing, the Plaintiff argued that the Fraudulent Transfer Claims should not be

dismissed because (a) under United States Supreme Court precedent, fraudulent transfer actions

are excepted from the Defendants' sovereign immunity, (b) the doctrines of claim preclusion and

issue preclusion do not bar the Fraudulent Transfer Claims, and (c) the Fraudulent Transfer

Claims state a claim for which relief can be granted against the Defendants because the Transfer

at issue occurred within the statutory look-back period, constituted a transfer of an interest in the

Debtor's property, and was made without the Debtor receiving reasonably equivalent value.

    At the Hearing, the Parties also made arguments not previously made or briefed.  The

Parties argued for the first-time regarding application of Pennsylvania's Statutory Construction

Act of 1972 (the "Statutory Construction Act")[10] to the issue of whether the License constituted

the property or an asset of the Debtor for purposes of fraudulent transfer law.  The Court

thereafter directed the Parties to submit supplemental briefs on their respective positions

regarding that issue (the "Supplemental Briefs"), which the Parties submitted on December 20,

---

[9] The Defendants also argued in their Brief on Remand that the Fraudulent Transfer Claims failed to state a claim because the Debtor received reasonably equivalent value for revocation of the License.  The Court, however, agrees with the Plaintiff that the reasonably equivalent value inquiry is fact-based and not amenable to the Motion to Dismiss.  *See* Adv. Pro. Docket No. 89, at pgs. 1-3.

[10] 1 Pa. C.S.A. §§1501, *et seq.*

2019.[11]  In their Supplemental Brief, the Defendants argued that the application of the Statutory

Construction Act confirms that the License did not constitute property or an asset of the Debtor

for purposes of the Fraudulent Transfer Claims because the plain language of the Gaming Act

confirms the Pennsylvania legislature's intent that the License was only a revocable privilege,

and any conflicting language in the PUFTA does not supersede the clear intent of the Gaming

Act.  In its Supplemental Brief, the Plaintiff argued that the application of the Statutory

Construction Act confirms the License was property of the Debtor because the language of the

PUFTA, rather than the Gaming Act, is clear that government-issued licenses are property for

purposes of that statute, even if not considered property for other purposes.  The Plaintiff argued

there is no conflict between the Gaming Act and the PUFTA as to whether the License was the

Debtor's property because the Gaming Act is limited in scope to the process for obtaining a

gaming license, but to the extent there is a conflict, the PUFTA's provisions should prevail

because it is a statute special in nature dealing specifically with fraudulent transfers.

## III.  DISCUSSION

### A.  Clarification of the Transfer Sought to Be Avoided

In Count II of the Complaint, Plaintiff asserted that the Defendants are liable for a

fraudulent transfer pursuant to §548(a)(1)(B) of the Bankruptcy Code because the "revocation of

the License" was a transfer for which the Debtor received no value, and defined revocation as

"the Transfer."  Complaint at ¶97.  The Plaintiff further alleged that "the Debtor is entitled to a

judgment avoiding and preserving the Transfer."  Complaint at ¶104.  Likewise, in Count III of

the Complaint, the Plaintiff asserted that the Defendants are liable for the Transfer under §544(b)

of the Bankruptcy Code and the PUFTA.  Complaint at ¶¶105-110.  In Count IV of the

---

[11] Adv. Pro. Docket Nos. 94, 95.

Complaint, the Plaintiff sought both to avoid the Transfer and a directive that the full value of the

Transfer, in the amount of $50,000,000, be turned over to the Plaintiff.  Complaint at ¶¶111-

114.[12]

In *Philadelphia Entertainment I*, this Court observed that notwithstanding the

plain language of the Complaint's allegations that the Plaintiff sought to avoid revocation of the

Debtor's license as a fraudulent transfer, the Plaintiff contended that it was *not* seeking to avoid

revocation of the license, but rather was seeking to avoid the transfer of the license without a

refund of the $50,000,000 the Debtor paid for it.  This Court also observed that the Defendants

argued the transfer at issue was when the Debtor paid the $50,000,000 license fee, not when the

license was revoked or when no refund was issued.  Thus, as the Circuit Court noted, this Court

identified three possible transfers: the payment of the license fee, the loss of the license, and the

Defendants' failure to refund the license fee.

In its appellate briefing before the Circuit Court, the Plaintiff clarified its theory

of the transfer for which it asserts the Defendants are liable.  The Circuit Court, citing the

Plaintiff's appellate brief, instructed that the operative transfer for which the Plaintiff seeks relief

is the loss of the license, *i.e.* the revocation of the license.[13]  The Plaintiff has now confirmed that

for this Court.[14]  As such, this Court, with the much-needed clarification that the transfer the

Plaintiff seeks to avoid is the revocation of the License without receiving value in return, now

proceeds with its analysis of the viability of the Fraudulent Transfer Claims.

---

[12] The $50,000,000 figure serves as a proxy for the value of the License rather than a sum-certain amount of damages, based on the license fee the Debtor paid.  *Circuit Court Opinion*, 879 F.3d at 499 n.3.

[13] The Circuit Court acknowledged that this Court's difficulty in identifying with precision the transfer the Plaintiff seeks to avoid was the product of the Plaintiff's briefs and oral arguments in this Court and the District Court "often conflat[ing] the claim with other claims in the adversary complaint that sought a refund of the license fee."  *Circuit Court Opinion*, 879 F.3d at 499, n.3.

[14] September 21, 2018 Hearing Recording, at 11:19.

B.    **The Fraudulent Transfer Claims Are Not Barred by Claim or Issue
Preclusion**

1.    Claim Preclusion (*Res Judicata*)

The Defendants argue that claim preclusion bars the Plaintiff's Fraudulent Transfer

Claims because the Debtor could have challenged in the state proceedings the lack of value

received in return for revocation of the License.  Claim preclusion bars suit when three elements

are met: (1) a final judgment on the merits in a prior suit involving (2) the same parties or their

privies and (3) a subsequent suit based on the same cause of action.  *Davis v. Wells Fargo*, 824

F.3d 333, 341 (3d Cir. 2016) (*quoting Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir.

1991)).  The purpose of claim preclusion is to "relieve parties of the cost and vexation of

multiple lawsuits, conserve judicial resources and, by preventing inconsistent decisions,

encourage reliance on adjudication."  *Id.* (*quoting Marmon Coal. Co. v. Dir., Office of Workers'*

*Comp. Programs*, 726 F.3d 387, 394 (3d Cir. 2013)).  Because of this, as noted by both the

Plaintiff and the Defendants, claim preclusion bars not only claims that were brought in a

previous action, but also claims that could have been brought.  *Id.* (*citing In re Mullarkey*, 536

F.3d 215, 225 (3d Cir. 2008)).

The Court has no difficulty concluding that the proceedings before the Gaming Control

Board and the Commonwealth Court resulted in final judgments against the Debtor, and that the

Plaintiff and the Defendants are privies to the parties in those proceedings.  The only issue to

determine is whether this action, now based only on the Fraudulent Transfer Claims, can be

considered a suit based on the same cause of action in the Gaming Control Board proceedings

under the broad understanding of that concept for claim preclusion purposes.

In the litigation before the Gaming Control Board, the Debtor defended against the state

Bureau of Investigations and Enforcement's (the "BIE") Complaint seeking revocation of the

7

License pursuant to The Pennsylvania Race Horse Development and Gaming Act, 4 Pa. C.S. §§1101, *et seq.* (the "Gaming Act").  In defending against that action, the Debtor did not claim that the Commonwealth needed to return the License Fee upon revocation or otherwise provide value in return for it.  The Debtor instead defended against the action on the basis that it could satisfy the conditions for operation of a casino set by the Gaming Act and the Gaming Control Board, and therefore grounds did not exist to revoke the License.  The Gaming Control Board decided in favor of the BIE at the summary judgment stage, and the legal issue before the Gaming Control Board was strictly whether grounds existed to revoke the License, and not what should happen in the event it did.  The cause of action litigated therefore was revocation under the Gaming Act, not any claim for what value should be returned to the Debtor upon revocation.

Moreover, the Fraudulent Transfer Claims at issue here could not have been brought by the Debtor in the Gaming Control Board proceedings.  The Plaintiff's §548 claim (Count II) is a creature of the Bankruptcy Code and is dependent on the existence of a bankruptcy case.  It therefore could not have been brought at any time prior to the Debtor's bankruptcy filing, including before the Gaming Control Board.

Likewise, the Plaintiff's claim under §544 and the PUFTA (Count III) could not have been brought in the Gaming Control Board proceedings.  First, a §544 claim is not only a creature of the Bankruptcy Code, but also is dependent on both the existence of a bankruptcy and applicable non-bankruptcy law authorizing avoidance.  Here the applicable non-bankruptcy law is the PUFTA.  A claim to avoid and recover a fraudulent transfer under the PUFTA could not have been brought by the Debtor.  The PUFTA "serves as a tool *for creditors* to recover fraudulent transfers."  *In re Skinner*, 636 Fed. Appx. 868, 870 (3d Cir. 2016) (emphasis added). Section 5104(a) of the PUFTA provides that a transfer made by a debtor is voidable "as to *a*

*creditor*" whether that creditor's claim arose before or after the transfer was made.  12 Pa. C.S. §5104(a) (emphasis added).  Section 5104(b) sets forth the applicable burden of proof for "*a creditor* making a claim for relief" under §5104(a).  12 Pa. C.S. §5104(a) (emphasis added).  Section 5105 of the PUFTA likewise provides that a transfer is avoidable "as to a creditor" and sets forth the burden of proof "a creditor" must meet when making a claim under that provision.  12 Pa. C.S. §5105.  Section 5107 of the PUFTA provides for the remedies *a creditor* may seek in an action to avoid a transfer under the PUFTA, and further provides that if *a creditor* obtains judgment on a claim against the debtor, the creditor may levy execution on the asset transferred or its proceeds.  *See* 12 Pa. C.S. §5107.  The plain language of these PUFTA provisions support the conclusion that a claim under the statute may only be brought by a creditor.[15]  *See also Silica Tech, L.L.C. v. J-Fiber, GmbH*, 2009 U.S. Dist. LEXIS 73700, at *117-119 (D. Mass. May 19, 2009) (collecting case law confirming that a plaintiff must be a creditor within the meaning of the statute to proceed with a Uniform Fraudulent Transfer Act).  The Debtor was not a creditor under the PUFTA when litigating before the Gaming Control Board or the Commonwealth Court, and therefore could not have brought a claim under the statute.

The Fraudulent Transfer Claims are not causes of action that are based on the claims that were or could have been litigated in the state proceedings.  They are therefore not barred by the principle of claim preclusion.

### 2.    Issue Preclusion (Collateral Estoppel)

Although the Defendants did not submit any further argument on the issue in their Brief on Remand, in their initial briefing on the Motion to Dismiss, the Defendants argued that the

---

[15] As is the case here, once a bankruptcy case is commenced a PUFTA claim may also be brought by a debtor or trustee pursuant to §544's "strong-arm" power.  11 U.S.C. §544; *D'Angelo v. J.P. Morgan Chase Bank (In re D'Angelo)*, 475 B.R. 424 (Bankr. E.D. Pa. 2012).

Plaintiff is collaterally estopped from relitigating issues raised in the proceedings before the

Gaming Control Board and the Commonwealth Court.  Memorandum of Law in Support of

Defendants' Motion to Dismiss Adversary Complaint or, In the Alternative, to Abstain (the

"Defendants' Opening Brief"), at 33.[16]  The Defendants did not identify what specific issues they

believe are barred by collateral estoppel, but argued in a more general sense that the legal issues

the Plaintiff raises in the Complaint "are precisely the same as those addressed by the State

Court: whether (i) the License was lawfully revoked by the Gaming Board; and (ii) forfeiture of

the License under the Gaming Act was appropriate."  Defendants' Opening Brief, at 33.

Where the preclusive effect of a state court judgment is at issue, a federal court must

apply state preclusion principles to determine the extent to which the state court judgment bars

relitigation of the issues.  *Aiello v. Aiello (In re Aiello)*, 660 Fed. Appx. 179, 182 n.4 (3d Cir.

2016) (*citing Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 381-82 (1985)).

Here, the Gaming Control Board and Commonwealth Court decisions were rendered by

Pennsylvania tribunals, and therefore Pennsylvania law applies.  Under Pennsylvania law, an

issue previously decided cannot be relitigated when: (1) the issue decided in the prior case is

identical to the one presented in the later action; (2) there was a final adjudication on the merits;

(3) the parties in the later proceeding are identical or in privity to those in the earlier proceeding;

(4) the party seeking to relitigate the issue decided had a full and fair opportunity to litigate the

issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to

the judgment.  *Id.* (*citing Metro. Edison Co. v. Pa. PUC*, 767 F.3d 335, 351 (3d Cir. 2014);

*Office of Disciplinary Counsel v. Kiesewetter*, 889 A.2d 47, 50-51 (Pa. 2005)).

The Court recognizes why the Defendants asserted in the Defendants' Opening Brief that

---

[16] Adv. Pro. Docket No. 13-1.

claim preclusion applies. The allegations of the Complaint can be read largely as a list of perceived grievances the Plaintiff has with the Gaming Control Board's process and decision to revoke the License. The Complaint asserted claims against the Defendants due to revocation of the License that included not just the Fraudulent Transfer Claims, but also for turnover (Count I), unconstitutional taking (Count V), unjust enrichment (Count VI), and promissory estoppel (Count VII). The allegations under each of these Counts, together with the Complaint as a whole, could fairly be argued to be an attempt to rehash the issues already decided by the Commonwealth Court regarding the propriety and fairness of the Gaming Control Board's decision. In light of that, the Defendants were almost compelled to argue in their Motion to Dismiss that the issues raised by the Complaint were subject to collateral estoppel.

At this stage of the litigation, however, the only claims remaining are the Fraudulent Transfer Claims.[17] Those claims do not allege or relate to the unfairness or impropriety of the revocation. Rather, they hinge on whether, as a matter of bankruptcy and state fraudulent transfer law, the Debtor transferred its property upon revocation while insolvent or becoming insolvent and whether revocation of the License had to be accompanied by reasonably equivalent value. 11 U.S.C. §548(a)(1)(B); 12 Pa. C.S. §5104(a)(2); 12 Pa. C.S. §5105(a). The Plaintiff correctly argues that these issues were not, and could not have been, litigated in the state proceedings. Whatever issues the Debtor, and now the Plaintiff, had or has with the process and result in the Gaming Control Board and Commonwealth Court litigation, the Fraudulent Transfer Claims exist independent of those issues. The Fraudulent Transfer Claims were not decided in the prior case, nor would the insolvency and reasonably equivalent value analysis underlying them have been essential to a determination of the issue that *was* before those courts, *i.e.*,

---

[17] This Court dismissed Counts I, V, VI, and VII of the Complaint *in Philadelphia Entertainment I*. Plaintiff did not appeal the dismissal and the dismissal of those claims is final.

whether the Debtor's License should be revoked.  The elements of collateral estoppel under

Pennsylvania law are not met, and it does not apply to bar litigation of the Fraudulent Transfer

Claims.

      C.      **Sovereign Immunity Does Not Bar Fraudulent Transfer Actions In General,
But Is a Defense to the Fraudulent Transfer Claims in This Case**

      1.      <u>Review of *Philadelphia Entertainment I*'s Sovereign Immunity Analysis</u>

In *Philadelphia Entertainment I*, the Court extensively discussed whether the

Defendants' sovereign immunity under the Eleventh Amendment of the United States

Constitution barred the Fraudulent Transfer Claims.  *Philadelphia Entertainment I*, 549 B.R. at

123-135.  The Court initially noted that pursuant to United States Supreme Court precedent in

*Central Virginia Community College v. Katz*, 546 U.S. 356 (2006), a State's sovereign immunity

is waived if a cause of action is (1) an *in rem* cause of action, or (2) a cause of action that is

ancillary to a court's *in rem* jurisdiction.  *Philadelphia Entertainment I*, 549 B.R. at 124.  The

Court concluded that the Fraudulent Transfer Claims, seeking to avoid revocation of the License,

failed to implicate either of these categories of causes of action because the License constituted a

revocable privilege under state law, rather than "property of the Debtor," and therefore did not

constitute a *res* to which the Court's *in rem* jurisdiction attaches.  *Id.* (looking to *Commonwealth

Court Opinion*, 34 A.3d 261 (finding that the License is a revocable privilege under state law)

and *Village of Rosemont v. Jaffee*, 482 F.3d 926 (7th Cir. 2007) (finding the State of Illinois'

post-petition revocation of the debtor's gaming license did not implicate a *res* and therefore

affirming the dismissal of a lawsuit seeking to enjoin revocation on the basis of sovereign

immunity)).

      The Court then analyzed whether the Fraudulent Transfer Claims nonetheless implicated

the Court's jurisdiction because fraudulent transfer actions were, at the time of the

Commonwealth's ratification of the Constitution, and specifically the Bankruptcy Clause, understood to be "Laws on the subject of Bankruptcy" for which sovereign immunity was waived. *Id.* at 126. In doing so, the Court engaged in an extensive discussion of the historical nature of fraudulent transfer actions, their similarities to and differences from preference actions (for which *Katz* found sovereign immunity to be waived), Supreme Court precedent addressing whether fraudulent transfer actions are core bankruptcy proceedings, and the limited caselaw to have squarely addressed whether ratification of the Bankruptcy Clause operated as a waiver of States' sovereign immunity with respect to fraudulent transfer actions. *Id.* at 126-134. Ultimately, however, the Court concluded that "[w]ithout concrete guidance, this Court is unwilling to premise the outcome of this dispute upon inferences as to what or what not the States, at the time of ratification, may have understood of the scope of the Bankruptcy Clause to be." *Id.* at 134. Given the general lack of clarity on this area of law, the Court determined it need not resolve the issue because the Plaintiff's Fraudulent Transfer Claims required dismissal on other grounds.

2.     <u>*Katz* and *Nordic Village* Guide What Actions Are Not Subject to State Sovereign Immunity</u>

In *Katz*, the Supreme Court found that States' sovereign immunity does not provide a defense to actions for the avoidance and recovery of preferences pursuant to §§547 and 550 of the Bankruptcy Code. In doing so, the Supreme Court looked to the historical context in which the States ratified the Bankruptcy Clause at the Constitutional Convention. 546 U.S. at 362-368. The Court observed that bankruptcy jurisdiction, as much in the 18th century as it is today, is at its core *in rem* and does not implicate States' sovereign immunity nearly to the same degree as other kinds of jurisdiction. *Id.* at 361-62. As such, "[t]he Framers would have understood that laws 'on the subject of Bankruptcies' included laws providing, in certain limited respects, for

more than simple adjudications of rights in the *res* … [C]ourts adjudicating disputes historically

have had the power to issue ancillary orders enforcing their *in rem* adjudications." *Id.* at 370.

Given that historical context, the Supreme Court found that in ratifying the Bankruptcy

Clause, the States waived sovereign immunity both with respect to actions invoking the

bankruptcy court's *in rem* jurisdiction as well as actions ancillary to that *in rem* jurisdiction:

"Insofar as orders ancillary to the bankruptcy courts' *in rem* jurisdiction, like orders directing

turnover of preferential transfers, implicate States' sovereign immunity from suit, the States

agreed in the plan of the Convention not to assert that immunity." *Id.* at 373.  With respect to

preference actions under §§547 and 550 of the Bankruptcy Code, the Supreme Court found it

unnecessary to determine whether they are properly characterized as actions *in rem* or actions

ancillary to the bankruptcy court's *in rem* jurisdiction:  "Whatever the appropriate appellation,

those who crafted the Bankruptcy Clause would have understood it to give Congress the power

to authorize courts to avoid preferential transfers and to recover the transferred property …

[T]hat authority has been a core aspect of the administration of bankrupt estates since at least the

18th century." *Id.* at 372.

*Katz* distinguished the case before it from its prior decision in *U.S. v. Nordic Village,

Inc.*, 503 U.S. 30 (1992).  There the Supreme Court addressed whether a bankruptcy trustee's

action pursuant to §§549 and 550 of the Bankruptcy Code to recover a post-petition transfer from

the debtor to the Internal Revenue Service was barred by the government's sovereign immunity.

*Nordic Village*, 503 U.S. at 31-32.  In finding that the government did not waive its sovereign

immunity, the Supreme Court rejected, among other arguments, the bankruptcy trustee's position

that a bankruptcy court's *in rem* jurisdiction overrides sovereign immunity. *Id.* at 38.  The

Supreme Court found that the trustee's action did not even invoke the bankruptcy court's *in rem*

jurisdiction because the trustee sought to recover a sum of money, not "particular dollars." *Id.* (*citing Begier v. IRS*, 496 U.S. 53, 62 (1990)).  Therefore, there was no *res* to which the bankruptcy court's *in rem* jurisdiction could have attached.  *Id.*  The *Nordic Village* court found this critical to determining whether an action is *in rem*: "A suit for payment of funds from the Treasury is quite different from a suit for the return of tangible property in which the debtor retained ownership."  *Id.* at 38-39 (distinguishing the bankruptcy trustee's action from the transfer at issue in *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198 (1983)); *see also In re La Paloma Generating Co.*, 588 B.R. 695 (Bankr. D. Del. 2018), *aff'd, Kravitz v. Board of Equalization (In re La Paloma Generating Co. LLC)*, 2019 U.S. Dist. LEXIS 159724 (D. Del. Sept. 19, 2019) ("Similarly, *in rem* jurisdiction is not created by bluntly asking for a lump sum of value … The distinction drawn between [*Katz* and *Nordic Village*] is crucial, as it remains in dispute whether states intended to submit themselves to suit for retroactive money damages.") (internal quotation omitted).  The *Katz* court acknowledged the holding and reasoning of *Nordic Village*, but concluded that the proper characterization of the preference action before it as an action *in rem* or ancillary to *in rem* jurisdiction was not clear because, unlike the plaintiff in *Nordic Village*, the *Katz* trustee sought both return of the "value" of the preference and return of the actual "property transferred."  *Katz*, 546 U.S. at 372 n.10.

> 3.    State Sovereign Immunity is Waived for Fraudulent Transfer Actions Implicating *Res* of the Bankruptcy Estate

The Supreme Court's guidance in *Katz* and *Nordic Village* regarding the scope of States' waiver of sovereign immunity still leaves open whether fraudulent transfer actions, like preference actions, are subject to that waiver.  In analyzing this issue, the Court finds helpful the analysis provided by the court in *La Paloma*.  In that case*,* the court was faced with a liquidating trustee's motion (the "Tax Motion") seeking a determination of the value of the debtor's facility

15

pursuant to §505 of the Bankruptcy Code and whether the debtor was entitled to a property tax refund due to overpayments to the California State Board of Equalization (the "SBE"). *La Paloma*, 588 B.R. at 701. The SBE filed a motion for summary judgment, arguing, *inter alia*, that the bankruptcy court lacked jurisdiction to decide the Tax Dispute on state sovereign immunity grounds. *Id.*[18] After reviewing the principles enunciated in *Katz*, the *La Paloma* court turned to whether the Tax Motion either invoked the court's *in rem* jurisdiction or was ancillary to its *in rem* jurisdiction. *Id.* at 727. The court found that because the trustee sought a refund of funds already paid to SBE, there was no discrete *res* that invoked the court's *in rem* jurisdiction. *Id.* at 731. Rather, the trustee's claim was "nothing more than a state law claim for a sum of dollars," and to disregard SBE's sovereign immunity "would be to erase the distinction made between *Katz* and *Nordic Village*, and to allow a wholesale suit for money damages." *Id.*

The *La Paloma* court therefore turned to whether resolution of the Tax Motion was ancillary to the court's *in rem* jurisdiction. Noting that courts had not settled on a criteria under which to evaluate such proceedings, the court looked to two factors set forth in *Zazzali v. Swenson (In re DBSI, Inc.)*, 463 B.R. 709 (Bankr. D. Del. 2012): (1) whether the relevant law applies uniform treatment between state and private creditors, and (2) then whether the activities constitute core aspects of bankruptcy administration through either its history or effect on the estate. *Id.* (*citing DBSI*, 463 B.R. at 714).[19] The *La Paloma* court found that a tax assessment under §505 of the Bankruptcy Code aids in the uniform treatment of state and private creditors because it could "be utilized by both creditors and debtors, respects state administrative

---

[18] Although filed as a motion for summary judgment, the *La Paloma* court treated the motion as one to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

[19] The *La Paloma* court appears to have slightly synthesized the two factors as articulated by the *DBSI* court, which were expressed as follows: "(1) whether those who crafted the Bankruptcy Clause intended to give Congress the power to authorize courts to avoid fraudulent transfers and recover the relevant property, and (2) whether there is a relevant law on the subject of bankruptcy that Congress applied to the [States] and other creditors in the same way." *DBSI*, 463 B.R. at 712.

proceedings related to taxes, and implicates governmental entities of all types." *Id.* at 733.

Addressing the second *DBSI* factor, the court observed that a proceeding's connection to the core

administration of a bankruptcy can extend from historical roots or from practical effects. *Id.* In

order for historical roots to support a proceeding being deemed core bankruptcy administration,

it had to be "core…since at least some point in the eighteenth century." *Id.* (*citing DBSI*, 463

B.R. at 715, which in turn cited *Katz*, 546 U.S. at 372). The Court then noted that historical

connections had been used to justify the collection of preference and fraudulent transfer actions

in bankruptcy, and stated that "where historical connections exist, there usually is no need for

further analysis as to whether such proceedings fall under the *Katz* waiver." *Id.* The Court,

however, found that no such historical connection existed with respect to motions under §505,

which date back only approximately 60 years, "a far cry from the history used to support

preference and fraudulent transfer actions." *Id.* at 734.

Nonetheless, the court reasoned, proceedings could still be ancillary to *in rem*

proceedings where they functionally serve the administration of the *res* by connecting to one of

the core *in rem* processes of the bankruptcy court: (a) the exercise of exclusive jurisdiction over

all of the debtor's property, (b) the equitable distribution of that property among the debtor's

creditors, and (c) the ultimate discharge that gives the debtor a fresh start. *Id.* (*citing In re Allen*,

768 F.3d 274, 279-80 (3d Cir. 2014); *Florida Dept. of Revenue v. Diaz (In re Diaz)*, 647 F.3d

1073, 1084 (11th Cir. 2011)). The *La Paloma* court determined that the Tax Motion did not

entail any true estate administration that could not be accomplished by litigation already pending

in state court against a county defendant that did not enjoy sovereign immunity, thereby

preserving the assets of the estate. *Id.* The court was also persuaded by the potential for a

money judgment against SBE, which "seemingly goes beyond the realm of 'ancillary orders' and

into the adjudication of the *in rem* proceedings themselves." *Id.* Adjudication of the Tax Motion

was therefore too remote to be considered ancillary to the court's *in rem* jurisdiction and fell

outside the *Katz* consent-by-ratification waiver. *Id.*

This Court, like the court in *La Paloma,* believes that the factors identified by the *DBSI*

court provide the analytical guideposts needed to determine whether fraudulent transfer actions

are ancillary to the Court's *in rem* jurisdiction.[20] The first issue to be determined is whether they

aid in uniform treatment between state and private creditors. The Court finds that they do.

Section 548 permits a trustee to avoid "any transfer" of an interest of the debtor in property.

11 U.S.C. §548(a)(1). Section 544 permits a trustee to avoid "any transfer" of property of the

debtor. 11 U.S.C. §544(a). These statutory provisions do not make any distinction between state

transferees and other transferees, thereby promoting the "uniformity" about which the *Katz* court

was concerned. *See Katz*, 546 U.S. at 379 (concluding that the scope of Congress's power to

enact "Laws on the subject of Bankruptcies" under the Bankruptcy Clause included the power to

either treat States in the same way as other creditors insofar as those laws are concerned or

exempt them from the operation of such laws); *La Paloma*, 588 B.R. at 733 (finding that an

action under §505 of the Bankruptcy Code aids in the uniform treatment of state and private

creditors because it can be utilized against any governmental entity assessing and collecting

taxes, most of which are not beneficiaries of sovereign immunity under the Eleventh

Amendment); *DBSI*, 463 B.R. at 716-17 (finding that §106(a)'s abrogation of sovereign

---

[20] At oral argument, the Defendants argued that *DBSI* is distinguishable, and therefore presumably unhelpful, because in that case the trustee's fraudulent transfer claims sought to recover specific property, *i.e.,* tax payments the debtors made to state taxing authorities. Nov. 20, 2018 Hearing Transcript at 8:24 to 9:4; 14:3 to 14:13. Nothing in the *DBSI* opinion suggests that the trustee sought return only of the actual dollars the debtors paid to the state taxing authorities. Rather, review of the First Amended Complaint in that action reflects that the fraudulent transfer counts subject to the motion to dismiss addressed in *DBSI* sought avoidance and recovery of the alleged fraudulent transfers "or the value thereof." *See* Adv. Pro No. 10-54649 (PJW) (Bankr. D. Del.), Docket No. 3 at ¶¶1165 to 1202. Those claims therefore paralleled the preference claims at issue in *Katz*, where the trustee sought, in the alternative, both the return of the value of the preference and return of the actual property transferred. *Katz*, 546 U.S. at 373 n.10.

immunity with respect to, among others, actions to avoid and recover fraudulent transfers under §544 made it apparent that Congress intended to apply that avoidance liability to state and non-state transferees alike).[21]

The Court also concludes that the history of fraudulent transfer actions supports the conclusion that they constitute a core aspect of bankruptcy administration.  The court in *DBSI* looked to the historical presence of fraudulent transfer actions to conclude that those who crafted the Bankruptcy Clause would have understood it to give Congress the power to authorize courts to avoid and recover fraudulent transfers.  *DBSI*, 463 B.R. at 715.  Looking to the Supreme Court's declaration in *Granfinaciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), that "actions to recover preferential or fraudulent transfers were often brought at law in late eighteenth century England," the *DBSI* court cited its understanding of "the long tradition of fraudulent transfer law, including the cores of actual and constructive fraud."  *DBSI*, 463 B.R. at 715 (collecting authorities).  The *DBSI* court concluded that, given this historical base, avoiding and recovering fraudulent transfers was within the scope of Congress's authorizing powers when the Bankruptcy Clause was ratified, just as the *Katz* court found with respect to preference actions.  *Id.* at 716.  This Court agrees that the historical presence of fraudulent transfer actions since at least the late eighteenth century supports the conclusion that they were part of the fabric of debtor-creditor law

---

[21] The Defendants argue that one of the factors *Katz* enunciated for determining whether an action is ancillary to the bankruptcy court's *in rem* jurisdiction is whether it promotes equitable distribution among the debtor's creditors.  Nov. 20, 2018 Hearing Transcript, at 9:19 to 10:16.  The Defendants argue that because they did not file a claim in the Debtor's bankruptcy case and were not owed a debt, this factor is not met.  *Id.*  The *Katz* court stated that "[c]ritical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her or it from further liability for old debts."  *Katz*, 546 U.S. at 363-364 (*citing Local Loan Co. v. Hunt*, 292 U.S. 234 (1934)).  *Katz* did not hold, however, that a state actor transferee has to be a creditor of the debtor in order for an action against it to be ancillary to the bankruptcy court's *in rem* jurisdiction.  Moreover, the *Katz* court observed that a preference action against a state actor would be ancillary to the bankruptcy court's *in rem* jurisdiction where it not only sought avoidance of the preferential transfer but also its recovery in order to marshal the entirety of the debtor's estate.  *Id.* at 371-372.  Therefore this Court understands *Katz* to support the conclusion that a fraudulent transfer action against a state actor is ancillary to the bankruptcy court's *in rem* jurisdiction where it seeks recovery of the alleged fraudulent transfer or, alternatively, its value, because that recovery promotes the marshalling of the entirety of the debtor's estate for distribution to creditors, whether or not the state actor is a creditor itself.

at the time of ratification and constitute core aspects of bankruptcy administration.[22]

Fraudulent transfer actions both aid in the uniform treatment of state and non-state transferees

and constitute core aspects of bankruptcy administration.  They are therefore ancillary to the

Court's *in rem* jurisdiction.

Pursuant to *Katz*, the Court finds that, in general, the States have waived their sovereign

immunity to suit in fraudulent transfer actions in bankruptcy court.  Actions seeking the return of

a debtor's fraudulently transferred property or, alternatively, the value of such property, were the

types of actions with respect to which States would have contemplated narrowly waiving their

sovereign immunity when ratifying the Constitution.  This is because such actions implicate the

*res* of the bankruptcy estate and were part of the fabric of debtor-creditor law at the time of

ratification.

4.    The Fraudulent Transfer Claims in this Action Do Not Invoke the Court's
*In Rem* Jurisdiction and Are Not Ancillary to that Jurisdiction

The Court finds that the Fraudulent Transfer Claims here neither invoke the Court's *in*

*rem* jurisdiction nor are they ancillary to that jurisdiction.  As discussed in detail below, the

License did not constitute the property or an asset of the Debtor.  It therefore did not fall under

the Court's jurisdiction to administer the *res* of the bankruptcy estate.  The Debtor could not

have sought the return of the revoked License in a fraudulent transfer action in this Court, and

therefore, in contrast to *Katz* and *DBSI*, the Fraudulent Transfer Claims seek only to recover the

purported value of the License.  The Fraudulent Transfer Claims are, in essence, a suit for money

damages.  *Nordic Village* is clear that such actions are not subject to any limited *in rem*

---

[22] The *Katz* court warned that not every law labeled a bankruptcy law could properly impinge upon state sovereign immunity. 546 U.S. at 378 n.15.  Moreover, in the wake of *Stern v. Marshall*, 564 U.S. 462 (2011), not every proceeding deemed "core" under 28 U.S.C. §157 is necessarily so for purposes of a bankruptcy court's ability to issue a final order.  In the context of determining whether fraudulent transfer actions constitute a core aspect of bankruptcy administration, however, this Court deems it at least noteworthy that the statutory provision granting bankruptcy court jurisdiction designates "proceedings to determine, avoid, or recover fraudulent conveyances" as core proceedings.  28 U.S.C. §157(b)(2)(H).

exception to States' sovereign immunity, and while *Katz* allows for actions ancillary to the

bankruptcy court's *in rem* jurisdiction to fall under the States' waiver, the scope of that waiver is

narrow: "[t]he Framers would have understood that laws 'on the subject of Bankruptcies'

included laws providing, in certain limited respects, for more than simple adjudications of rights

in the *res* … [C]ourts adjudicating disputes historically have had the power to issue ancillary

orders enforcing their *in rem* adjudications."  *Katz*, 546 U.S. at 370.  Here, where the License

does not constitute a *res* that invokes the Court's *in rem* jurisdiction, an action to recover only

the value of the License cannot be found to be an action ancillary to the Court's *in rem*

jurisdiction.  The Court therefore concludes that while States waived their sovereign immunity

with respect to fraudulent transfer actions generally, the Fraudulent Transfer Claims at issue in

this case do not fall under that waiver, and the Defendants' sovereign immunity serves as a

defense to those claims.

>    **D.    The Fraudulent Transfer Claims Do Not State a Claim for Which Relief Can
>    Be Granted Because the License Did Not Constitute an Interest of the Debtor
>    in Property or an Asset of the Debtor**

The Plaintiff asserts that the Defendants are liable for the Transfer under two separate,

but similar, statutory provisions.  Count II asserts that the Defendants are liable for a

constructively fraudulent transfer under §548(a)(1)(B) of the Bankruptcy Code.  Count III asserts

that the Defendants are liable for a constructively fraudulent transfer under the PUFTA, which

the Plaintiff may assert by virtue of §544 of the Bankruptcy Code.  The Complaint does not

specify whether the Plaintiff asserts the Defendants' liability falls under §§5104(a)(2) or 5105 of

the PUFTA, both of which provide for a transferee's liability for a constructively fraudulent

transfer.

The elements of a claim under §548(a)(1)(B) are the following: (1) the debtor had an

interest in property; (2) the interest was transferred within two years of filing of the bankruptcy

petition; (3) the debtor was insolvent at the time of the transfer or was rendered insolvent as a result thereof; and (4) the debtor received less than reasonably equivalent value in exchange for the transfer.  11 U.S.C. §548(a)(1)(B); *Merritt v. MidAtlantic Farm Credit, ACA (In re Merritt)*, 529 B.R. 845, 864 (Bankr. E.D. Pa. 2015) (*citing In re Gutpelet*, 137 F.3d 748, 751 (3d. Cir. 1998)).

Similarly, to prevail on a claim for a constructively fraudulent transfer under the PUFTA, a plaintiff must show that the Debtor made a "transfer" of property without receiving reasonably equivalent value in exchange and was insolvent.[23]  12 Pa. C.S. §§5104(a)(2), 5105; *Sikirica v. Midtown Niki Group (In re Dressel Assocs.)*, 2014 Bankr. LEXIS 4781 at *5-*6 (Bankr. W.D. Pa. Nov. 19, 2014).  The term "transfer" as used in PUFTA is defined in §5101(b) to mean "Every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset.  The term includes payment of money, release, lease, license, and creation of a lien or other encumbrance."  12 Pa. C.S. §5101(b).  The term "asset," in turn, is defined to mean "property of a debtor," and the term "property" is defined to mean "anything that may be the subject of ownership."  *Id.*

A threshold requirement for a fraudulent transfer claim under §548(a)(1)(B) is therefore that the thing transferred be an interest of the debtor in property.  Likewise, a threshold requirement for a fraudulent transfer claim under the PUFTA is that the thing transferred be an asset of the debtor.  Synthesizing the various relevant definitions, the PUFTA limits an asset to anything that may be the subject of ownership by the debtor.  The Court must determine whether

---

[23] If making a claim under §5104(a)(2), this insolvency test is judged by whether the debtor (a) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.  12 Pa. C.S. §5104(a)(2).  If making a claim under §5105, insolvency is judged by whether the debtor was insolvent at the time or became insolvent as a result of the transfer.  12 Pa. C.S. §5104(a)(2).

the Debtor had an interest in the License sufficient to satisfy these statutory requirements.

1.    <u>The License Does Not Constitute an "Interest of the Debtor in Property" for Purposes of §548</u>

The Bankruptcy Code does not define "property" or "an interest of the Debtor in property" under §548. Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law. *Butner v. U.S.*, 440 U.S. 48, 54 (1978); *Gaughan v. The Edward Ditloff Revocable Trust (In re Costas)*, 555 F.3d 790, 793 (9th Cir. 2009) (*citing Butner*). In the absence of any controlling federal law, the scope of "property" and "interests in property" are creatures of state law. *Costas*, 555 F.3d at 793 (*citing Barnhill v. Johnson*, 503 U.S. 393, 397 (1992)); *Simpson v. Penner (In re Simpson)*, 36 F.3d 450, 452 (5th Cir. 1994) (*citing Barnhill*). The Court therefore looks to state law, *i.e.,* the law of Pennsylvania, to determine whether the License constituted property in which the Debtor had an interest. *Union Meeting Partners v. Lincoln Nat'l Life Ins. Co. (In re Union Meeting Partners)*, 163 B.R. 229, 234 (Bankr. E.D. Pa. 1994) (*citing*, among others, *Butner*).

The Gaming Act governs, *inter alia*, the creation, issuance, maintenance, and revocation of slot machine licenses. As such, the Court finds that the Gaming Act is the appropriate source of Pennsylvania state law for determining the Debtor's interest in the License. The Defendants first point the Court to §1102, which sets forth the Pennsylvania General Assembly's stated legislative intent in enacting the Gaming Act. Section 1102(7) states, in relevant part, that "Participation in limited gaming authorized under this part by any licensee … shall be deemed a privilege, conditioned upon the proper and continued qualification of the licensee … and upon the discharge of the affirmative responsibility of each licensee … to provide the regulatory and investigatory authorities with assistance and information necessary to assure that the policies declared by this part are achieved." 4 Pa. C.S. §1102(7). The Court views this as an

unequivocal statement that the Pennsylvania legislature intended that the License constitutes a revocable privilege.  *In re Williams*, 2014 Bankr. LEXIS 330, at *9 (Bankr. D.N.J. Jan. 24, 2014) (the starting point to discern legislative intent is the existing statutory text).

This intention is supported by various other provisions of the statute.  Section 1311(d) of the Gaming Act states that the issuance or renewal of a license "shall be a revocable privilege." 4 Pa. C.S. §1311(d).  Likewise, §1327 states that a license issued by the Gaming Control Board "is a grant of the privilege to conduct business in this Commonwealth" and that, except as provided in §1328 relating to a change in ownership or control of a licensee, a license "shall not be sold, transferred, or assigned to any other person; nor shall a licensee … pledge or otherwise grant a security interest or lien on the license …."  4 Pa. C.S. §1327.  Importantly, that section goes on to state that nothing contained in the Gaming Act "is intended or shall be construed to create in any person an entitlement to a license."  *Id.  See also* 58 Pa. Code §421a.1(a) (Pennsylvania's Administrative Code related to the Gaming Control Board's licensing authority, providing in relevant part that "A license … issued by the Board is a revocable privilege.  No person holding a license … is deemed to have any property rights related to the license ….").

The Commonwealth Court Opinion, while not binding on this Court, is also instructive. In rejecting the Debtor's argument that it was denied due process when the Gaming Control Board granted summary judgment to the BIE in its action to revoke the License, the Commonwealth Court acknowledged that government licenses to engage in a business or occupation create an entitlement to partake of a profitable activity and are property rights, therefore requiring some form of due process prior to revocation.  *Commonwealth Court Opinion*, 34 A.3d at 276.  The Court, however, reviewed the lengthy proceedings before the Gaming Control Board and found that the debtor had been afforded such due process.  *Id.* at 276-

280.  Importantly for this Court, the Commonwealth Court confirmed that "[t]he Gaming Act, the Board's Regulations and PEDP's Statement of Conditions reflect that [the Debtor's] License has been deemed by the General Assembly and the Board a revocable privilege." *Id.* at 276.[24]

Based on the clear provisions of the Gaming Act stating that the License was a revocable privilege with respect to which the Debtor had no entitlement, and supported by the Commonwealth Court's finding that the License was a revocable privilege, the Court finds that under Pennsylvania state law, the Debtor's interest in the License was not an "interest of the debtor in property" under §548(a) of the Bankruptcy Code. *Cf. Costas*, 555 F.3d at 793-794 (debtor's disclaimer of entitlement to trust distribution was not subject to fraudulent transfer action under §548 because under Arizona law upon the disclaimer retroactively eliminated any property interest the debtor would have otherwise had).  Failing to meet that threshold requirement, Count II of the Complaint fails to state a claim against the Defendants under §548 of the Bankruptcy Code.

      2.      The Transfer Is Not Voidable Under the PUFTA Because the License Does Not Constitute an Asset of the Debtor

Section 544(b)(1) of the Bankruptcy Code allows the Debtor, and now the Plaintiff, to "avoid any transfer of an interest of the debtor in property … that is voidable under applicable law …."  11 U.S.C. §544(b)(1).  The Plaintiff argues that under the PUFTA, the revocation of the License without receiving reasonably equivalent value is voidable.

As discussed *supra,* the License did not constitute an interest of the Debtor in property under the Gaming Act.  The Plaintiff urges the Court, however, to look to the PUFTA, pursuant to which the Plaintiff seeks to avoid the Transfer, rather than the Gaming Act, to find that the

---

[24] In addition to §1102(7) of the Gaming Act, the Commonwealth Court cited to §421a.1(a) of the Gaming Control Board's regulations, which specifically state that "A license … issued by the Board is a revocable privilege.  No person holding a license … is deemed to have any property rights related to the license …." *Id.* at 276 n.10.

License does constitute property as a matter of Pennsylvania state law.  The Plaintiff argues that

the legislative history of the PUFTA shows that the definition of the term "property" under that

statute was intended to be construed broadly.  Specifically, the Plaintiff cites to the March 1993

"Report on the Pennsylvania Uniform Fraudulent Transfer Act with Committee Comments"

produced by the Fraudulent Conveyance Task Force of the Pennsylvania Bar Association's

Section on Corporation, Banking and Business Law.  That report states, in relevant part, that

"The definition of 'property' is intended to be construed broadly, to include any right or interest

that contributes to the value of a person.  Hence, for example, 'property' in general includes

licenses, permits, franchises and contracts, whether or not transferable.  In particular, but without

limitation, government licenses and permits that contribute to the value of the holder in general

should be deemed 'property' whether or not transferable, regardless of whether such items are

deemed 'property' for other purposes …."  12 Pa. C.S. §5101, Committee Cmt. – 1993, No. 9.

The Plaintiff argues that this legislative history constitutes "clear language from the drafters of

PUFTA [that] the Debtor's Category 2 Slot Machine License is property."  Plaintiff's

Supplemental Brief, at p.4.

    The Plaintiff correctly notes that the comments are part of the legislative history of the

PUFTA, and because they were written by the drafters of the statute and the Pennsylvania

legislature had access to them prior to passing the legislation, the comments inform the meaning

and operation of the PUFTA's provisions.  *Fidelity Bond & Mortg. v. Brand*, 371 B.R. 708, 717-

18 (E.D. Pa. 2007).  The Plaintiff asks this Court to hold, however, that the legislative history of

the PUFTA trumps the statutory provisions of the Gaming Act, arguing that "under the clear

language of the drafters of PUFTA, regardless of the Gaming Act's language calling the License

a revocable privilege or this Court's determination as to transferability, the License is clearly

property and as such can be the basis for a fraudulent transfer claim." Plaintiff's Brief on Remand at 23-24.

The Plaintiff argues that there is no irreconcilable conflict between the PUFTA's articulation of property for fraudulent transfer purposes and the Gaming Act's provisions with respect to the License: "The Gaming Act, while identifying the Gaming License as a 'revocable privilege,' simply established the manner under which the Debtor was able to obtain the license. By contrast, PUFTA clearly identifies the Gaming License as a property right for purposes of a fraudulent transfer claims [sic]." Plaintiff's Supplemental Brief, at p. 6. The Court rejects both of these statements. The Gaming Act clearly goes beyond simply establishing the manner by which the Debtor obtained the License. As discussed herein, it addresses, *inter alia*, obtaining a gaming license, revocation of a gaming license, transfer of a gaming license, and most importantly for present purposes, the nature of a gaming license as a revocable privilege that did not create an entitlement in any party. With respect to the Plaintiff's position that the PUFTA "clearly identifies" the License as a property right for purposes of fraudulent transfer claims, the Court finds this argument disingenuous. The PUFTA does not "clearly" address gaming licenses specifically, but rather addresses government-issued licenses "generally." As discussed below, the general nature of the PUFTA's commentary, in the face of a specific statute related to gaming licenses, makes it less than "clear" that the License is property under the PUFTA.

Contrary to the Plaintiff's argument, the Court finds that the legislative history of the PUFTA and the statutory provisions of the Gaming Act are in conflict as to whether the License constitutes property of the Debtor. The Gaming Act's provisions unambiguously state that the License is a revocable privilege to which no party may claim an entitlement. The PUFTA provides, albeit in official comments to the legislation, that in general, government-issued

licenses shall be deemed property regardless of whether they are deemed property for other

purposes. The Court therefore looks to Pennsylvania's rules of statutory construction to resolve

that apparent conflict. *Winterberg v. Transportation Ins. Co.*, 72 F.3d 318, 324 (3d Cir. 1995).

In Pennsylvania, conflicting provisions of statutes should be construed to give both

effect, if possible. *Id.* If the two provisions are irreconcilable, however, the specific provisions

shall prevail over general provisions, and shall be construed as an exception to the general

provisions. *Id.* This is true unless the general provision was (1) enacted later, and (2) manifestly

intended to prevail over the earlier specific provision. 1 Pa. C.S. §1933; *Winterberg*, 72 F.3d at

324 (*citing* §1933 of the Statutory Construction Act); *see also* 1 Pa. C.S. §1936 ("Whenever the

provisions of two or more statutes enacted finally by different General Assemblies are

irreconcilable, the statute latest in date of final enactment shall prevail."). The Court finds that

the conceptions of property in the Gaming Act and the PUFTA are irreconcilable, and therefore

employs Pennsylvania's rule of statutory construction holding that the specific supersedes the

general, unless the general is later in time and evidences manifest intent to prevail over the

specific.

The Court rejects the Plaintiff's argument that the PUFTA, not the Gaming Act, contains

the specific provisions with respect to the License that must prevail over the Gaming Act.

Defendant's Supplemental Brief, at p. 6. Here, the Gaming Act, which was enacted later in time

than the PUFTA, specifically relates, *inter alia*, to the issuance, maintenance, and revocation of

slot machine licenses. It clearly and unequivocally provides that the licenses constitute

revocable privileges. It also clearly and unequivocally provides that it does not create in any

person an entitlement to a license. The PUFTA, on the other hand, is a general statute that

relates to fraudulent transfers of any kind. With respect to the specific issue before this Court,

*i.e.,* whether the License constitutes property for purposes of fraudulent transfer liability, the legislative history to which the Plaintiff cites evidences the general nature of the statute; it expressly states that government licenses and permits that contribute to the value of the holder "*in general*" should be deemed property whether or not transferable and regardless of whether such items are deemed 'property' for other purposes.  12 Pa. C.S. §5101, Committee Cmt. – 1993, No. 9 (emphasis added).  Moreover, the PUFTA predates the 2004 amendments to the Gaming Act authorizing the issuance of slot machine licenses.  *See* 2004 Pa. Laws 71 (enacted July 5, 2004).  Therefore, the Gaming Act's authorization for slot machine licenses did not exist at the time the PUFTA was enacted and its reference to government-issued licenses clearly did not include slot machine licenses such as the License issued to the Debtor.  In enacting those amendments, including specific provisions regarding the revocable nature of the gaming licenses and the legislature's lack of intent to create an entitlement to a license, the Pennsylvania General Assembly is presumed to have been familiar with the PUFTA as it then existed.  *The Birth Ctr. v. The St. Paul Cos.*, 567 Pa. 386, 404 (Pa. 2001).  As such, consistent with Pennsylvania's rules of statutory construction, the Court finds that the specific provisions of the Gaming Act providing that the License is a revocable privilege and not intended to create an entitlement for the benefit of any person supersede the general provisions of the PUFTA's legislative history, and support the conclusion that the Debtor did not hold a property or ownership interest in the License for purposes of either §544 of the Bankruptcy Code or §§5104 and/or 5105 of the PUFTA.

>   3.   <u>Jurisprudence in the Federal Takings Context is Irrelevant to Whether the License Was the Property or An Asset of the Debtor for Purposes of the Fraudulent Transfer Claims</u>

Perhaps recognizing that the express provisions of the Gaming Act and Pennsylvania's rules of statutory construction are not on its side, the Plaintiff contends that the Court should consider the factors courts look to in determining whether a compensable property right exists in

intangible interests for purposes of the Takings Clause of the Constitution.  Plaintiff's Brief on Remand at 24-25.  The Court finds the Taking Clause irrelevant to its determination whether the License was property or an asset of the Debtor for purposes of the Fraudulent Transfer Claims for several reasons.

First, as discussed above, the property inquiry under §§548 and 544 is driven by state law, and not federal takings law.  *Butner v. U.S.*, 440 U.S. 48, 54 (1978); *Gaughan v. The Edward Ditloff Revocable Trust (In re Costas)*, 555 F.3d 790, 793 (9th Cir. 2009) (*citing Butner*).  Second, the Plaintiff's Takings Clause argument is simply a verbatim rehash of the Plaintiff's argument contesting dismissal of Count V of the Complaint, asserting that revocation of the License was an unconstitutional taking under the United States and Pennsylvania Constitutions.  *See* Memorandum of Law of Plaintiff, Persil Mangeur LLC, as Liquidation Trustee, in Opposition to Defendants' Motion to Dismiss, at pgs. 58 to 61.[25]  This Court dismissed Count V of the Complaint when issuing *Philadelphia Entertainment I*, and dismissal of that count was not appealed and is final.  As such, it is unclear what jurisdiction, if any, the Court has to reconsider the Plaintiff's argument that the License was property for purposes of takings law.  Third, even if the Court considered the Taking Clause factors, they do not support the Plaintiff's position.

The Taking Clause factors, as the Plaintiff articulates them, are: (1) whether the license confers the right to exclude others from the market; (2) whether the license may be assigned, sold, or otherwise transferred; and (3) statutory language conferring or precluding a property interest.  *Id.* (*citing Members of the Peanut Quota Holders Ass'n, Inc. v. U.S.*, 421 F.3d 1323, 1331-34 (Fed. Cir. 2005)).  The Court agrees with the Plaintiff that the License conferred on the Debtor the right to exclude other potential participants from the slot machine gaming market in

---

[25] Adv. Pro. Docket No. 19.

Philadelphia. The Court does not, however, agree that the other two factors the Plaintiff cites

support a finding that the License constituted the Debtor's property or asset.

The Plaintiff argues that the License was "obviously transferable" pursuant to §1328 of

the Gaming Act. An examination of that provision reveals that the License, while potentially

transferable, was anything but freely transferable. Rather, the License could only be transferred

(i) either through a sale of the Debtor's assets (as opposed to a sale of only the License) or

through a change of control of the Debtor, (ii) upon Gaming Control Board approval, and (iii)

upon payment of the license fee. Under §1328, where a licensee proposes to consummate any of

one of several transactions set forth in the statute, the licensee is required to immediately notify

the Gaming Control Board. 4 Pa. C.S. §1328(a).[26] If the transaction contemplates a sale of the

licensee's assets other than in the ordinary course of business, the proposed purchaser must

independently qualify for a license and must pay the required license fee. *Id.* at §1328(b). If the

proposed transaction will result in a change in control of the licensee, the licensee must

independently qualify for a license and pay a new license fee. *Id.*[27] Failure to comply with

§1328's requirements can result in revocation or suspension of a licensee's license. *Id.* at

§1328(e). Thus, contrary to the Plaintiff's suggestion that the License was "obviously

transferable" under §1328, transfer under that provision is both highly regulated and applicable

only where there is a change in ownership of the licensee's assets or a change in control of the

---

[26] Those transactions are any involving (i) more than 5% of a slot machine licensee's securities or other ownership interests; (ii) more than 5% of the securities or other ownership interests of a corporation or other form of business entity that owns directly or indirectly at least 20% of the voting or other securities or other ownership interests of the licensee; (iii) the sale other than in the ordinary course of business of a licensee's assets; or (iv) any other transaction or occurrence deemed by the Gaming Control Board to be relevant to license qualifications. 4 Pa. C.S. §1328(a).

[27] Change of control is defined in the statute to mean "the acquisition by a person or group of persons acting in concert of more than 20% of a slot machine licensee's securities or other ownership interests, with the exception of any ownership interest of the person that existed at the time of initial licensing and payment of the initial slot machine license fee, or more than 20% of the securities or other ownership interests of a corporation or other form of business entity which owns directly or indirectly at least 20% of the voting or other securities or other ownership interests of the licensee." 4 Pa. C.S. §1328(c).

licensee.  Moreover, §1327 of the Gaming Act makes clear that the License alone was not freely

transferable.  That section provides that a slot machine license is the grant of a privilege to

conduct business in Pennsylvania, and except as permitted under §1328, the license "shall not be

sold, transferred, or assigned to any other person …."  4 Pa. C.S. §1327.  The express restrictions

in the Gaming Act contradict the Plaintiff's argument that the License was transferable and

therefore constituted the Debtor's property.[28]

The Court also rejects the Plaintiff's argument that, despite the Gaming Act's express

provisions, an entitlement to take part in a profitable activity is still a property right for purposes

of §548 of the Bankruptcy Code and the PUFTA.  Here, the Gaming Act's provisions make clear

the Pennsylvania legislature's intent not to create a property right.  In *Peanut Quota Holders*, the

court noted that while the Supreme Court and the Federal Circuit had evaluated various

regulatory schemes to determine whether intangible property such as government-issued permits

and licenses give rise to property interests protected by the Takings Clause, "the Supreme Court

has found that express statutory language can prevent the formation of a protectable property

interest."  *Id.*  421 F.3d at 1330 (*citing U.S. v. Fuller*, 409 U.S. 488 (1973)).  To wit, the *Peanut*

*Quota Holders* court found that *in the absence of express statutory language,* the court looked to

whether or not the alleged property has the hallmark rights of transferability and excludability,

which indicate a property right.  *Id.*  By contrast, in *Fuller*, the Supreme Court refused to

recognize a compensable property interest in grazing permits because under the federal statute

authorizing their issuance, the permits were revocable and there was a clear Congressional intent

that the issuance of a permit not create any right, title, interest, or estate in or to the lands subject

---

[28] As the Defendants note, this bar on the sale, transfer, or assignment of the License distinguishes it from a liquor license, which has been found to constitute property of the estate based in part on the value it provides to the holder given that it can be transferred.  *In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir. 1991).

to the permit. *Id.* (*citing Fuller*, 409 U.S. at 494). That is precisely the case here. The

Pennsylvania legislature included express statutory language in §1327 of the Gaming Act that

not only barred the sale, transfers or assignment of the License, but also prevented the formation

of a property interest by precluding any entitlement to a license. There is therefore no merit to

the Plaintiff's assertion that, under the factors for evaluating whether a property interest exists

for purposes of the Takings Clause, the Debtor's entitlement to take part in the slot machine

gaming industry pursuant to the License created a property interest, notwithstanding express

statutory language to the contrary.

The Plaintiff relies heavily on the Commonwealth Court's recognition that government

licenses to engage in a business or occupation create an entitlement to partake of a profitable

activity, and therefore constitute property rights. Plaintiff's Brief on Remand at 25-26 (*citing

Commonwealth Court Opinion*, 34 A.3d at 276). As discussed *supra*, the Commonwealth

Court's conclusion was made in the context of whether the Debtor was entitled to due process

prior to revocation of the License, and the Commonwealth Court cited to Pennsylvania decisions

that, likewise, found a government-issued license was a sufficient property right to afford the

licensee a due process right prior to revocation. *Id.* (*citing City of Philadelphia Bd. of License &

Inspection Review v. 2600 Lewis*, 661 A.2d 20, 22 (Pa. Commw. Ct. 1995) (finding that

revocation of a business privilege license required due process protections); *Young J. Lee, Inc. v.

Dept. of Revenue, Bureau of State Lotteries*, 504 Pa. 367, 376 (Pa. 1983) (finding that revocation

of lottery license required due process protections)). What may constitute property for purposes

of entitlement to due process protections does not, however, govern whether it is property for

other purposes under state law. *See Barnes v. Boyer (In re Barnes)*, 258 B.R. 712, 718-719

(Bankr. N.D. Ind. 2000) (concluding that liquor licenses had value and are considered property

for purposes of the Due Process Clause but are not property under Indiana law for purposes of whether they are subject to liens, and stating "[W]hat is or is not property for purposes of the Due Process Clause represents a continuum.  This continuum includes things that are property in every sense of the word and fully subject to its protection.  It also includes things that are not property in the traditional sense of the word and, yet, are subject to its protection, and still other things that may fulfill almost any definition of property, but, remain outside its scope … [Liquor licenses] are not property in the traditional sense of the word, although they are treated like property for the purposes of the Due Process Clause.").[29]  The Commonwealth Court's determination that the License was property for purposes of the Debtor's due process rights does not *per ipsum* dictate that the License is property for purposes of the Fraudulent Transfer Claims, nor does it override the Gaming Act's express provisions.

The Court finds that even if they were relevant for purposes of fraudulent transfer law, the factors used for determining a property interest under the Takings Clause do not support the Plaintiff's argument that the License constituted an interest of the Debtor in property or an asset of the Debtor for fraudulent transfer purposes.

## IV.   CONCLUSION

For the reasons set forth herein, the Court finds that (1) Plaintiff's Fraudulent Transfer Claims are not barred by claim or issue preclusion, (2) Plaintiff's Fraudulent Transfer Claims are

---

[29] Moreover, the *Young J. Lee* decision cited by the Commonwealth Court stated that government licenses "*generally* constitute a form of property insofar as they are an entitlement to engage in a valuable activity." *Id.* 504 Pa. at 375 (emphasis added).  The *Young J. Lee* court then quoted from *Greco v. Commonwealth*, C.A. 80-1817 (W.D. Pa. Apr. 21, 1981), which, in analyzing whether a state lottery license constitutes a protected property interest for due process purposes, stated that "The lack of notice and prior hearing, however, are of no constitutional moment unless a legitimate, protected, property right has been infringed.  Describing the nature of such a property interest, the Court stated in *Board of Regents v. Roth* that, '[t]o have a property interest in a benefit, a person must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must have a legitimate claim of entitlement to it.'" (*quoting Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  As discussed *supra*, the Gaming Act expressly states at §1327 that the License was a revocable privilege and did not create an entitlement in any person.  The *Young J. Lee* and *Greco* decisions therefore further support the conclusion that the Debtor did not have a property right with respect to the License.

barred by sovereign immunity, and (3) even if sovereign immunity were inapplicable to the

Fraudulent Transfer Claims, the Plaintiff has failed to state a claim against the Defendants.

Counts II, III, and IV of the Complaint shall be dismissed with prejudice pursuant to Federal

Rule of Civil Procedure 12(b)(1) and (6).

An Order consistent with this Opinion will be entered.


DATED: DECEMBER 31, 2019

_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE


Jared D. Bayer, Esquire
Stephen A. Cozen, Esquire
F. Warren Jacoby, Esquire
Jennifer M. McHugh, Esquire
Cozen O'Connor
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103

Richard A. Barkasy, Esquire
Albert S. Dandridge, III, Esquire
Bruce P. Merenstein, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

Vincent J. Marriott, II, Esquire
Jon T. Pearson, Esquire
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103

Daniel M. Pereira, Esquire
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103